**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARIA E. MEDINA, Individually, MARIA E. MEDINA, Administrator of the Estate of Edvin Medina, Deceased, MARIA E. MEDINA, Guardian Ad Litem for G.M., E.P, and T.L., Minors,<br><br>Plaintiffs,<br><br>v.<br><br>DAIMLER TRUCKS NORTH AMERICA, LLC, A Daimler Company, THOMAS J. O'NEIL, Individually, and T.P. SAMPSON COMPANY, INC.<br><br>Defendants. | Civil Action No. 10-623 (JLL)<br><br>**OPINION** |

**LINARES, District Judge.**

This matter comes before the Court by way of Defendant Daimler Trucks North America, LLC ("Defendant")'s (1) motion for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure as to Plaintiff Maria E. Medina ("Plaintiff")'s claim of design defect and the related wrongful death and survivorship claims and (2) motion to exclude the expert testimony of Terrance D. Martin ("Mr. Martin") and George H. Meinschein ("Mr. Meinschein"). [CM/ECF No. 58.] The Court has considered the submissions made in support of and in opposition to the instant motion. For the reasons that follow, Defendant's motion to exclude the expert testimonies of Mr. Martin and Mr. Meinschein is denied. Defendant's motion for summary judgment as to Plaintiff's claims is also denied.

1

I. **BACKGROUND**

On February 5, 2008, at approximately 7:20 AM, Thomas O'Neill ("O'Neill") lost control of his white minivan as he was crossing an overpass on Interstate 91 in Brattleboro, Vermont. (Docket #58-4: 1; Exhibit A.) The minivan struck the left and right side guardrails and eventually came to a halt on the overpass. (*Id.* at 6-7.) Moments later, Plaintiff's husband, Edvin Medina ("Medina"), approached the overpass driving a tractor which was pulling a 54 foot trailer. (*Id.* at 1, 5, 14.) Medina saw O'Neil's crashed minivan and took evasive actions to avoid hitting it. (*Id.* at 5.) As a consequence, the tractor-trailer driven by Medina crashed into the bridge guardrails and plummeted off the overpass through a high-voltage power line. (*Id.* at 11-12.) At some point after the tractor-trailer crashed into the guardrails, but before it fell off the bridge, the tractor caught on fire. (*Id.* at 12.) Though unseen, Medina was heard screaming from the burning tractor. (Docket #58-5: 33; Exhibit F at 95:5-7.) He was pronounced dead at 9:37 AM. (Docket #58-4: 25, Exhibit C at 2.) The medical examiner, Dr. Bundock, concluded that Medina died of blunt force trauma and thermal injuries. (Docket #58-4: 24, Exhibit C at 1.)

Plaintiff alleges that a design defect in the truck that Medina was driving caused her late-husband's death. She contends, through George H. Meinschein's expert report, that "mounting the batteries on the outboard side of the frame rail and in close proximity to the fuel tank is a design defect that presented a contributory cause in the instant . . . fire[.]" (Docket #58-5: 44, Exhibit G at 4.) According to Plaintiff, the fire was started by a shower of electric sparks that originated from the truck's battery box, which was located inches away from the driver side fuel tank. (Pl. Statement of Undisputed Material Facts, ¶29.) ("The left fuel tank was attached to the frame just below the driver's door and within inches of the metal battery box.") During the accident, the fuel tank was pierced and began spilling diesel. (Docket #58-5:44, Exhibit G at 4.) The batteries were

ripped off the tractor. (*Id.*) The loose wires from the battery box caused electrical arcing, which ignited the fuel vapors and caused the fire. (*Id.*)

Plaintiff filed her Complaint on February 4, 2010. (Docket #1.) Count I of the Complaint asserts a claim of design defect, Count II asserts a claim of wrongful death, and Counts III and IV assert claims of survivorship on behalf of Plaintiff and Medina's surviving children. (*Id.*) Defendant filed its motion for summary judgment on August 15, 2014. (Docket #58.) This Court has jurisdiction over the matter at hand pursuant to 28 U.S.C. §1332, as there is diversity between the parties and the amount in controversy exceeds the $75,000 minimum.

