William J. Caldwell, 019481979
Carter, Van Rensselaer
And Caldwell
P.O. Box 5185
Clinton, New Jersey 08809
908-730-7900
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Case Number 2:10-cv-00623-JLL-CCC

| | | |
|---|---|---|
| MARIA E. MEDINA, Individually, MARIA E. MEDINA, Administrator Of the Estate of Edvin Medina, Deceased, MARIA E. MEDINA, Guardian Ad Litem for G.M., E.P. and T.L., Minors, | : | CIVIL ACTION |
| Plaintiff, | : | |
| vs. | : | |
| DAIMLER TRUCKS, NORTH AMERICA L.L.C., A Daimler Company, THOMAS J. O'NEIL, Individually, And T.P. SAMSON COMPANY, INC. | : | |
| Defendants. | : | |

---

PLAINTIFF'S BRIEF IN SUPPORT OF MOTION TO PRECLUDE DEFENDANT'S EXPERTS

---

# TABLE OF AUTHORITIES


| | Page |
|---|---|
| *Brown v. United States Stove Co.,* 98 N.J. 155, 165 (1984) | 5 |
| *Daubert v. Merrell Dow Pharm, Inc.,* 125 L.Ed. 2d 469, 113 S. Ct. 2786 (1993) | 4 |
| *Feldman v. Lederle Labs,* 97 N.J. 429 (1984) | 5 |
| *Great N. Ins. Co. v. Ruiz,* 688 F. Supp. 2d. 1373 (S.D.Ga. 2010) | 7 |
| *Green v. General Motors,* 310 N.J. Super 507 (1998) | 9 |
| *Michalko v. Cooke Color & Chem. Corp.* 91 N.J. 386, 394 (1982) | 5 |
| *Oddi v. Ford Motor Co.,* 234 F.3d 136, 145-46 (3d Cir. 2000) | 7 |
| *Suter v. San Angelo Foundry & Machine Co.* 81 N.J. 150, 176 (1979) | 5, |

EXHIBITS

Plaintiff will rely on Defendant's Exhibits A through N

Exhibit O - Deposition Transcript of Olsen

Exhibit P - Report of Olsen

Exhibit Q - Report of Fisher

Exhibit R - Deposition Transcript of Fisher

Exhibit S - Report of Granat

Exhibit T - Deposition Transcript of Granat

Exhibit U - Deposition Transcript of Bucossi

Exhibit V - Supplemental Crash Report

Exhibit W - Portions of Deposition Transcript of Monteiro

Exhibit X - Measurement Log

Exhibit Y - Heavy Truck Fuel System Safety Study

Exhibit Z - Photos (1-14)

DEFENDANT'S EXPERT'S OPINIONS DO NOT SATISFY THE STANDARD OF DAUBERT V. MERRELL DOW PHARMACEUTICALS, INC., 509 U.S. 579 (1993) AND SHOULD BE PRECLUDED AT THE TIME OF TRIAL.

Under Rule 702 "a witness qualified as an expert...may testify in the form of an opinion or otherwise." To do so, under Rule 703, "the facts...may be perceived by or made known to the expert..." before or during trial. If those "facts are of a type reasonably relied upon by experts in the particular field...the facts...need not be admissible in evidence." In applying these rules under the analysis set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993) the opinions of defendant's experts are insufficient to withstand scrutiny.

As will be more fully developed below, defendant's expert opinions, while purportedly applying the rudiments of accepted theory, rely on speculation or inconsequential facts that lack a probative, rational nexus relating to the issue of whether Daimler's tractor was defective. Defendant's experts "facts" are so deficient or speculative that their resulting opinions are unreliable. Defendant's experts in their reports and testimony have failed to demonstrate sufficient "deductive reasoning" in evaluating the provable empirical data. Deductive reasoning based on speculation does not serve the purpose of Rule 703. Such opinions would not serve to assist the jury. Rather, the defense experts' opinions would only serve to

improperly confuse and befuddle the jury. As such, they should be stricken under *Daubert, supra*.

