true jack knifing, but the trailer, I mean the tractor was snapped to the right. Not a ninety, a true jack knifing. But it had an angle going to the right and the trailer was still straight..." (Exhibit W) Defendant has no eye-witness account to the contrary.

Granat tried to establish his wishful, jack-knife left opinion by relying on dash-cam footage from Trooper Loyzelle and paint scrapings on the bridge guardrail. Neither provided any meaningful foundation for his opinion. Trooper Loyzelle arrived at the I-91 scene at least fifteen (15) minutes after the crash. He reported heavy traffic, backed up in both lanes of traffic. The dash-cam footage from his troop car shows slush on the road with cars, vans, school buses and trucks as he approached the scene.

More importantly, it shows multiple tire paths through the slush. It shows vehicles backed up in both lanes. As Loyzelle approached, vehicles can be seen moving from the left lane to the right lane. The State Police included Monteiro's description of his tractor trailer as being in the right lane, then pulling to the left land to avoid hitting a car, then back to the right lane. Monteiro was driving a tractor-trailer, just as Medina.

Granat claims that he could identify a specific set of tire tracks on the road, even though there was no evidence of skid or

16

yaw marks on the pavement. Given the facts it is scientifically impossible for Granat to identify Medina's tire tracks separate from all the other vehicles that traversed the same lanes of traffic. The acid test is that Granat did not do so in his report or deposition testimony.

Granat attempted to bolster his tire slush analysis by asserting that he could detect "blue paint" on the guardrail just before the 110' gap in the bridge rail. The "blue paint" supposedly furthered his jack-knife right configuration by marking a specific point of impact between the nose of the tractor and the guardrail.

This is more wishful thinking, inconsistent with proven facts. At the beginning of the damaged bridge guardrail section photographic evidence shows only white paint on the horizontal rails. Granat agreed that the white paint corresponded to the damage on the left side of the white O'Neil vehicle. Granat explained that the presence of white paint was the direct result of the O'Neil vehicle having mounted the curb and remaining in contact with the bridge rails for 30' (Exhibit T at 67:2).

Other than Granat making the naked claim that there is blue paint on the rail from "over the left wheel" (*Id.* 35:23) not the nose of the cab, no Trooper mentioned, let alone identified, any paint transfer from the tractor to the bridge rails as a basis for drawing conclusions about Medina's path of travel.

17

Granat's contention that the presence of the "embedded" guard rail, in the tractor is contrary to plaintiff's jack-knife right conclusion is contradicted in the crash report. When stated in its proper context from Sergeant Stringer's reconstruction: "The truck tractor had a guard rail embedded in it from the area of the left front and came out in front of the [right rear] dual wheels of the tractor. This would indicate the direction of travel for the front of Vehicle # 2 to be in a northwest direction." (*Id.* 12) Such directionality is contrary to Granat's claim of jack-knife left with increasing counterclockwise rotation of the tractor toward the southeast.

Granat cannot establish with any degree of scientific certainty Medina's path of travel on the roadway. Speculation, no matter how firmly asserted, can form the basis for an admissible expert opinion. Granat's speculative path of travel analysis became the lynchpin for the second part of defendant's theory. Defendant has asserted in opposition to Meinschein's analysis of the cause and origin of fire analysis, that the electric wire on Williams Street was the source of ignition for the leaking fuel. Granat, Fisher and Olsen undoubtedly tried to build upon the incorrect premises that the cab of the tractor had been sheared off by the wire and that the tractor had the power line in it. Defendant's experts concluded that the cab

was torn from the tractor chassis by the force of impact on the embankment.

Defendants own proofs are inconclusive at best, contradictory at worse. In Exhibit T 106:6 Granat stated: "I don't think that [contact] can be determined to any precision, just that the wire or the high tension cable has been severed to some point, yes, and it was found underneath the tractor. Beyond that, I don't think that we can place an exact location where it would have contacted [the tractor]." (Id. 166:8) Additionally, his opinion does not account for the fact that the tractor managed to tear down only one of the four wires strung along the road. Granat recited no evidence to support his otherwise naked assertion that the front of the tractor contacted the wire. For that matter, consistent with Stempler's description, Granat admitted that the tractor could have not been involved at all: "there is certainly the potential for some of the bridge structure itself, the bridge rails for the steel link fencing... to [have contact[ed] the electrical lines." (Id.)

Granat's front-of-the-tractor analysis also has been directly contradicted by defendant's fire cause and origin expert, Olsen. According to Olsen, contact occurred at the rear of the tractor and the front of the trailer. It is impossible to reconcile the differences between Granat and Olsen. While

19

they both cannot be correct, they both lack a reliable scientific basis for either position and should therefore be excluded.

Granat, not only admitted that he did not have any scientific observations or criticisms of Mechschein's report, but also (Exhibit T at 109), admitted that in arriving at his opinion he did not consider whether there was an explosion or not on the roadway. He admitted that he did not separately evaluate fire causation. Granat's jack-knife left, electric wire contact below the I-91 roadway opinion is contrary to five (5) eye-witness accounts which amply supports plaintiff's conclusion of explosion and fire on the roadway. He simply ignored uncontroverted, countervailing facts to create his unreliable opinion.