## II. **STANDARD OF REVIEW**

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. *Id.* at 324. In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus, the non-moving party may not rest upon the mere allegations or denials in its pleadings. *See Celotex,* 477 U.S. at 324. Further, the non-moving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment. *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.,* 172 F.3d 238, 252 (3d Cir.1999). The

3

Court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party. *See, e.g., Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir. 1995).

## III. DISCUSSION

Defendant argues that summary judgment should be granted as to all of Plaintiff's claims because her experts fail a *Daubert* analysis. It argues that there is no admissible expert testimony regarding accident reconstruction, to show a design defect, or to prove proximate cause. Defendant's arguments in support of its motion to exclude focus only on Mr. Martin and Mr. Meinschein's methodology. Defendant further argues that, even if the experts are not excluded, summary judgment should still be granted in its favor because Plaintiff fails to show causation. As such, this Court first determines whether Mr. Martin and Mr. Meinschein's testimonies are admissible. This Court then considers whether their testimony sufficiently creates a material issue of fact regarding design defect and proximate cause. Given the reasons that follow, Defendant's motion to exclude the expert testimonies of Mr. Martin and Mr. Meinschein are denied. Defendant's motion for summary judgment as to Plaintiff's claims is also denied.

### A. Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Fed. R. Evid. 702. This Rule allows a witness qualified as an expert to give testimony if: (i) the testimony is based upon sufficient facts or data, (ii) the testimony is the product of reliable principles and methods, and (iii) the expert witness has applied the principles and methods reliably to the facts of the case. Fed .R. Evid. 702; *Schneider v. Fried,* 320 F.3d 396, 407 (3d Cir. 2003); *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 74 (3d Cir. 1994). The Third Circuit has explained that Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit."

4

*Schneider*, 320 F.3d at 404 (citing *In re Paoli*, 35 F.3d at 741–43). A District Court is required to act as a gatekeeper, preventing the admission of opinion testimony that does not meet these three requirements. *Id.* (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)). The proponent of the evidence bears the burden of establishing the existence of each factor by a preponderance of the evidence. *Daubert,* 509 U.S. at 592; *In re Paoli,* 35 F.3d at 743–44. A court's rejection of expert testimony should be the exception rather than the rule. Fed. R. Evid. 702 Advisory Committee Note. As the Supreme Court noted in *Daubert,* "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 595.

An expert's opinion is reliable if it is "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Daubert,* 509 U.S. at 589). "*Daubert* suggests several factors that a district court should take into account in evaluating whether a particular scientific methodology is reliable[.]" *In re Paoli*, 35 F.3d at 742. The factors that *Daubert* and this Court have already declared important include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on *746 the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* at 742 n. 8 (citing *United States v. Downing*, 753 F.2d 1224, 1238–41 (3d Cir. 1985)).

The Third Circuit in *Kumho Tire*, however, makes clear that this list is non-exclusive and that each factor need not be applied in every case. The Court further explained that:

> [T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony.

*Kumho Tire*, 526 U.S. at 152; *see also Milanowicz v. The Raymond Corp.*, 148 F.Supp.2d 525, 536 (D.N.J. 2001) (reconfiguring *Daubert* for application to "technical" or "other specialized" subjects such as engineering and identifying several factors for trial courts to consider in evaluating reliability, including relevant literature, evidence of industry practice, and product design and accident history). As such, "[t]he inquiry envisioned by Rule 702 is . . . a flexible one." *Daubert*, 509 U.S. at 594.