The pertinent principals of products liability law are well-settled in New Jersey. All products liability law is based on public policy considerations. *Suter v. San Angelo Foundry*, 81 N.J. 150, at 172 (1979). Accordingly, a duty is imposed on every manufacturer to ensure that its products, when and as placed into the stream of commerce are suitably safe for their intended uses or reasonably foreseeable uses. *Brown v. United States Stove Co.*, 98 N.J. 155, 165 (1984); *Suter*, at 169. If a manufacturer fails to meet that duty, it will be held strictly liable for damages caused by its defective product. *Michalko v. Cooke Color & Chem. Corp.*, 91 N.J. 386, 394 (1982). A defect can arise from a manufacturing flaw, design defect or inadequate warning. *Feldman v. Lederle Labs*, 97 N.J. 429, 449 (1984). No defense expert has offered an opinion that the tractor was not defective. No defense expert has offered an opinion regarding Medina's cause of death.

Daimler breached its duty to Medina in part by designing and manufacturing a tractor with a metal battery box located within inches of a 90 gallon diesel fuel tank, both attached to the outside of the steel tractor frame rails simultaneously exposing them to damage. Daimler, knew from the Heavy Truck Study, that while tractor fires were rare, such fires had a high probability

of serious injury or death to tractor drivers. Daimler knew that the report concluded that a simple, effective and cost-efficient design change involved physically separating the battery box from the fuel tank.

It matters not that the original purchaser may have requested the tractor assembled in this configuration, as Daimler had, at all times, a duty to assure that its product was safe. There is no authority for the proposition that because Daimler assembled the tractor as requested by the original purchaser (not Medina's employer) they are relieved of their duty to each and every driver of that vehicle.

Daimler's standard design of its tractor was a plastic battery box mounted on the inside of the frame rails. Since Daimler undoubtedly had a safer, available and cost effective alternative design, their criticism fails to recognize that Meinschein's proposed alternative design was already known to and utilized by Daimler. Daimler chose expediency over safety. Edvin Medina paid the price of their expediency with his life.

INADMISSIBILITY OF DEFENDANT'S EXPERT OPINIONS.

Conversely, even by the liberal standards for such a determination, defendant's experts do not. Granat's reconstruction is fatally flawed. Since Olsen and Fisher based their opinions on Granat, if his analysis fails, so must theirs. Even considering Olsen and Fisher separately, their opinions

suffer from their own fatal deficiencies. Review of defendant's expert reports and testimony will demonstrate that their opinions are factually deficient, are predicated on wishful belief and lack scientific basis. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145-46 (3d Cir.2000) as cited by Judge Linares, 12/21/2015, page 10.

Defendant's theories completely disregard significant, material and corroborated facts. They lack the internal thought analysis based on empirical date. *Great N. Ins. Co. v. Ruiz*, 688 F. Supp.2d 1362, 1373 (S.D.Ga. 2010) as cited by Judge Linares, 12/31/2015, page 12. Defendant's experts failed to evaluate the statements of five witnesses who not only observed the crash but also reported that the fire began on the roadway before the tractor trailer fell to the steeply sloped embankment below. These witnesses saw, heard and felt the explosion. Defendant's experts inexplicably disregard these numerous eyewitness accounts. It is understandable that Defendant wants to ignore facts and plaintiff's reliable opinions based upon them, but ignoring facts only serves to render defendant's opinions unreliable.

In almost every aspect of the crash defendant has ignored or taken out of context facts documented by State Police in their written, video and still photography which incontrovertibly render Defendant's expert opinion unreliable.

The debris field alone proves the tractor-trailer must have jack-knifed right prior to leaving the roadway surface. To find otherwise defies the laws of physics. Portions of the tractor were located in the right-hand lane of the interstate, northerly of where the Medina vehicle impacted the guardrail. The debris clustered together from the left side of the tractor included four batteries and step, the tractor license plate and red marker lens. Nearby lay the battery box cover. Pre-impact, the batteries, its case and step were located on the left side of the tractor attached to the outside of the chassis frame, immediately adjacent to a 90 gallon diesel fuel tank, both located just below the driver's door.

In order for the debris to continue northerly, beyond the end of the 110' gap in the bridge guardrails, the tractor trailer must have been oriented in such a way to allow for this continued forward momentum. Jack-knife right is entirely consistent with these facts. As discussed below, that is what an eye-witness saw. If one were to accept Defendant's speculative theory of a jackknife left, the debris would have both been different and positioned below the roadway or south (behind) the tractor trailer. Accepting any other explanation flies in the face of the laws of gravity, velocity and physics.