Granat's last port of call is his extrapolation of path of travel on the roadway based on the final position of the tractor and trailer on the embankment. The observation is meaningless without considering when did this damage occur; and to what extent, if any did it relate to product defect and Medina's death. Plaintiff contends that the damage was done when the tractor, in its inverted V formation, hit the ground, rear-end of the chassis and front end of the trailer leading.

Granat agreed that the inertia from this impact tore the cab off the chassis. Granat denied that the same force of

20

inertia caused the rail to bend. His explanation, if not incredible on its face, is contradicted by Fisher.

Granat has opined that the right frame rail was bent when the tractor, in a jack-knife left configuration on the roadway, exposed the right frame rail to multiple impacts with the guardrail posts on the bridge. (Exhibit T 132). His theory is not supported by his owns facts and is contradicted by Fisher. Granat identified 12 guardrail posts in the 110' gap that were severed from their anchors by the Medina vehicle. Of those 12 posts, he admitted that 4 posts never impacted the chassis (*Id.* 131).

By process of elimination contact with 8 posts caused the damage. Recognizing that Granat has asserted that the impacts occurred in eight separate points along the right side of the tractor, his opinion has been entirely debunked by defendant's bio-mechanical expert. Fisher testified: "it is my understanding from Granat's analysis that the impacts with the posts [were] not high acceleration impacts. The truck is able to break those off without a lot of resistance." (Exhibit R 102:12). Fisher attributed so little force to these impacts that he stated that none of Medina's blunt force injuries occurred while the tractor was still on the roadway.

Further proof of the unreliability of Granat's opinion arises from that portion of his analysis placing the path of the

21

trailer parallel to the bridge guardrail while the tractor was rotating counterclockwise and moving northerly impacting the guardrail posts. The crash report indisputably proves, however, that the trailer sustained impact damage along its lower left edge. This damage was determined by the State Police to have occurred when: "...the trailer came around too far striking rails on the bridge..." "Vehicle #2's semi-trailer portion had the left side damaged on the lower half of the box. This was in the center of the semi-trailer. This was between the dual axles and the landing gear of the semi-trailer. This is from the contact with the guard rails on the west side of the bridge. This damage was approximately 25 feet in length. The left front outside dual tire had rim damage... This is believed to have been when the semi-trailer came into contact with the 6 inch...granite curbing before going over the bridge." (Id.) It would be physically impossible for there to be left front tire rim damage if Granat's nose first impact is plausible.

    His opinions are not a matter of credibility or weight to be decided by the jury. No reasonable juror could reject all the eye-witnesses accounts of explosion and fire on the roadway. No reasonable jury could discern "blue paint" where none has been documented. No reasonable jury could conclude that the tractor rotated counterclockwise on the basis of contact wire the electric wire, nor based on the final position of the tractor

22

and trailer. Since both Olsen and Fisher relied on Granat, the unreliability of his opinions undercuts their opinions, even without considering their own unreliability.

ii) Olsen, who is defendant's fire cause and origin witness, relied upon Granat's reconstruction in order to conclude that 1)contact with the wire as the tractor fell from the roadway was the only efficient cause of the fire. Assuming the sufficiency of this opinion, it necessarily and conclusively eliminates all other speculative sources of ignition

Addressing the reliability of his opinion, Olsen violated the cognitive analysis established by this Court in its December 30, 2014 opinion requiring Olson, as the "the investigator...to document the facts that support the cause determination to the exclusion of all other reasonable causes." Olsen merely adopted Granat's "contact with the wire" speculation to justify his opinion just as Granat merely speculated regarding tire tracks and blue paint.

As recited above, five witnesses reported the fire and explosion started in the tractor while it was on the bridge. While the State Police adopted and incorporated these witness observations into their report, Olsen simply ignored them. He could identify no proof that the tractor had been subjected to an electrical charge from the wire. Olsen had no explanation regarding how that could be true when it was undisputed, as

23

concluded by Dr. Bundock, that Medina had not suffered electrocution.

Without scientific basis or cognitive analysis he dismissed Meinschein's opinions simplistically stating: "It's my view that the batteries had nothing to do with this fire." (Exhibit 96:14). The National Highway Administration Study, supra detailed the role that batteries and their location play in fire origin. Undisputed proof of a punctured tank in close proximity to a battery box torn loose from the frame rail during a crash warranted more analysis from Olsen beyond his out-of-hand rejection of plaintiff's position. Olsen's opinion is unreliable.

iii) Fisher, who provided bio-mechanical opinion, also relied on Granat's reconstruction. Although not offering any opinion as to cause of death, Fisher acknowledged that: "the presence of the power line has no particular bearing on my final opinion." (Exhibit R at 45.) He could not have concluded otherwise in the face of Dr. Bundock's opinion recited above. (supra, Exhibit D at 119:17-19).

Fisher sought to rely upon the blunt force injuries listed by Dr. Bundock to conclude that Medina would have died, notwithstanding the fire. Defendant has asserted that Dr. Bundock could not rule out a "fatal" head injury. This is

24

simply false. Bundock only stated that she could not rule out "brain trauma."