### 1. Mr. Martin

Plaintiff hired Terrance D. Martin to conduct an investigation of the collision that led to Mr. Medina's death. In forming his opinion as to how the accident occurred, Mr. Martin reviewed: (1) the Uniform Crash Report of Trooper First Class Christopher Loyzelle; (2) Corporal Claude Marcoux's Supplemental Report; (3) Sgt. Albert Stringer's Supplemental Report; (4) Sgt. Michael Sorenson's Supplemental Report; (5) Sgt. Sorenson's diagrams, which included the calculations used by these police officers to reconstruct the accident; (6) a VHS video recorded by Sgt. Christopher Buckley; and, (7) 255 photographs taken by Sgt. Buckley. (Docket #58-5: 2; Exhibit F, pg. 1.) Sgt. Stringer and Sgt. Sorenson are motor vehicle reconstructionists. (*Id.*) Mr. Martin also interviewed several witnesses and the police officers that were involved in the investigation of the accident. (*Id.*) According to Mr. Martin, his opinion is based on the facts of the case, his training in the field of motor vehicle collision reconstruction, over 40 years of experience, his

"personal investigation, additional interviews of new witnesses, research," and the materials listed above. (*Id.*)

Defendant argues that Mr. Martin's testimony is inadmissible because he did not "actually perform[] an accident reconstruction[.]" (Def. Br. 9.) Specifically, Defendant contends that Mr. Martin's methodology is flawed because Mr. Martin did not: take any measurements, take photographs, do any photogrammetry, inspect the vehicle, read any of the depositions, make calculations, use formulas or any rules of physics, analyze the speeds involved in the crash, determine the sequence of truck impacts, analyze the tractor-trailer's orientation during the impact, consider the magnitude or direction of the impact forces, analyze the intrusion in the cab, determine how the batteries separated from the cab, or otherwise simulate or recreate the accident. (Def. Br. 10.) Defendant does not provide, however, any binding legal case law in support of the proposition that an accident reconstruction expert must in fact conduct his own accident reconstruction in order to qualify as an expert.

The fact that Mr. Martin did not conduct his own accident reconstruction may go to the weight of the testimony but does not automatically disqualify him from testifying as an expert. *See e.g., United States v. Arias,* 678 F.2d 1202, 1206 (4th Cir.1982), *cert. denied,* 495 U.S. 910 (1982) ("This does not mean that an expert must rely solely on his own work, but he can rely on another's information or work, if it is of the type normally relied upon by an expert in the course of his work."); *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.,* 285 F.3d 609, 613 (7th Cir. 2002) (explaining that an expert may apply the results of another expert's calculations, if a proper foundation is laid.) Federal Rule of Evidence 703 states that an expert may formulate an opinion based on facts or data that he or she did not personally observe. Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of *or* personally observed.") (emphasis

added). The Rule's Advisory Committee explained that one of the possible sources of "facts or data" an expert may rely on to form his or her opinion is data gathered "outside of court and other than by his [or her] own perception." Fed. R. Evid. 703, Advisory Committee Notes. The Advisory Committee gave as an example:

> [A] physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays. . . . His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes.

*Id.* Mr. Martin relied on several sources similar to the ones relied by the physician in this example. These included calculations made by the police officers at the scene of the accident, pictures and videos taken by the officers, the accident reports, and his own interviews. Defendant does not point to any authority indicating that Mr. Martin's reliance on other's work is improper. Given the plain language of Rule 703, Defendant's argument for excluding Mr. Martin's testimony is unpersuasive.

Moreover, Defendant's specific arguments regarding the flaws in Mr. Martin's methodology do not warrant excluding Mr. Martin's testimony at this stage of the litigation. As explained above, courts analyze reliability from a flexible, case-specific standpoint. *Kumho Tire*, 526 U.S. at 149–150. Additionally, "[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. *Id.* at 150.

Given this flexible standard, Mr. Martin's knowledge of accident reconstruction, along with his review of the information provided by the police officers and the interviews he conducted make his expert testimony regarding the nature of the accident in this case sufficiently reliable to survive a *Daubert* challenge at this stage of the litigation. *See e.g., Calhoun v. Yamaha Motor*

*Corp.*, U.S.A., 350 F.3d 316, 322 (3d Cir. 2003) (holding that the District Court properly permitted an expert to testify about the general description of an alleged defect given the expert's "general knowledge of human factors engineering, along with his review of the record evidence[.]"). Mr. Martin explained in his deposition:

> I rely in a major part of the accident reconstructionists that were at the scene. I talked to each accident reconstructionist. Many of them I taught in the academy. I was a patrol commander for ten years and reviewed investigative reports and either supplemented them or affirm the investigations. This is all based on my past training and my certifications in the field.