Diesel fuel residue was evident on the roadway where the tractor had gone through the guardrail substantiating the fact

that a fuel tank had been punctured during the initial crash. The trailer had extensive damage along its lower left side. The tractor impacted the Williams Street embankment, shearing the cab from the chassis. Most importantly, the area inside the chassis frame rails where the battery box should have been located was undamaged. Without damage to the battery box there would not have been fire and explosion. Locating the batteries on the inside of the chassis rail, physically separated from the fuel tank would have spared Mr. Medina from fire-related pain and suffering, injury and death.

Defendant's own internal documents support plaintiff's theory. Defendant's *approved standard design* for its trucks was to place a plastic battery box inside the frame rails, on the opposite side from the fuel tank. Defendant is required to anticipate the consequences of vehicle impact, no matter the speed, and design, and must manufacture and deliver vehicles that can withstand forseeable events. *Green v. General Motors*, 310 N.J. Super 507 (1998). Defendant ignored foreseeable consequences of the use of its tractor. Defendant knowingly deviated from safe design intended to address those foreseeable risks in favor of a defective design that led to Medina's death.

In the jack-knifed right configuration the driver's side fuel tank was immediately exposed to the foreseeable highway speed impacts. The battery box, being located only inches

behind the fuel tank was similarly exposed. The batteries were connected by cables running from the battery box, along the steel frame-rails, to the alternator which is bolted to the engine. When the engine was running the alternator created a constant source of electrical energy.

During the crash the fuel tank was ruptured releasing the vapors always present as well as creating a mist of fuel. At the same time the cables to the batteries were torn loose, ripping the batteries from their cables. In the presence of air streaming by the tractor, the diesel fuel atomized lowering the energy needed to ignite the mixture (defendant's own documents describe this very scenario). A shower of sparks, most probably from the primary battery cable arcing against the steel frame-rails, ignited the mixture instantaneously creating a flash fire and explosion.

Defendant merely worked backwards driven by its need to rebut plaintiff's factually based and scientifically reliable expert opinions. Under defendant's unsupportable jack-knife left configuration, the fire would not be the result of puncture of the left side tank and damage to the battery box. Instead a jack-knife left configuration resulted in right tank puncture with the fire being precipitated by contact with an electric wire below the surface of the interstate. Defendant's secondary

line of defense involves rebutting death proximately caused by fire in favor of death by blunt force trauma.

Defendant's accident reconstruction expert, Granat concluded: "The transient condition of ice, snow or slush on the road surface was a circumstance that existed at the time of the crash, but was not itself the cause of the crash." (Exhibit T at 75:23). Granat's implication that excessive speed was the reason Medina "perished" is legally deficient in analyzing a product liability claim. His opinion lacks any factual basis as Granat did not calculate Medina's speed.

Granat acknowledged that he was not a certified accident reconstructionist (Exhibit T 15:25), who also admitted that he had no experience in battery or fuel tank components (Id. at 15:5) nor specific training in commercial motor vehicle accident reconstruction. He, nonetheless, he opined that: "No feature of the tractor caused the crash." (Exhibit S)

While Granat's shortcomings should render this opinion inadmissible, even if it were admitted, it is irrelevant. Plaintiff has never asserted the opposite. It is not the cause of the crash that is at issue, but rather the defective, dangerous design and assembly of the tractor that resulted in Medina's painful, violent death. Regardless of the cause of the crash, the ensuing series of events could have been avoided had Defendant followed the safety conclusions of their own internal

documents: separate the batteries as a foreseeable source of ignition from the fuel tanks. Defendant failed to do so.

Contrary to Granat's speculation, it is well-documented that the fire began upon the roadway and not as a result of anything that happened after the tractor-trailer left the bridge. This opinion was first formulated by the State Police on the date of the crash. The State Police concluded that "while the trailer and tractor were striking the guardrails V#2's diesel tank was punctured." "While V#2 was on the guardrails an explosion happened then the vehicle went over the guard rails tractor first throwing the trailer straight in the air."