While Bundock could not opine on Medina's consciousness, the facts demonstrate that Medina probably remained conscious during the fire. There are eye-witness accounts of screams from the cab, the Assistant ME reporting that Medina may have crawled away from the cab and Dr. Bundock concluding that Medina initially survived the flash fire. Fisher stated that he did not disagree (Exhibit R at 35) with Bundock.

Fisher's claim that Medina may have suffered fatal head trauma is untethered to any fact or medical opinion. It is unreliable conjecture.

Fisher's alternative theory was that Medina would have died from general blunt force trauma. In Exhibit A at 6 Trooper Loyzelle recounted a conversation with the Dr. Bundock regarding Medina's cause of death being a combination of "blunt force trauma [and] thermal injuries. Bundock's statement, if admissible, is debatable at best. In her deposition testimony she stated that no single blunt force injury itself would cause death; and she made no analysis of which injuries in combination would have done so.

As stated above, Fisher concluded that Medina incurred no blunt force injury during the roadway portion of the crash sequence. With the exception of the bowel evisceration, Fisher

25

concluded that Medina only sustained blunt force trauma when, as Medina was facing the front of the cab, it impacted the embankment. Without the fire, emergency personnel who would have arrived within minutes of the crash could have easily transported Medina to the local hospital. Based on the AIS scale developed as a triage tool, emergency room treatment would have been implemented. Plaintiff's bio-mechanical expert utilized the AIS scale to conclude that all such blunt force trauma was survivable. Fisher did not disagree.

Fisher opined that the bowel evisceration was caused by a section of wire mesh fencing intruding and then exiting the cab in the time it took the cab to fall 32'. (Exhibit R 135) Such assertion is fatally flawed when the genesis of the intrusion theory is explored. Trooper Marcoux videotaped the scene beginning at a point south of the bridge, continuing beyond the 110' gap in the bridge rail to the O'Neil vehicle and then on the Williams Street embankment.

As he was walking around the remains of the tractor he pointed to discoloration on a post that was part of the mesh fencing attached to the rear of bridge guardrail posts. He commented that the discoloration may look like blood. Contrary to defendant's expert's assertion no comment was made about "body matter." (Exhibit R at 70-72)

26

Marcoux's observation was not reported to Sergeant Stringer who was the accident reconstructionist assigned to evaluate the circumstances of the crash and Medina's death. No sample was taken of the substance. No reference to blood or body matter appears in any other State Police or Medical Examiner report. None of the defendant's experts claimed any experience, let along expertise in identifying blood, body fluids or body matter.

Fisher's entirely speculative intrusion theory is, however, a necessary component of defendant's overall jack-knife left argument. According to their theory, as the tractor was rotating counterclockwise with the nose downward, the mesh fence together with its supporting post and rail, intruded into the cab through the right front door, impaled Medina causing bowel evisceration, then exited the cab. Fisher, at first, insisted that the evisceration could only have occurred pre-mortem until he was confronted with an authoritative text. He was forced to admit evisceration was a documented fire induced post-mortem injury.

Fisher's theory is also contradicted to the point of unreliability by his own overall assertion that Medina suffered his blunt force trauma while he was facing forward in the cab, but falling rearward, thus fracturing his right rear ribs on hard surfaces in the rear of the cab. This necessarily means

27

that the cab nose was pointed upwards, consistent with the agreed upon fact that the rear of the chassis struck the ground.

The "blood" on the mesh fencing was found to the left of the remains of the cab. Medina's body was found to the right of the cab, prone on the ground. The unsubstantiated lone "blood" observation became Fisher's sole factual predicate for his speculative feat of physics and bio-mechanics. Fisher's opinions are inherently unreliable. They should be stricken.
CONCLUSION.

Crashes involving tractor-trailers are a fact of life. Their presence on the nation's highways, especially the Interstate system, is a foregone conclusion. No reasonable person could conclude that Daimler did not know that these highways include hundreds of thousands of miles of guardrails, of varying designs, running along the side of the road. It would be entirely foreseeable to Daimler that a significant percentage of tractor-trailer crashes would occur at highway speeds with guardrails frequently referred to in the report and by defense counsel in deposition as being "standard W beam."

Based on the facts and opinions of plaintiff's experts, the jury could find that Daimler's standard configuration was a plastic battery box on the inside of the steel tractor frame rails. In this location the box and batteries would not have

28

exposed been to being torn loose during the crash. The jury could find that with this design, the "primary cables" would not have been torn loose. The uninsulated ends of the cables would not have come into contact with some other metal component creating the "shower of sparks" which acted as the source of ignition. The jury could find that the resulting fire and explosion occurred on the I-91, dooming Medina to an agonizing death.

The jury could find that Daimler, however, chose to knowingly ignore the increased risk of fire and death. Defendant's experts have nothing to offer but misleading, incorrect, out of context facts which have resulted in speculative, unreliable musings. Plaintiff's motion to exclude Defendant's experts should be granted.

                Carter, Van Rensselaer and Caldwell

                By _____
                      William J. Caldwell