(Docket #58-5: 23-24; Exhibit G, 56:19-25 – 57:1-5.) Mr. Martin further explained that he "confirmed the work that [the police accident reconstructionists] did and then [] based [his] opinion upon [his] training, certifications, and the information that [he] saw firsthand and the people [he] interviewed. (Docket #58-5: 24; Exhibit G, 57:10-16.) This is sufficient to qualify as an expert to describe how the accident occurred. As previously stated, Defendant's criticisms of Mr. Martin's methodology are more appropriately aimed at the weight to be accorded to Mr. Martin's opinion and not its admissibility. The alleged weaknesses of Mr. Martin's opinions are best left to the consideration of the jury, presented through vigorous cross-examination and other appropriate evidence at trial.

### 2. Mr. Meinschein

Plaintiff hired George H. Meinschein to conduct an engineering evaluation to determine whether the tractor-trailer driven by Mr. Medina at the time of the accident contained any defects "that presented an underlying cause of the February 5, 2008 motor vehicle fire and subsequent fatal injuries suffered" by Mr. Medina. (Docket #58-5: 41, Exhibit G at 1.) In forming his opinion, Mr. Meinschein reviewed: the Vermont State Police crash report and supplemental reports, drawings of the scene made by police officers, the Brattleboro Police and Fire Department reports,

9

digital pictures taken of the accident scene, Mr. Medina's autopsy report, transcripts of the depositions of the investigating police officers and the coroner that conducted the autopsy, and the documents produced by Defendant through discovery. (Docket #58-5: 41-42, Exhibit G at 1-2.) Ultimately, Mr. Meinschein concluded that "mounting the batteries on the outboard side of the frame rail and in close proximity to the fuel tank was a design defect that presented a contributory cause in the instant . . . fire[.]" (Docket #58-5: 44, Exhibit G at 4.) As an alternative design, he proposed that the truck's battery box should have been mounted inside the frame rails and away from the fuel tanks. (*Id.*) According to Plaintiff's expert, this change would have prevented the electric arcing that allegedly caused Medina's truck to catch on fire. (*Id.*)

Defendant argues that Mr. Meinschein's testimony should be precluded under *Daubert* as unreliable because Mr. Meinschein "followed no methodology, employed no science, and conducted no testing." (Def. Br. 18.) Specifically, Defendant contends that the expert's methodology is unreliable because: (1) Mr. Meinschein's opinion was not published or peer reviewed; (2) Mr. Meinschein did not test his hypothesis or subject it to a statistical, data, or fault tree analysis; and, (3) he committed a 'serious error' in his analysis by identifying, but not eliminating, "multiple other reasonable causes for this fire[.]" (*Id.* at 17, 31) (citing NFPA 921, Section 18.7).

Given Defendant's arguments, the scope of this Court's inquiry is "whether the 'particular opinion is based on valid reasoning or methodology.'" *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145-46 (3d Cir. 2000) (quoting *Kannankeril v. Terminix International Inc.*, 128 F.3d 802, 806 (3d Cir. 1997). As Defendant points out, some of the factors the Court may consider in determining whether an expert's testimony is reliable are whether the expert properly applied a theory or technique that is generally accepted within the relevant scientific community, whether the expert's

opinion has been published or subjected to peer review, and whether it has been tested. *Id.* Applying these factors to Mr. Meinschein's proffered expert opinion, this Court finds it sufficiently reliable to survive a *Daubert* challenge.