Sergeant Stringer adopted in his report the several eye-witness accounts that the tractor "was said to have caught on fire when it was on top of the bridge and before it fell to the ground." The uncontroverted proof is a crash immediately resulting in an explosion, followed by the tractor going over the edge of the roadway. This is amply supported by the statement of witnesses: a) Catherine Seminatore, who saw "flames coming from the northbound lane on I-91." *Id.*; b) Seminatore, who saw "a big flaming mass come off the bridge." *Id.*; c) James McDonald, who was driving on I-91 at the time of the incident; stated that "when the tractor trailer was on the guardrails an explosion happened then the vehicle went over the guard rails tractor first throwing the trailer straight in the air." *Id.* at

4, 1.; d) Americo Monteiro who was driving on I-91 within 100-200' testified that the Medina vehicle was in a jack-knife right configuration when it crashed into the bridge guardrail system. Consistent with the other eyewitnesses, Monteiro described an instantaneous explosion as the Medina vehicle struck the guardrails on the left-hand side of the bridge Id.; e) Kenneth Fellows, who was also driving on I-91, stated "as soon as the Tractor hit the guard rails there was an explosion and lots of flames before it fell off the side of the bridge." *Id.* f) Jeffrey Stamler, who was driving in his Toyota Pathfinder southbound on I-91, where "there is approximately "43 feet between the south bound land and the north bound lane" (*Id.* 2) saw "a huge explosion." Stameler was so close to the incident that debris was showering around his vehicle as he traveled on I-91 South. Mr. Stamler stated: "the shock wave of the explosion almost made [me] drive off the roadway." (Exhibit V) Mr. Stamler also stated: "the debris from the explosion showered down on [my] vehicle and the entire northbound lane. *Id.*

Given the material issues in question, Defendant's expert opinions are unrelated to the jury questions presented. Medina's death was determined by the Vermont Medical Examiner to be a combination of blunt force trauma and 100% thermal injuries Neither Granat, nor Fisher, nor Olsen, as experts for the defendant, offered any opinion as to Medina's cause of death.

None of these experts offered any opinion as to design defect, alternative design or safety of the tractor as assembled and placed in commerce.

i) UNRELIABILITY OF DEFENDANT'S EXPERT OPINIONS.

Granat asserted that Medina's tractor rotated 1) counterclockwise i.e. jack-knife left while striking the guardrails based on his review of tire tracks in the slush as shown on Trooper Loyzelle's dash-cam video made twenty minutes after the crash; 2) "blue" paint on the bridge guardrail; 3) a bent right tractor frame rail; and 4) the configuration of the tractor and trailer on the Williams Street embankment. Neither individually nor collectively do these alleged facts form the basis for a reliable, admissible opinion.

Granat conceded that he had no engineering basis for establishing the relative position of the Medina vehicle, no basis for countering the testimony of eyewitness, Monteiro's description of the position and path of movement. (Exhibit T 49:14, 55:3) He had no basis for establishing the absolute position of the Medina tractor or its path along the roadway. He did not calculate changes in velocity i.e. Delta-V as it was not "really the main issue." (*Id.* 232). He did not calculate a coefficient of friction because "there is insufficient data to do that (Id. 65:6). Granat admitted that he "definitely" (Id.

15:4) had no experience in battery components or fuel tank design or safety.

Recalling that the batteries and box lid were found on the interstate roadway northeasterly of the paint scrapings, Granat ignored the law of gravity and conservation of energy. During the crash sequence, he conceded that the batteries and driver's side mounted battery box lid along with the left step and license plate must have become separated from the tractor while it was still positioned over the interstate roadbed, otherwise once the tractor has crossed beyond the edge of the roadway those items would have, by gravity, fallen onto Williams Street below.

Since it cannot be disputed that they became separated from the tractor while still on the interstate roadway, if the tractor were jack-knifed left, with the passenger side facing northerly, then these objects would have been on the southerly, non-impact side of the tractor. If separated by force being applied from north to south, it would be physically impossible for those objects to be propelled northeast to their point of rest.

The uncontroverted eye-witness testimony refutes Granat jack-knife left theory). During deposition, eye-witness Americo Monteiro was asked: "Q. Is it your recollection that the Medina vehicle was ever in a jack knifed position? A. "I wouldn't say a