Based on Mr. Meinschein's description of his methodology in his expert reports and his deposition, the Court is satisfied that he reached his conclusions using a generally-accepted methodology. Both parties concede, and Mr. Meinschein acknowledges in his deposition, that the National Fire Protection Association 921: Guide for Fire & Explosion Investigations ("NFPA 921") is "an authoritative source for the proper methodologies for evaluating the cause and origin of fires such as this." (Docket #58-6: 23; Exhibit I, 65:5-9, 65:17-66:13.) Consistent with NFPA 921, Mr. Meinschein reviewed the available evidence, obtained information regarding eyewitness accounts, evaluated the electrical arcing, and eliminated possible alternative causes of the fire in the way the accident occurred.

According to the NFPA 921, and investigator must: (1) recognize that a need exists to determine what caused the fire; (2) define the problem; (3) collect data; (4) analyze the data; (5) develop a hypothesis based on the data; and (6) test the hypothesis. Technical Committee on Fire Investigations, National Fire Protection Association, Inc. 921: Guide for Fire and Explosion Investigations, 9-10 (1998). Here, Mr. Meinschein recognized the need to determine what caused the fire and defined the problem in his first expert report. He explained that Mr. Medina died in a car accident and that Plaintiff's counsel retained his services to determine whether a defect in Mr. Medina's truck caused the fire that led to Mr. Medina's death. (Docket #58-5: 41, Exhibit G at 1.) He also collected data by reviewing the materials listed above. (Docket #58-5: 41-42, Exhibit G at 1-2.) He then analyzed the data and developed his hypothesis – that the electric arcing that occurred when the batteries were ripped off the truck caused the fire. (Docket #58-5: 43-44, Exhibit G at 3-

11

4.) Finally, Mr. Meinschein tested his hypothesis during his deposition by relying in deductive reasoning, a method recognized as scientific by the NFPA 921 as discussed below, to discard, as unreasonable, all of the potential ignition scenarios that were presented to him by Defendant's counsel.

With respect to this final investigative step, the NFPA 921 states:

> Test the Hypothesis (Deductive reasoning). The investigator does not have a truly provable hypothesis unless it can stand the test of careful and serious challenge. Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares his or her hypothesis to all known facts. (*See 3.3.35, Deductive Reasoning.*) This testing of the hypothesis may be either cognitive or experimental. If the hypothesis cannot withstand an examination by deductive reasoning, it should be discarded as not provable and a new hypothesis should be tested. This test may include the collection of new data or the reanalysis of existing data. This process needs to be continued until all feasible hypotheses have been tested. Otherwise the fire cause should be listed as "undetermined."

*Kozar v. Sharp Electronics Corp.*, No. 04–901, 2005 WL 2456227, at *2 (W.D. Pa. Sept. 30, 2005) (quoting National Fire Protection Agency, User's Manual for NFPA 921: Guide for Fire and Explosion Investigations, §4.3.6). Thus, the NFPA 921 makes clear that an expert may test his or her hypothesis either cognitively or experimentally. Regarding cognitive testing, the manual explains:

> [D]uring the testing and analysis of a hypothesis, the investigator will cognitively test the hypothesis on the basis of his or her knowledge and experience. Cognitive testing is the use of a person's thinking skills and judgment to evaluate the empirical data and challenge the conclusions of the final hypothesis.

*Great N. Ins. Co. v. Ruiz*, 688 F. Supp. 2d 1362, 1373 (S.D. Ga. 2010) (quoting National Fire Protection Agency, User's Manual for NFPA 921: Guide for Fire and Explosion Investigations 17 (2005).

During his deposition, Mr. Meinschein testified as to the possible causes of the fire and the reasons why he determined that the electrical arcing that occurred when the battery box separated from the truck was the most likely cause. Defendant's counsel tested Mr. Meinschein's hypothesis by pointing to several viable sources of ignition other than the cables from the battery box. Specifically, counsel asked the expert whether steel on concrete contact, steel on steel contact, hot surfaces, or exposure to electrical cables could have caused the fire. Though Mr. Meinschein conceded that all of the above were viable sources of ignition, he relied on his experience and knowledge to sufficiently discard those sources as not reasonable sources under the circumstance and facts of this particular case.

As to steel on concrete contact, Mr. Meinschein explained that he did not believe that any steel hit the concrete on the bridge deck. (Docket #58-6: 40, Exhibit I, 136: 13-20.) He explained that the main contact between the truck and the bridge deck was aluminum on concrete, which would unlikely have created a spark. *Id.* He also explained that even if steel scrapped against concrete as the truck went off the bridge, the truck must have fallen at a sufficiently high speed to cause any sparking. (Docket #58-6: 41, Exhibit I, 137: 15-22.) Similarly, Mr. Meinschein explained that the fire could have been started by a hot surface only if fuel touched the surface of the engine compartment. (Docket #58-6: 41, Exhibit I, 140: 23-25.)

Mr. Meinschein also explained that the circumstances for the electrical wire to have caused the fire are attenuated. According to Mr. Meinschein, a fire could have started this way only if one of the cables made contact with steel while the other cable touched the floor simultaneously. He stated that this was improbable as "there are many accidents that take down power lines without causing a fire." (Docket #58-6: 42, Exhibit I, 144: 3-8.) This source of ignition is also unlikely

given the fact that multiple witnesses stated that the fire occurred while the truck was still on the bridge, before it made contact with the electrical wires.

Finally, regarding steel on steel contact, the expert stated that the speed of the impact was not high enough to cause sparks. (Docket #58-6: 43, Exhibit I, 147: 19-23.) Mr. Meinschein testified: "It has to be of a sufficient energy. You know you can take a hammer and set it on a nail; it's not going to spark. And even if you whack it pretty good, it might not spark. So the conditions have to be just right." (Docket #58-6: 44, Exhibit I, 148: 19-24.) He opined that given the facts of the case, the probability that the fire started by the electrical arcing that occurred when the battery box was detached from the truck "so far outweigh sparking from steel touching steel, its like not even a contest." (Docket #58-6: 44, Exhibit I, 149: 15-22.)

In addition to this reasoning, Mr. Meinschein relied on a Department of Transportation study titled Heavy Truck Fuel System Safety and a study from the Texas Transportation Institute. 47; 161: 9-15. According to Mr. Meinschein, these studies warned about the dangers of placing the battery box next to the fuel tank. 161:23-162:7.

After examining all of the aforesaid evidence, Mr. Meinschein concluded that his hypothesis was most probably the cause of the fire. Based on this logical analysis coupled with his extensive professional experience as a fire investigator, Mr. Meinschein's conclusion passes the threshold of admissibility mandated under *Daubert* and Federal Rule of Civil Procedure 702.

Because Plaintiff applied NFPA 921 appropriately to form his expert opinion, Defendant's other two arguments for exclusion of this testimony also fail. The NFPA 921 methodology is widely considered to be reliable for purposes of Rule 702. *Hoang v. Funai Corp.*, 652 F. Supp. 2d 564, 570 (M.D. Pa. 2009). The methodology has been published, subjected to peer review, and has been generally accepted. *Id.* Accordingly, these factors also weigh in favor of finding Mr.

Meinschein's testimony reliable. As such, Defendant's motion to exclude Mr. Meinschein as an expert witness is denied.

### B. Motion for Summary Judgment

As stated above, Plaintiff claims that "mounting the batteries on the outboard side of the frame rail and in close proximity to the fuel tank is a design defect that presented a contributory cause in the instant . . . fire[.]" (Docket #58-5: 44, Exhibit G at 4.) Defendant moves for summary judgment as to Plaintiff's design defect claim and the related wrongful death and survivorship claims. Defendant argues that Plaintiff cannot establish the causation element of a design defect cause of action because Plaintiff fails to show that Medina's injuries would not have occurred "but for" the alleged defect. This Court disagrees.

In her Complaint, Plaintiff alleges that Medina "survived the initial accident but the tractor portion of the defendant Daimler Truck's vehicle was engulfed in flames." (Compl. 17.) Plaintiff argues that as a result of the design defect in Defendant's vehicle – the location of the battery box and its proximity to the fuel tank – "Medina suffered bodily injury, pain and suffering." (Compl. 19.) Defendant construes this to be a "crashworthiness claim[,] that a defect caused her husband to sustain enhanced injuries in the crash." (Def. Br. 19.) Plaintiff does not dispute this in her opposition. As such, this Court will construe Plaintiff's design defect claim under the "crashworthiness" doctrine.

Under New Jersey law, a manufacturer in a crashworthiness case is liable only for those injuries that would not have occurred but for the alleged defect. In *Poliseno v. Gen. Motors Corp.*, the Superior Court of New Jersey, Appellate Division, explained that "[s]trict liability is imposed on a manufacturer for injuries sustained in an accident involving a design or manufacturing defect that enhanced the injuries, but did not cause the accident." 328 N.J. Super. 41, 52 (App. Div. 2000)

15

(citing *Seese v. Volkswagenwerk, A.G.*, 648 F.2d 833, 839 (3d Cir. 1981), *cert. denied*, 454 U.S. 867 (1981)). The Court further explained that "[e]nhanced injury refers to the degree by which a defect aggravates collision injuries beyond those which would have been sustained as a result of the impact or collision absent the defect." *Id.* (citing *Barris v. Bob's Drag Chutes & Safety Equip., Inc.*, 685 F.2d 94, 100 (3d Cir. 1982)). Thus, the plaintiff's burden in a crashworthiness case is to show that the alleged design defect "was a substantial factor in producing an injury that would not have occurred, or would have been substantially diminished, in the absence of the defect." *Id.* at 55.

Here, Plaintiff has created a sufficient question of material fact as to whether Mr. Medina would have suffered the same burn injuries had the battery been located under the rails of the truck. As explained above, Mr. Meinschein testified that had the alternative design been used, the electric arcing that caused Medina's truck to catch on fire would not have occurred. Given the fact that this Court denied Defendant's motion to preclude Mr. Meinschein as an expert, his testimony creates a sufficient issue of fact regarding whether the proposed alternative design would have prevented the fire from occurring. As such, Defendant's motion for summary judgment as to Plaintiff's design defect claim is denied.

As to Plaintiff's wrongful death claim, "the Wrongful Death Act provides to decedent's heirs a right of recovery for pecuniary damages for their direct losses as a result of their relative's death *due to the tortious conduct of another.*" *Aronberg v. Tolbert*, 207 N.J. 587, 593 (2011) (emphasis added); *see also Miller v. Estate of Sperling*, 166 N.J. 370, 385 (2001) ("The statutory language is designed 'to prevent recovery for death where the decedent could never at any time have maintained an action, as, for example, where there was simply no tortious conduct toward him.' Because Defendant's motion for summary judgment as to Plaintiff's design defect claim was

denied, Defendant's motion for summary judgment as to Plaintiff's claim for wrongful death is also denied.

Similarly, Defendant's motion for summary judgment as to Plaintiff's claims of survivorship is also denied. The Survivor's Act, N.J.S.A. 2A:15–3, permits, for the benefit of the decedent's estate, an appointed representative to file any personal cause of action that decedent could have brought had he lived. In other words, the survival action preserves 'the right of action which the deceased himself would have had[ ] to redress his own injuries.'" *Aronberg*, 207 N.J. at 593 (citations omitted). N.J.S.A. 2A:15–3 provides:

> In those actions based upon the wrongful act, neglect, or default of another, where death resulted from injuries for which the deceased would have had a cause of action if he had lived, the executor or administrator may recover all reasonable funeral and burial expenses in addition to damages accrued during the lifetime of the deceased.

Again, because Defendant's motion for summary judgment as to Plaintiff's design defect claim was denied, Defendant's motion for summary judgment as to these claims are also denied and the Plaintiff is left to his proofs at trial regarding the nature and extent of his injuries as a result of the subject fire.

## IV. CONCLUSION

Based on the reasons set forth above, Defendants' motion for summary judgment [CM/ECF No. 58] is denied.

An appropriate Order accompanies this Opinion.

Dated: December __, 2014

Jose L. Linares
United States District Judge