# EXHIBIT F

**ORIGINAL**

1
1     UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF NEW JERSEY

3

4 MARIA E. MEDINA, for the :

5 Estate of Edvin Medina, :

6   Plaintiff,    :

7   v.      : CIVIL ACTION NO.

8 DAIMLER TRUCKS NORTH : 10-cv-00623-JLL-CCC

9 AMERICA, et al.,   :

10   Defendants.   :

11

12   Computer-aided transcript of the

13 deposition testimony of JACOB L. FISHER, Ph.D.,

14 P.E., taken stenographically in the above-entitled

15 matter before EDWIN SILVER, Certified Court

16 Reporter and Notary Public of the State of New

17 Jersey, at the offices of Goldberg Segalla, LLP,

18 902 Carnegie Center, Suite 100, Princeton, NJ

19 08540, on Tuesday, February 18, 2014, commencing

20 at 10:10 a.m.

21

22    JACQUELINE KLAPP, CCR

23    59 OLD CROTON ROAD

24    FLEMINGTON, NJ 08822

25    (908) 782-0874

---

2
1 A P P E A R A N C E S :

2

3

4  CARTER, VAN RENSSELAER & CALDWELL, P.C.,

5  BY: WILLIAM J. CALDWELL, ESQ.,

6    1728 Route 31 North

7    Clinton, NJ 08809

8    Phone:  (908) 730-7900

9    E-mail:  billcaldwell@centurylink.net

10  For the Plaintiff.

11

12

13  GOLDBERG SEGALLA, LLP,

14  BY: ROBERT M. COOK, ESQ.,

15    902 Carnegie Center, Suite 100

16    Princeton, NJ 08540

17    Phone: (609) 986-1300

18    E-mail:  rcook@goldbergsegalla.com

19  For the Defendant Daimler Trucks North

20  America.

21

22

23

24

25

JACQUELINE KLAPP, CCR - (908) 782-0874

---

3
1     I N D E X

2 WITNESS          PAGE

3 JACOB L. FISHER, Ph.D., P.E.

4  Examination Mr. Caldwell   6

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JACQUELINE KLAPP, CCR - (908) 782-0874

---

4
1      EXHIBITS

2 NUMBER DESCRIPTION       IDENT.

3 F-1  Thumb drive       12

4 F-2  Dr. Fisher's binder of various 13

5    documents

6 F-2A Dr. Fisher's report, dated  19

7    12/23/13

8 F-3  8 1/2" by 11" color photograph 77

9 F-4  Hand-drawn diagram, entitled 81

10    "Medina v. DTNA"

11 F-5  Tractor model      93

12 F-6  Freightliner brochure of  96

13    On-Highway Truck Interiors

14 F-7  8 1/2" by 11" color photograph 130

15    entitled "Accident Scene

16    Photos: Cab"

17 F-8  8 1/2" by 11" of two color  140

18    photographs entitled "Police

19    Accident Scene Photos"

20 F-9  8 1/2" by 11" color photograph 170

21 F-10 8 1/2" by 11" color photograph 170

22    of a skull

23 F-11 8 1/2" by 11" color photograph, 179

24    with the decedent's body

25

JACQUELINE KLAPP, CCR - (908) 782-0874

5

EXHIBITS (CONTINUED)

| NUMBER | DESCRIPTION | IDENT. |
|--------|-------------|--------|
| F-12 | 8 1/2" by 11" color photograph, with the passenger's and driver's seat frame | 180 |
| F-13 | 8 1/2" by 11" color photograph | 187 |
| F-14 | 8 1/2" by 11" color photograph | 194 |

JACQUELINE KLAPP, CCR - (908) 782-0874

---

6

Fisher - By Mr. Caldwell

J A C O B   L.   F I S H E R, Ph.D., P E, duly

sworn, testifies as follows:

EXAMINATION

BY MR. CALDWELL:

Q    Good morning, sir.  My name is--well,

even though we met out in the reception room, my

name is Bill Caldwell.  I'm here on behalf of the

plaintiff in this matter.  We're here to take your

deposition today.

You understand that?

A    I do.

Q    And you've had your deposition taken

before, so I can dispense with all the preliminary

instructions?

A    I have.

Q    And you've had sufficient time to

prepare in this matter with your counsel, so

you're ready to proceed?

A    I believe so.

Q    Okay.  I have one very bad habit when

it comes to depositions.  I have a tendency, when

people's voice drop, to conclude that they have

finished answering the question, and I sometimes

go on to next question when, in fact, they're

still thinking.  So, if I do that, just tell me

JACQUELINE KLAPP, CCR - (908) 782-0874

---

7

Fisher - By Mr. Caldwell

that you weren't finished.  I'm not trying to

force you to go faster than you want to.

A    Okay.

Q    All right?

A    Okay.

Q    Good.

Also, obviously, this is not a

torture session.  If at any time you need to

stretch your legs, or whatever, just let me know.

Okay?

A    Thank you.

Q    Good.

You were hired as the biomechanical

expert for the defendant in this matter?

A    I was.

Q    And when were you so engaged?

A    I think sometime in 2011.

Q    Okay.

A    I believe we have provided my

retention letter to you, and that would have the

precise date.

Q    And I was also provided with your

time and billing records as you submitted them to

defense counsel, and I note from that that there

was a nine-hour time charge for April 2013, where

JACQUELINE KLAPP, CCR - (908) 782-0874

---

8

Fisher - By Mr. Caldwell

it appears that you came here.

Do you recall that?

A    Correct.

Q    Okay.  And at that time, who else was

present in April of 2013?

A    I believe Mr. Cook here; Bobby

Hanlon, a partner in his firm; Mr. Granat, who was

deposed last week; Mr. Olson, who is the fire

causation expert; and a gentleman retired from

Daimler Trucks, whose name is eluding me.

Koepke?

Q    Okay.  And what did you talk about

for the nine hours?

A    So that nine hours also includes my

travel time.

Q    What did you talk about for seven

hours?  And take an hour off for lunch--

A    That's right.

Q    --what did you talk about for six

hours?

A    I think each of the experts presented

our analyses.

So Mr. Granat presented what he

had--what his conclusions were to that point

regarding the accident reconstruction.

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell                    9

1    I presented my biomechanical analysis
2  of what I had found.
3         I think at that point we had reports
4  of plaintiff's experts.  We did not--I don't
5  believe they had been deposed yet at that point.
6         So I had assessed Dr. Manion's
7  report, Dr. Arslanoglu's report.  I had some
8  critique of those.
9         Mr. Olson presented his entire
10  causation analysis.  And we just kind of went down
11  the row, and each of us presented--I believe it
12  was Kevan, then maybe Mr. Olson, and then me, I
13  think was the order we went in, and we just
14  presented our stuff.
15         The attorneys asked us questions,
16  asked us for more detail, whether we could
17  elucidate anything further, and we answered those
18  questions and said this is where we are today with
19  our analysis.
20      Q      Since that time, did you
21  substantially change your analysis?
22      A      Well, one important part of that
23  meeting for me was to understand Mr. Granat's
24  accident reconstruction.  For any kind of
25  biomechanical analysis I'm going to do of an

Fisher - By Mr. Caldwell                   10

1  automotive crash, I generally start with the
2  vehicle dynamics, which is something I relied on
3  the accident reconstructionist for.
4         So I came with a certain amount of my
5  analysis done, and I needed to fill in some holes:
6  the directions the truck was moving, how it moved
7  on the bridge, how it moved through the bridge
8  rails, what kind of impacts it sustained in what
9  directions on the bridge, what its orientation was
10  through the fall, what its orientation was upon
11  impact with the ground.  That sort of information
12  I came to get from Mr. Granat that day.  I had a
13  long list of questions in my head that I went
14  through with him.
15         So it wasn't just the attorneys
16  asking Mr. Granat questions, but I had my own list
17  of questions that I wanted to go through and build
18  into my report.  Obviously, I have a section in my
19  report where I say based on Mr. Granat's accident
20  reconstruction analysis, and then I summarized
21  what I learned from him regarding the vehicle
22  dynamics, and then I build upon that for my
23  biomechanical analysis.
24      Q      Did you go through the Marcoux video
25  at that meeting?

Fisher - By Mr. Caldwell                   11

1      A      I don't recall whether we went
2  through the whole thing.  I have a recollection
3  that maybe we went through parts of it.
4      Q      Okay.  Do you recall going through
5  the dash cam footage from Trooper Loyzelle?
6      A      Kevan may have gone through some of
7  that during his presentation.  I paid closest
8  attention to what was happening through the bridge
9  rails in the fall to the ground.
10         Kevan, obviously, had a lot of detail
11  on what happened with the O'Neil vehicle and, you
12  know, the motions of both vehicles on the bridge
13  before they went over.  That was not as critical
14  to my analysis, and I may not have paid the best
15  attention to how the vehicles were moving before
16  the accident sequence, the more forceful accident
17  sequence began.  So that may have been early in
18  his analysis and presentation.  I'm not sure.
19      Q      I see you have a binder on the desk
20  next to you.
21         Does that constitute your entire file
22  in this matter?
23      A      I don't have everything in here.  I
24  have everything on a thumb drive.  I have printed
25  out everything that I anticipated pulling out to

Fisher - By Mr. Caldwell                   12

1  point out to you, to show you.
2         There are things, obviously, like the
3  video, which does not come in a printable format,
4  and there are other things that might have been
5  hundreds of pages.  So I didn't print out binders
6  and binders of material.
7         MR. CALDWELL:  Let's back up here.
8         The thumb drive, we'll call F-1.
9         (Thumb drive received and marked
10         Exhibit F-1 for identification.)
11         MR. COOK:  That's his entire file on
12  the thumb drive.  So I think he can explain
13  his work product is generally contained in
14  the binder.  But there's correspondence in
15  there, and that's privileged.
16         MR. CALDWELL:  Okay.
17         MR. COOK:  But, you know--
18         MR. CALDWELL:  He was holding it as
19  though he was about to hand it over, and
20  that's why--
21         MR. COOK:  Yeah.  That's fine.  If he
22  needs it for certain things today, it's
23  certainly here.  So I wanted it in here with
24  him, Bill.  But as far as getting you a
25  copy, if you want a copy of that, we can get

13

Fisher - By Mr. Caldwell

1  you a copy of that, minus the privileged

2  material. So, that's fine.

3       MR. CALDWELL: Certainly. I'd still

4  like to indicate that the thumb drive is

5  F-1--

6       MR. COOK: Sure.

7       MR. CALDWELL: --and I accept

8  counsel's representation that you will sort

9  through it and take out the privileged

10  material. I'm not going to ask you to do

11  that.

12       So, then, the binder we're going to

13  call F-2.

14       Let's first let the court reporter do

15  his job.

16       (Dr. Fisher's binder of various

17  documents received and marked Exhibit F-2

18  for identification.)

19  Q    F-1 is everything from the day that

20  you were engaged down through the present time?

21  A    Correct.

22  Q    But not including videos.

23  A    The videos are on there as well.

24  Q    Both the Marcoux video and dash cam

25  video from Loyzelle?

JACQUELINE KLAPP, CCR - (908) 782-0874

14

Fisher - By Mr. Caldwell

1  A    I believe--I believe it's all on

2  there.

3       The dash cam video was a--from

4  Loyzelle was a deposition exhibit.

5  A    It's part of G-3. G-3 we marked at

6  Mr. Granat's deposition the other day is a DVD,

7  which included, among other things, his analysis,

8  the crash report, the still photos, one of which

9  you can see on the TV, the Marcoux video, the dash

10  CAM video.

11  A    The Marcoux video is definitely on

12  here. I don't recall--I don't recall whether the

13  Loyzelle video is on here. If it was a deposition

14  exhibit from Loyzelle's deposition, it's on

15  there. Otherwise, it may not be.

16  Q    All right. So can I just see the

17  binder for a moment, please?

18  A    Absolutely.

19  Q    Thank you.

20       (Pause.)

21  A    In the front sleeve, I printed out a

22  few other things that I thought might be helpful

23  for our discussions today that I had not

24  previously had in the tabulated--or that might be

25  in the tabulated parts under the analysis, but I

JACQUELINE KLAPP, CCR - (908) 782-0874

15

Fisher - By Mr. Caldwell

1  printed out a separate sheet for our discussion.

2  Q    Okay. Are all the articles in the

3  binder also on--sorry. Let's do it this way.

4       The thumb drive is all inclusive, and

5  the binder a subset?

6  A    Correct.

7  Q    So anything that I see in the binder

8  I will find ultimately on the thumb drive, less

9  the privileged information that Mr. Cook is going

10  to redact from; is that correct?

11  A    Yes.

12  Q    Okay. I presume that you have

13  testified as an expert before?

14  A    I have.

15  Q    And qualified as an expert in New

16  Jersey?

17  A    Yes.

18  Q    In state and federal court?

19  A    Yes, in New Jersey state court, and I

20  don't know if I've had a federal case in New

21  Jersey, but I have testified in federal court.

22  Q    Civil cases only?

23  A    Yes. In terms of testimony, yes.

24  Q    Well, have you been engaged as a

25  consultant for criminal cases?

JACQUELINE KLAPP, CCR - (908) 782-0874

16

Fisher - By Mr. Caldwell

1  A    Yes.

2  Q    For the state or for the defense or

3  both?

4  A    For the defense, I have a case now,

5  and I have assisted the Pennsylvania State Police

6  in some investigations and analyses.

7  Q    For what purpose?

8  A    For potentially bringing criminal

9  charges against someone, for their purposes.

10  Q    For their purposes.

11       You mean death by auto type case?

12  A    Both of the cases I'm thinking of

13  were death on premises. One was a fall, an

14  alleged fall from stairs, and the other one

15  regarding a recreational vehicle.

16  Q    Have you ever testified for the

17  plaintiff in a civil case involving a

18  tractor-trailer?

19  A    No.

20  Q    Have you ever testified for the

21  plaintiff in an automobile case?

22  A    I have not testified, no.

23  Q    Testifying includes preparing reports

24  and submitting to deposition.

25  A    Oh, sorry.

JACQUELINE KLAPP, CCR - (908) 782-0874

---

**17**

Fisher - By Mr. Caldwell

1  Q    That's okay.  I'm expanding it.  You
2  took it correctly to begin with.  I was talking
3  about court appearances.  Now I'm talking about a
4  broader scope of activities.
5       Have you testified in deposition for
6  plaintiffs in civil cases?
7  A    Not in depositions.  I have prepared
8  reports for plaintiffs.
9  Q    For auto accidents?
10  A    I'm thinking of a pedestrian
11  accident, which is a kind of auto accident.
12  Q    If it involved an auto and a
13  pedestrian--
14  A    Yes.
15  Q    --or a fixed object along the side of
16  the road, yes.
17  A    Yes.
18  Q    Who besides yourself, if anybody, is
19  responsible for the work product in the binder and
20  the thumb drive?
21  A    In addition to me, I was assisted in
22  basic factual review of materials by an engineer
23  who reports to me, Dr. Swathi Ravi.  S-w-a-t-h-i
24  R-a-v-i.
25  Q    Anybody else?

JACQUELINE KLAPP, CCR - (908) 782-0874

---

**18**

Fisher - By Mr. Caldwell

1  Q    I saw a lot of initials on your time
2  and billing sheet.  So--
3  A    Yeah.
4       I think at one point I discussed some
5  material with John Struble.  S-t-r-u-b-l-e.  Mr.
6  Struble is an accident reconstructionist in our
7  vehicle practice, who has a lot of familiarity
8  with large trucks, and I was looking through the
9  photos trying to identify different components of
10  the chassis and cap of that vehicle, attachment
11  points for the cab onto the chassis, and it was
12  valuable to have him assist me in identifying
13  parts of the truck and which parts would have
14  matched with other parts when the truck was still
15  assembled.
16  Q    The written report, which we haven't
17  marked yet, do you have a separate copy of your
18  report?
19  A    Yes.  In the binder there is a copy.
20  Q    It's not in the front under
21  "Analysis"?
22  A    No, it's not.  It just says "Fisher
23  Biomechanics Report."
24  Q    Okay.
25  A    It's about halfway down.  Here we

JACQUELINE KLAPP, CCR - (908) 782-0874

---

**19**

Fisher - By Mr. Caldwell

1  go.  "Biomechanics Report."
2       (Dr. Fisher's report, dated 12/23/13,
3       received and marked Exhibit F-2A for
4       identification.)
5  Q    Is the report entirely your own work
6  product, from drafting through the end, when you
7  signed it, or are there portions of the report
8  that reflect the work product of your colleagues?
9  A    I was assisted in drafting the
10  factual sections of the report, and, in general,
11  the layout of my report is that there's a summary
12  of various received items, summaries of the police
13  report, summaries of deposition testimony,
14  summaries of the medical records, or the autopsy
15  records, and then the second half of the report is
16  the biomechanical analysis.
17  Q    So is it fair to basically say that
18  beginning on page 3, where it says "Accident
19  Summary," through the top portion of page 10, that
20  that is intended to be a summary of other people's
21  observations and findings?
22  A    Yes.  And--
23  Q    So did you go through and verify the
24  information that you have excerpted on various of
25  these pages?

JACQUELINE KLAPP, CCR - (908) 782-0874

---

**20**

Fisher - By Mr. Caldwell

1  A    I did.
2  Q    So you--
3  A    I did a thorough fact checking and
4  review of everything up through page 10, though
5  some of the initial drafting was done by Dr.
6  Ravi.  Subsequent to that, the rest of the report
7  is all directly my writing.
8  Q    So on page 10, at the end of the
9  first pull paragraph, under the section
10  "Biomechanical Analysis," where it says, "I have
11  also relied upon the accident reconstruction of
12  Kevan Granat," tell me, what does that mean when
13  you say that you "relied upon the accident
14  reconstruction"?
15  A    So, as I mentioned earlier, to do a
16  biomechanical analysis, I first need to understand
17  how the vehicle moved, what the vehicle dynamics
18  are, and as I have summarized primarily in the
19  next paragraph, where I say, "Based on Mr.
20  Granat's accident reconstruction analysis," and
21  then I continue on with a summary of how the
22  vehicle moved, based on Mr. Granat's analysis, I'm
23  relying on his accident reconstruction for that
24  part of understanding how the vehicle moved.
25  Q    So you're relying upon, beginning on

JACQUELINE KLAPP, CCR - (908) 782-0874

21

Fisher - By Mr. Caldwell

1   page 10, in the second full paragraph, beginning

2   with the phrase, "Based on Mr. Granat's accident

3   reconstruction analysis," all the ways through to

4   the end of the paragraph on the top of page 11 is

5   that which you are relying upon from Mr. Granat?

6        A.   Yes.

7        Q.   And then beginning with the paragraph

8   that says, "When a vehicle collides," this is now

9   what?  Your interpretation and analysis?

10       A.   Yes.

11       Q.   And your interpretation and analysis

12  continuous on through the remainder of the report,

13  other than where you're criticizing or analyzing

14  plaintiff's experts?

15       A.   Correct.

16            Let me back up and note that the

17  first full paragraph on page 11 does contain

18  elements that I got from Mr. Granat as well.  The

19  tractor-trailer falling approximately 32 feet,

20  that was an assessment he made.  The series of

21  small delta-V impacts through the bridge rails,

22  that was something that I got from him.  That was

23  a specific question I had for him, in fact on the

24  day that day we met, was how severe those impacts

25  were.

JACQUELINE KLAPP, CCR - (908) 782-0874

22

Fisher - By Mr. Caldwell

1        Q.   Okay.  If I could divert you for a

2   moment, then, did you independently calculate how

3   fast the truck was going at the time that it hit

4   the embankment?

5        A.   I did do that based on a 32-feet drop

6   in gravity.

7        Q.   But you relied on somebody else's

8   32-feet measurement.  You just did the resulting

9   calculation from that.

10       A.   Correct.

11       Q.   Okay.  And so when you calculated 30

12  miles per hour, did you assume that the truck and

13  trailer were in free fall?

14       A.   That assumes--so the free fall comes

15  out to something over 30 miles an hour.  I forget

16  the precise number, 32, 33, something like that,

17  miles per hour.

18       Q.   Right.  You did a chart, it's on the

19  chart, and it shows that 32 miles per hour is

20  slightly more than 44 feet per second.

21       A.   Yes.

22       Q.   It's 45 point something feet per

23  second.

24       A.   Yes.  So I did that calculation

25  assuming free fall.

JACQUELINE KLAPP, CCR - (908) 782-0874

23

Fisher - By Mr. Caldwell

1            And then, of course, I had some

2   questions for Mr. Granat regarding how the vehicle

3   went over the bridge, whether there were

4   significant changes that we need to subtract from

5   free fall, you know, whether the--my understanding

6   is that as it goes over the bridge, part of the

7   truck remains in contact with the bridge as part

8   of it is going down.  Those sorts of things are

9   going to hinder complete free fall, but we're not

10  going to have a huge change in the speed.

11       Q.   Okay.  Can we agree on a nomenclature

12  device so that we're not talking at

13  cross-purposes?

14            I want to talk about the tractor

15  separately from the trailer.

16            Okay?

17            And so when you say the truck,

18  conversely, are we talking, then, about the two

19  units together?

20            I want to make sure when it comes out

21  of your mouth that I understand what you're

22  telling me.

23       A.   So let me rephrase what I just said

24  and use the nomenclature--

25       Q.   Give me an example right here on page

JACQUELINE KLAPP, CCR - (908) 782-0874

24

Fisher - By Mr. Caldwell

1   11, at the end of the paragraph, it says, "Thus,

2   the truck impacted the ground..."

3            So are you telling me that you're

4   talking about the tractor or you're talking about

5   the trailer or you're talking about both

6   components together?

7        A.   From my purposes, I would say the

8   tractor in this case.  That was most important to

9   me looking at Mr. Medina, and that's the part of

10  the vehicle he was in.  So we can say the tractor

11  there.

12            Whether the trailer's speed is

13  impeded because it hangs up on the bridge longer,

14  that's not something I looked closely into.  So we

15  could replace that with the tractor.

16       Q.   Above that, in the same paragraph,

17  you say, "Subsequently, the tractor-trailer

18  traveled over the edge of the bridge and fell

19  approximately 32 feet to the embankment below..."

20            So the 32 feet, then, is referring to

21  which component of the vehicle?

22       A.   That would be the tractor.  The

23  trailer, obviously, extends over a longer

24  distance, with the nose end being farther down the

25  hill and the tail end being higher up the hill.

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell                                    25

1  So I'd have to account for a greater variability

2  in height for the trailer.

3        But, again, the tractor is going to

4  be the focus of my interest in this case, since

5  that's where Mr. Medina was located.

6        Q    So your analysis begins with the

7  movement of the tractor-trailer unit on the Route

8  91 roadway.  Correct?

9        A    Yes.

10       Q    You did not yourself determine the

11 position of the tractor-trailer unit at whatever

12 you're considering to be point 1?

13       A    No.

14       Q    You're relying upon Mr. Granat for

15 that?

16       A    Correct.

17       Q    And so, again, just by way of

18 example, we're still on page 10, when you put

19 something in quotation marks, do you have a cross

20 reference somewhere in all of your material that

21 allows us to find where that quotation mark came

22 from, for example, when it says "'wet, icy, snow,

23 slush'"?

24       A    I do not.  That would be from the

25 police report.  So if we go back--

---

Fisher - By Mr. Caldwell                                    26

1        Q    I'm not asking you to find it at the

2  moment.

3        I just want to make sure I understand

4  your nomenclature, because I had the same sort of

5  discussion with Mr. Granat, that that is not a

6  complete sentence, that you're excerpting that

7  from a larger sentence.  Correct?

8        A    Correct.

9        Q    Okay.  And so it's not your practice

10 to show that when you excerpt something that you

11 use an ellipsis, the quotation mark, three

12 dots, then what you're quoting, three dots, and

13 then the quotation mark to indicate that you have

14 lifted it out?

15       A    I have this fight with people in my

16 office.  The MLA Handbook tells us don't do that,

17 never begin or end a quote with an ellipsis.  So

18 I'm a stickler for MLA guidance on that one.

19       Q    Okay.  Fine.  Just like there's APA

20 guidance for other things and--

21       A    Strunk & White also says not to do

22 that.

23       Q    Strunk & White, right.

24       And again, I just want to make sure

25 that we're talking about the same terminology for

---

Fisher - By Mr. Caldwell                                    27

1  purposes of this deposition.

2        Yaw is the angle of the vehicle in

3  reference to a plane.  So if you're the edge of

4  the road, and running across the front of your

5  chest there, and we put something at an angle

6  towards that edge, that's yaw?

7        A    Yes.  Yaw is rotation in a horizontal

8  plane.

9        Q    In a horizontal plane.  Okay.

10       And then pitch is what?

11       A    Pitch is movement up or down along

12 the long axis of the vehicle.  So we sometimes

13 describe it as nose up or nose down or tail up or

14 tail down.

15       Q    Okay.  And the last rotation is roll?

16       A    Is roll, which would be rotation

17 along the long axis of the vehicle.  If we drew an

18 axis down the length of the vehicle and then

19 rolled about that axis, that would be roll.

20       Q    Do you believe that you have an

21 understanding of how the guide rail, the guardrail

22 system was constructed on the road deck on 91?

23       A    Not in a.

24       Q    I'm not talking about--

25       A    Not in a very detailed

---

Fisher - By Mr. Caldwell                                    28

1  understanding.  Just from Mr. Granat.

2        Q    Let's talk about a section, as if we

3  were standing and looking through it.

4        So if we were looking at it in a

5  section view, on the one side would be the rails

6  themselves.  Correct?  The beams of the rails

7  running horizontally and parallel to road.

8  Correct?

9        A    Correct.

10       Q    Okay.  And as we move through the

11 section, the next thing behind that would be the

12 posts that are holding the beams of the rails.

13 Correct?

14       A    Correct.

15       Q    And what do you understand to be

16 third?

17       A    Past that, the photos show what I'll

18 call a chain-link fence--

19       Q    Okay.

20       A    --strung up on steel posts and rails,

21 we see large sections of that chain-link fence--

22       Q    Before we get to what we see in the

23 pictures--

24       A    Okay.

25       Q    --I just want to understand what's

Fisher - By Mr. Caldwell                                   29

1   third.

2           Is the chain-link third, or is the
3   post and rails that hold the chain-link third and
4   the mesh is fourth?

5       A    I'm not sure.

6       Q    Do you have a sense of how close
7   these components are from the face of the section
8   to the end of the section?

9           So as we go through it from the rail
10  in front to the post to then either another post
11  or the mesh or the mesh and the post, how much
12  distance are we talking about?

13      A    I have not tried to quantify that
14  specifically. Looking at the photos, it looks
15  like it's within a few feet from the bridge rails
16  to that fence section.

17      Q    What do you understand the function
18  of the mesh fence to be?

19          And when I'm talking about the mesh
20  fence, I'm talking about the mesh and the post and
21  rails that hold that as opposed to the post and
22  the beams that are the guardrail system.

23      A    And I don't know that specifically.
24  My guess might be to prevent debris from falling
25  over down into the road below. That's not

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                                   30

1   something I've looked into or tried to research.

2       Q    Well, then, of these four components,
3   it is true, is it not, that the only things that
4   are anchored to the ground are the posts that hold
5   the rails of the guardrail system. Correct?

6       A    Anchored to the bridge deck.

7       Q    Anchored to the curb.

8       A    Yes. I mean, obviously, everything
9   is way above the ground. But yeah, yes.

10      Q    So the fence, the chain-link fence,
11  as you're generically calling it, is bolted onto
12  the back of the posts that are anchored to the
13  ground?

14      A    I would have to confirm that
15  specifically, but that sounds right--

16      Q    Well, wouldn't it make a--

17      A    --from the photos.

18      Q    Wouldn't it make a difference in
19  terms of the mechanics of what's happening to the
20  truck and what's happening to Mr. Medina inside
21  the truck as to whether or not how things are
22  anchored to the ground?

23      A    I know that it was torn loose, large
24  sections were torn loose and pulled to the ground
25  with the vehicle, and that fence is not,

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                                   31

1   regardless of whether it's anchored to the bridge
2   deck or anchored to the rails or anchored to the
3   post, it's not going to hold the truck--

4       Q    I agree.

5       A    --up on the deck.

6           And so it's not going to make a huge
7   difference one way or the other. That fence is
8   coming down when the tractor-trailer comes through
9   it.

10      Q    Okay. The fence is coming down as
11  the posts are coming down. Correct?

12      A    That's my understanding, yes.

13      Q    Well, is it fair to describe it in
14  effect, then, as if it's being pulled off its
15  foundation one post at a time as the vehicle is
16  going through it from south to north?

17      A    That sounds like a good possibility
18  of what happened. Again, I have not researched
19  that specifically.

20      Q    Did you develop any evidence to
21  indicate one way or the other whether or not the
22  fence came down as one long section or it came
23  down in pieces?

24      A    I have not looked at that one way or
25  the other.

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                                   32

1       Q    In your summary section, was it your
2   intent to encapsulate all of the material facts
3   that any one of these other investigators,
4   witnesses put down in their writings, or did you
5   selectively pick information?

6       A    It was not my intent to encapsulate
7   everything. It was my intent to lay out the
8   pieces that I would then build my biomechanical
9   analysis on.

10      Q    One of the issues that you built your
11  biomechanical analysis on was whether or not Mr.
12  Medina was restrained or not restrained in the
13  driver's position. Correct?

14      A    I was interested in his restraint
15  status just because that's going to affect the
16  kinematics. So I was looking at whether there was
17  anything about his injuries in the kinematics of
18  the vehicle that could give us insights into
19  whether he was restrained in the vehicle or not,
20  yes.

21      Q    Restrained or not, we know what the
22  resulting injuries were that Mr. Medina's body
23  suffered. Correct?

24      A    We certainly know what the injuries
25  were, and those helped to provide us some

JACQUELINE KLAPP, CCR - (908) 782-0874

33

Fisher - By Mr. Caldwell

1  information on whether he was or he was not
2  restrained, yes.
3      Q    Well, the recitation of the injuries
4  that Mr. Medina's body sustained are the result of
5  Dr. Bundock's autopsy.  Correct?
6      A    Correct.
7      Q    And you're not a medical doctor.
8  Right?
9      A    I'm not.
10      Q    Okay.  And so you're in no position
11  to question or challenge her findings from a
12  medical point of view.  Correct?
13      A    Absolutely not.
14      Q    So you're not saying that there were
15  any more rib fractures, for example, than what she
16  identified.  Correct?
17      A    Correct.
18      Q    And you're not saying that there were
19  any more long bone fractures than what she
20  identified.  Correct?
21      A    Correct.
22      Q    And for purposes of your analysis,
23  you're presuming that she is a competent
24  individual and knows her field of expertise.
25  Correct?

JACQUELINE KLAPP, CCR - (908) 782-0874

34

Fisher - By Mr. Caldwell

1      A    She appears very competent,
2  absolutely.
3      Q    So when she says she felt that there
4  was a flash fire, you accept that as being true.
5  Correct?
6      A    I'm not sure if that was a medical
7  opinion, but I have no reason to dispute that.
8      Q    Well, she was opining on cause of
9  death.  Correct?
10      A    I would have to take a look at where
11  she said flash fire and in what context.
12      Q    The general question is, she was
13  opining on cause of death.  Correct?
14      A    I think generally she was opining on
15  cause of death, yes.
16      Q    Are you opining on cause of death?
17      A    No, I'm not.
18      Q    Are you opining on survivability of
19  Mr. Medina at the end of the accident sequence
20  when the vehicle comes to rest?
21      A    I think there are parts of my
22  analysis which certainly provide insight on
23  survivability.  So I'm evaluating the severity of
24  his injuries, which then relate to survivability.
25      Q    Is it your opinion that Mr. Medina

JACQUELINE KLAPP, CCR - (908) 782-0874

35

Fisher - By Mr. Caldwell

1  survived the crash to the point of where the
2  vehicle, the tractor-trailer is at its final
3  position of uncontrolled rest?
4      A    I think it's unclear.  And I've done
5  some analysis to back that up, basically.
6      Q    Did you consider the anecdotal
7  evidence that Mr. Medina was heard by witnesses to
8  be screaming?
9      A    I saw the evidence I believe in the
10  police report, testimony of a Catherine
11  Seminatore, who said she thought she heard
12  screaming, and of a Mike Delesney, who said he
13  heard two distinct voices screaming.  I did
14  consider that evidence.
15      Q    If, in fact, their recitation is
16  true, then it would be fair to conclude that Mr.
17  Medina survived the accident.  Correct?
18      A    If Mrs. Seminatore's statement was
19  true and she heard--and what she thought she was
20  screaming was indeed screaming, then it would
21  indicate he survived.
22          In terms of what Mr. Delesney heard,
23  we would have to account for a second person.
24          So when you say their statements,
25  referring to both, we would have to account for a

JACQUELINE KLAPP, CCR - (908) 782-0874

36

Fisher - By Mr. Caldwell

1  little bit more for Mr. Delesney's statement to be
2  true.
3      Q    Well, we have to account for it in
4  the context of what's going on at the time that he
5  arrives at the scene and the tractor is fully
6  engulfed in flame.  Correct?
7      A    Correct.
8      Q    By the way, do you have a fixed--do
9  you think you have a fix on the time line of
10  events here?
11      A    I have a general understanding of the
12  time line.  I don't know whether you mean second
13  by second in terms of time line--
14      Q    No, I'm not saying--
15      A    --but I do, the order in which things
16  happened.
17      Q    Who do you understand to be the first
18  person at the scene of the crash on the embankment
19  by Williams Street?
20      A    I was looking at this the other day,
21  and I forget which of the police officers said, I
22  was the first one on the scene.  There may have
23  been other witnesses there--
24      Q    Well, that's not what I asked.
25          I asked you, who do you understand to

JACQUELINE KLAPP, CCR - (908) 782-0874

---

**Fisher - By Mr. Caldwell** 37

1  be the first person, regardless of their title,

2  rank or function, who do you understand to have

3  been first at the scene at the embankment off of

4  Williams Street?

5      A    I don't know.

6      Q    You do understand, do you not, that

7  Trooper Loyzelle says that it took him 15 minutes

8  from the time that he got the call to the time

9  that he showed up on the scene on the road deck?

10  Correct?

11      A    Yes.  I saw that.

12      Q    Okay.  And I presume that you also

13  understand that the first person among first

14  responders who appeared to have arrived on the

15  scene below was the assistant fire chief?

16      A    Bucossi.

17      Q    Well, Mr. Bucossi is the fire chief.

18      A    Oh, I'm sorry.

19      Q    The assistant.

20      A    Okay.  Yeah.

21      Q    Yes.  Okay.

22      And so do you know how long after the

23  truck came to rest that the assistant fire chief

24  shows up on the scene?

25      A    So Mr. Loyzelle--

---

**Fisher - By Mr. Caldwell** 38

1      Q    Trooper.

2      A    Trooper Loyzelle said that he was the

3  first responder official on the scene.  So if it

4  took him 15 minutes to arrive, it would be longer

5  than 15 minutes.

6      Q    And you saw that Dr. Bundock opined

7  that she believed that Mr. Medina survived for

8  maybe one or two minutes before he died from the

9  effects of the fire.  Correct?

10      A    I saw that, yes.

11      Q    So, then, if Chief Bucossi had been

12  asked whether or not he heard any screaming, he

13  would have been on the scene way too late to make

14  that observation one way or the other.  Correct?

15      A    Correct.

16      Q    In addition to which the chief said

17  that he was setting up a security perimeter and

18  never really approached the vehicle.  Correct?

19      A    Correct.

20      Q    And the same would be true for the

21  assistant fire chief.  He's showing up well after

22  Mr. Medina has expired.  Correct?

23      A    That would be my understanding, yes.

24      Q    By the way, when you viewed the dash

25  CAM, did you make note of the timing, of the times

---

**Fisher - By Mr. Caldwell** 39

1  that were stamped on the video?

2      A    I didn't pay any attention to that.

3      Q    Let me digress for a moment.

4      Prior to today, have you spoken to

5  anybody else about Mr. Granat's testimony?

6      A    Yes.  I spoke with Mr. Cook.

7      Q    Did you review a transcript?

8      A    I have reviewed parts of his

9  transcript that I received yesterday.  I didn't

10  get through the whole thing.

11      Q    You didn't read all 236 pages?

12      A    I did not.

13      Q    So your knowledge now today includes

14  whatever information or some of the information

15  that Mr. Granat provided at his deposition?

16      A    Yes, some of that.  I tried to search

17  for things that I thought might be important for

18  me.  I tried to focus my limited time to review

19  what I hoped would encapsulate the key parts.  I

20  haven't seen it all, but hopefully I got most of

21  the important stuff.

22      Q    Was there any particular portion of

23  Mr. Granat's transcript that you recall jumping

24  out at you?

25      A    No.  I thought it was pretty

---

**Fisher - By Mr. Caldwell** 40

1  consistent with what he had presented last, I

2  believe, April.

3      Q    You have in your report on page 5 for

4  Christopher Loyzelle--and tell me if I read this

5  correctly, please--"According to the testimony of

6  Police Officer Christopher Loyzelle, he arrived as

7  the first responding officer at the scene

8  approximately fifteen minutes after the incident

9  had occurred.  Officer Loyzelle was taking

10  photographs of the minivan/hearse when he heard

11  quote 'a mini explosion of tanks underneath the

12  bridge.'"

13      Did I read that correctly?

14      A    You did.

15      Q    Where did you derive the information

16  from that Trooper Loyzelle was taking photographs

17  of the minivan/hearse?

18      A    That would come from his deposition.

19      Q    And so if he arrived 15 minutes after

20  the call and the call he got was at approximately

21  7:28 in the morning, he arrives no earlier than

22  7:43.  Correct?

23      A    Correct.

24      Q    And so how much after that are you

25  saying he was standing there by the minivan and

## Page 41

Fisher - By Mr. Caldwell

taking photographs?

A    I haven't quantified that.

Q    Well, you do recall reviewing the dash cam.  Correct?

A    I recall that I believe we had the dash cam video when we were here and, as I said, Kevan Granat was very interested in that for his analysis.  I was not so much for mine.  So I'm not sure to what detail I reviewed the dash cam video.

Q    Well, you wouldn't have included this particular quotation unless you thought that it had some bearing on your ultimate analysis.  Correct?

A    Well, the quotation was not from the dash cam video but from his deposition.

Q    I understand that.  But you put in here, did you not, "'a mini explosion of tanks underneath the bridge'" because you were going to then use that fact as part of your analysis.  Correct?

A    I thought that helped to establish the big picture of what was going on here.  He arrives on the scene, he hears explosions, he noticed the smoke, and he sees that there's a fire

JACQUELINE KLAPP, CCR - (908) 782-0874

## Page 42

Fisher - By Mr. Caldwell

with a truck below.

Q    But that's incorrect.  That's not what happened.

We know that the trooper arrived on the scene.  Right?

The first thing he does is he arrives on the scene.  Correct?

A    Okay.

Q    Okay.  And then what's the next thing that he does?

A    Again, I don't have a very long time line drawn out here for Trooper Loyzelle.

Q    Well, don't you recall that he testified that he was concerned about the traffic backing up on the bridge and about whether or not the bridge could hold the weight of all the vehicles?

A    That's right.

Q    And don't you also recall--

A    The structural integrity of the bridge.  I do recall that, yes.

Q    And so he wasn't immediately going to the minivan/hearse which was beyond the bridge and taking pictures.  He was trying to get all the other traffic off of the bridge.  Correct?

JACQUELINE KLAPP, CCR - (908) 782-0874

## Page 43

Fisher - By Mr. Caldwell

A    Correct.

Q    And so he spent some period of time that we can establish the details of the time line doing that.  Correct?

A    Correct.

Q    As a matter of fact, doesn't Trooper Loyzelle say in his deposition that he didn't even notice the tractor-trailer incident until after he had already gone and examined the minivan/hearse?  Correct?

A    I do remember reading that, yes.

Q    So it's fair to conclude that some period of time has passed before he starts taking pictures?

A    It makes sense, yes.

Q    It makes sense.  Okay.

So what did you attribute his description of the mini-explosions to be?

A    I did not make any attribution for those.  There's a fire--

Q    Right, there's a fire.

A    --below.  So--

Q    And there's 18 wheels on this vehicle between the tractor and the trailer.  Correct?

A    Yes.

JACQUELINE KLAPP, CCR - (908) 782-0874

## Page 44

Fisher - By Mr. Caldwell

Q    And you've seen pictures of the tractor and the trailer after the fire is out.  Correct?

A    Yes.

Q    And on the tractor, all of the tires are exploded; are they not?

A    They're certainly burned up.  I don't know whether they exploded or whether they were just consumed in the fire, but they're--

Q    Well, before they're consumed in the fire, the tires were on the rim, and the tires were encapsulating a volume of air, because that's what keeps the tires inflated.  Correct?

A    Correct.

Q    And so if the fire causes the air inside the tires to expand, you can end up with a series of mini-explosions from each of the 10 tires exploding over time?

A    You could, yes.

Q    Well, but you're not concluding that this mini-explosion is described in the fuel tanks, are you?

Let's do the converse.

A    No.

Q    Not at all.

JACQUELINE KLAPP, CCR - (908) 782-0874

45

Fisher - By Mr. Caldwell

1    A    Those kinds of things dealing with
2  the fire and what burned and the timing of that, I
3  should clarify, for time line purposes, that would
4  be left to Mr. Olson.  I have not reached any
5  opinions in that regard.
6    Q    Okay.  That's fine.  I just want to
7  know what your--if you put it in your report, I
8  presume that it has some bearing.
9         Let's talk about the power line.
10   A    All right.
11   Q    Is the presence of the power line an
12  essential element of your analysis of your
13  report?
14   A    I considered it, but no, it has no
15  particular bearing on my final opinions.
16   Q    All right.  So whether there was a
17  power line there or not has no bearing on your
18  analysis; is that correct?
19   A    Correct.
20   Q    And whether the road, as you recited
21  on page 6, under Albert Stringer, whether the road
22  was "'icing up in places'" is not relevant to your
23  analysis either?
24   A    No.
25   Q    On the same page, where you refer to

JACQUELINE KLAPP, CCR - (908) 782-0874

46

Fisher - By Mr. Caldwell

1  Corporal Marcoux's observations,' is your analysis
2  dependent upon the quotation that you have there
3  that says, "'in a jackknife position except [the
4  tractor and trailer] were disconnected'"?
5    A    To the degree that the final position
6  of the truck helps to establish how it moved, how
7  it was oriented when it struck the ground--
8    Q    How did it strike the ground?
9         I'm sorry.  I did that.  Your voice
10  dropped.  I thought you were finished, and I cut
11  you off.  I'm sorry.  Please continue with your
12  answer.
13   A    No problem.
14        To the degree that the orientation of
15  the vehicle striking the ground and the opinions
16  that Mr. Granat has given in that regard are
17  reflected in Corporal Marcoux's description of the
18  vehicle orientation, this was important just
19  because it helps to confirm and lay out the entire
20  scene, which is going to then lead into my
21  occupant kinematics analysis, I wouldn't have had
22  to have relied on Corporal Marcoux.  I could have
23  relied solely on Mr. Granat.  But that consistency
24  was helpful, and I have noted it there.
25   Q    When you recite here that "He

JACQUELINE KLAPP, CCR - (908) 782-0874

47

Fisher - By Mr. Caldwell

1  observed Mr. Medina's body in the cab's sleeper
2  area," since we're only talking about Corporal
3  Marcoux, you're referring to his observation?
4    A    Yes.
5    Q    And you're deriving that from having
6  watched the video where Corporal Marcoux is
7  walking around and he points at a pile of stuff on
8  the ground at one point and says, "This looks like
9  the body"?
10   A    So I did see that video where he says
11  that.  This summary would be of his deposition.
12        Now, of course, in his deposition
13  there is discussion of his handwritten--or of his
14  dictated notes from the video.  So, ultimately,
15  the source of that may have been the video, which
16  was then incorporated into the deposition, and
17  this summary of the deposition now includes his
18  finding of where the body was located.
19   Q    In the next sentence you say,
20  "Corporal Marcoux also captured on the video..."
21        So we know where the source is.  This
22  is only from the video that follows.  Correct?
23   A    Yes.
24   Q    "...blood and 'red matter' on the
25  piece of the fence that interacted with the

JACQUELINE KLAPP, CCR - (908) 782-0874

48

Fisher - By Mr. Caldwell

1  tractor-trailer and fell with the vehicle to the
2  hill below."
3         First of all, did I read that
4  sentence correctly?
5    A    You did, yes.
6    Q    The quotation for the words "'red
7  matter,'" where are you deriving that from?
8    A    That would have been--everything here
9  would have been from his deposition.  Whether that
10  was--whether the deposition transcript was quoting
11  something he had said verbally in the video,
12  again, because we're discussing the video here in
13  the deposition, I'm guessing that it's a quotation
14  brought forward from the video through the
15  deposition transcript.  But I was reading this
16  from the deposition transcript when I put that in
17  quotes.
18   Q    So are you relying upon his
19  interpretation that the fence interacted with the
20  tractor-trailer, or did you arrive at that
21  conclusion independently?
22   A    This would all be summarizing
23  Corporal Marcoux's deposition at the time.  So at
24  this part of the report, it would not be my
25  interpretation, but what he described in his

JACQUELINE KLAPP, CCR - (908) 782-0874

49

Fisher - By Mr. Caldwell

1  deposition.

2      Q    And so would that also be true of

3  Albert Stringer and Elizabeth Bundock, that the

4  quotations that you have in your report are

5  derived from their deposition testimony?

6      A    Correct.

7           In fact, if we go back to the top of

8  page 5, there's a heading that says "Deposition

9  Testimony"--

10     Q    Right.

11     A    --and then a subheading for each of

12  people.  So anything quoted in here or paraphrased

13  and, therefore, not in quotations would all be

14  sourced from their deposition transcripts.

15     Q    Okay.  So everything from the top of

16  page 5 through almost the bottom of page 8 is all

17  derived from deposition testimony.

18     A    Correct.

19     Q    For Dr. Bundock, you do recall

20  reading in her deposition that she concluded that

21  the injuries that she found, the rib fractures,

22  lacerated liver, that neither individually nor

23  collectively would have been sufficient to have

24  caused Mr. Medina's death.

25          Do you recall that?

50

Fisher - By Mr. Caldwell

1      A    I believe her testimony was that,

2  absent the fire, his injuries would have been

3  fatal.  I'm not sure if the specific collection of

4  injuries we're talking about, individually or

5  collectively, include everything that she

6  summarized in her overall opinion.

7           Let me take a quick look.

8           (Pause.)

9      Q    Where are you looking, so I can

10  follow along?

11     A    I'm sorry.  I'm on pages 7 and 8 of

12  my report.

13          "She...believed that Mr. Medina

14  would likely have died from the blunt trauma his

15  body received in the accident."

16          I have that in the first--I believe

17  it's the first full paragraph, a short paragraph,

18  on page 8.

19          If you like, I can take a look and

20  probably source that back to her testimony.

21     Q    Well, let's go to page 102.

22          You've got page 102?

23     A    I don't have the full transcript

24  here.

25     Q    Okay.

51

Fisher - By Mr. Caldwell

1      A    If you can show me afterwards.

2      Q    Sure.

3           Well, I will represent to you that

4  I'm reading from Dr. Bundock's deposition,

5  beginning, actually, at page 103, where I'm the

6  questioner.

7           "So let's begin where perhaps we left

8  off here on the final autopsy report with the

9  "Final Pathological Diagnoses," right?  Is 1(A)

10  in and of itself sufficient to have caused Mr.

11  Medina's death, in your opinion?"

12          And you understand 1(A) is her

13  listing of the various injuries.  Correct?

14     A    Yes.

15     Q    And then Ms. Vincent, who was

16  representing the doctor, said, "Again, I'm just

17  putting the objection on that she put the cause of

18  death as 'blunt trauma of torso and thermal

19  injuries.'  You are getting more into the doctor's

20  expertise.  That's--I'm just putting that on the

21  record."

22          I responded, "Are you--are you

23  directing your--your doctor not to answer?  I need

24  to know, please.

25          "MS. VINCENT:  No, I'm--

52

Fisher - By Mr. Caldwell

1          "MR. CALDWELL:  Okay.  Your

2  objection's noted.

3          "QUESTION:  Thank you, Doctor, would

4  you please answer the question?

5          "ANSWER:  1(A) in and of itself may

6  not be sufficient to cause death."

7          Do you recall reading that?

8      A    And I see 1(A) in her autopsy report

9  is laceration of the abdominal wall--

10     Q    Right.

11     A    --with partial evisceration of

12  intestines--

13     Q    Right.

14     A    --with 1(B) through (F) being

15  additional blunt trauma.

16     Q    Right.  So the next question is:

17          "QUESTION:  Okay.  How about 1(B),

18  in and of itself sufficient to cause Mr. Medina's

19  death?

20          "ANSWER:  If you'd like, we can speed

21  this up by saying each of those, (A) through (F),

22  in and of themselves, in isolation, may not be

23  sufficient alone to cause death."

24     A    Might not be sufficient to cause

25  death, each of them in isolation.

Fisher - By Mr. Caldwell

Q    Each of them in isolation.

Are you concluding differently?

A    No, I'm not.

Q    And 1(A) is which injury that you refer to?

A    1(A) in her final report of autopsy is laceration of the abdominal wall, with partial evisceration of intestines.

Q    Laceration is different than puncture. Right?

A    Laceration is a tearing of tissue.

Q    Right.

A    Puncture can cause a laceration.

Q    Okay. But generically speaking, when we talk about laceration, we're not talking about puncture wounds?

A    Laceration would be a broader category. Puncture can be a subset of lacerations. Punctures can cause lacerations or have lacerations as part of their overall wound.

Q    And we also have crushing injuries. Correct?

A    Yes.

Q    You didn't include that the 1(A) injury was the result of a crushing injury, did

Fisher - By Mr. Caldwell

you?

A    No.

Q    Did you conclude that it was the result of a laceration?

A    Well, 1(A) is a laceration.

Q    Okay. Well, what is the object you're saying is the cause of the--sorry. Let me back up.

What are you saying caused that laceration?

A    I understand that this was caused, in my opinion, by the post and fence, from the chain-link fence, which caused this injury to--which caused the penetrating injury, a laceration of the abdominal wall and the evisceration of intestines through that opening in the abdominal wall.

Q    And what facts are you relying upon to arrive at that conclusion that it's the fence post that caused this 1(A) injury?

A    There are a couple of different things.

One is that we have this tissue and blood identified by Corporal Marcoux in his video on the fence. We can see it in the video. It

Fisher - By Mr. Caldwell

certainly appears to be tissue and blood. It's still very red. It's still, based on my experience, dealing with tissue and blood. It doesn't stay red very long. After it's been exposed and oxidizes in the air, it starts to get brown and dirty. So it looks like it's still relatively fresh.

Q    What does that mean, "relatively fresh"? One minute? Five minutes? Ten minutes?

A    Within a few hours.

Q    Within a few hours.

A    Yeah. It's not something that was--it's not something that's been on the fence for a couple of days, and the fence hasn't been on the ground for a couple of days at the location where Corporal Marcoux identified this red matter and blood on it.

So we have this tissue, which is within a few hours of being fresh on this fence post, which is at a distance from the truck. The cab is separated from the chassis, to the right side of the chassis. On the left side of the chassis we have this piece of fencing with tissue on it.

The only identifiable source of that

Fisher - By Mr. Caldwell

tissue is Mr. Medina. So now we have physical evidence of tissue on a piece of fence, which is separated from the truck by a distance, and on top of that is not charred or damaged by the fire in any way.

Q    Why is all this important to your analysis?

If it's not a fatal injury, what difference does it make?

A    Well, Dr. Bundock said none of--any of these in isolation might not be sufficient to cause death. So she has not ruled any of these out as fatal injuries, just to clarify that point first, in isolation.

But, furthermore, these kinds of injury when you have--once you start to stack up serious injuries combined, you start to increase the risk of fatality. So--

Q    Well, that's what the AIS says.

A    So I can't--or parts of the AIS, yes. And so even if we go through--there's the proverbial death by a thousand paper cuts. If we rule out each of those paper cuts as nonfatal and we move through all thousand of them having ruled each one out, then we have no death. But, as we

57

Fisher - By Mr. Caldwell

1  know, you can have cumulative damage.

2          And so I can't just say, Well,

3  nonfatal, so let's skip that, it's not important

4  to my analysis, and move on.

5          I think this is an important part of

6  an analysis, because it shows two things.  It

7  shows that we have penetration of the cab and of

8  Mr. Medina's body by this fence post, which

9  collects tissue and then gets stripped back out of

10 the truck and comes to a final rest at a distance

11 from where Mr. Medina's body came to rest.

12     Q    But the only persons--let me back

13 up.

14          Corporal Marcoux is pointing out and

15 he says he thinks it looks like blood.

16          Other than Corporal Marcoux, among

17 the professionals that are representing working

18 for the defendant here, who came to the conclusion

19 that, in fact, it was blood and not something that

20 Corporal Marcoux just misidentified?

21          Did you arrive at that conclusion

22 independently that it was blood and body matter,

23 independently of what Corporal Marcoux says?

24     A    I took a look, and I certainly agree

25 with his assessment.

JACQUELINE KLAPP, CCR - (908) 782-0874

58

Fisher - By Mr. Caldwell

1      Q    Well, at the nine-hour meeting, who

2  came up with--whose analysis turned on the fact

3  that there was blood and matter on the fence?

4      A    That would be my analysis.

5      Q    Your analysis.

6      A    Yes.

7      Q    And so your analysis of the blood and

8  matter on the fence is not in any way related to

9  which way the vehicle was turning as it came off

10 the road?

11     A    Well, putting together when that

12 interaction occurred needed to be matched up with

13 the kinematics, the vehicle dynamics that I'm

14 getting from Mr. Granat.  But we certainly see

15 tissue on that fence which we know is coming

16 from--it would be a stretch to attribute it to

17 anything other than Mr. Medina.  So we know that

18 that has penetrated the cab and Mr. Medina at some

19 point.

20          Now, putting together how and when

21 requires some understanding of the vehicle

22 dynamics which I got from Mr. Granat.  But I came

23 to the meeting that day saying this penetrated the

24 cab and Mr. Medina's body.

25     Q    Would your analysis of what you saw

JACQUELINE KLAPP, CCR - (908) 782-0874

59

Fisher - By Mr. Caldwell

1  on the Medina vehicle depend at all on which way

2  the vehicle was turned as it left the road deck?

3      A    I think I would still conclude

4  that--I would be forced to conclude that this

5  piece of fence penetrated the cab and penetrated

6  Mr. Medina's body, the fact that the truck, his

7  right side leading going through those rails, and

8  that his wound is to the right side of his body,

9  and knowing that he's going to be moving towards

10 the right side of the vehicle.  And when we look

11 at evidence of the vehicle on the ground, we see

12 that the cab is separated from the chassis in a

13 way that we have the ash, where it continues to

14 burn on the ground, demarcates the left side of

15 the truck pretty well, but over on the left side

16 we kind of have scattered ash, probably from

17 burning fiberglass structures, leading all the way

18 back to the chassis.

19          All of those things, all of those

20 things together help to build this consensus of

21 the truck going right side leading through these

22 rails, penetration of the right side of the cab, I

23 hadn't concluded on the day of our meeting that it

24 was--that the fence had penetrated the right side

25 of the cab.  I knew it had penetrated the cab and

JACQUELINE KLAPP, CCR - (908) 782-0874

60

Fisher - By Mr. Caldwell

1  Mr. Medina.

2          Understanding Mr. Granat's analysis

3  of how the vehicle was oriented and looking at the

4  physical evidence of where the ash field was,

5  where the debris field was on the ground certainly

6  matched up the pieces very well, that we have the

7  right side of the truck coming into this fence,

8  the fence penetrating the right side of the cab,

9  coming into Mr. Medina, and then stripping back

10 out as the truck fell and coming to rest at a

11 distance from where the cab and the chassis were.

12     Q    You understand that plaintiff's

13 theory is that it was the left side of the tractor

14 that was leading over the edge.  Correct?

15     A    That's my understanding, yes.

16     Q    Okay.  Assume that that's true,

17 hypothetical question, assuming that that's true,

18 tell me when in the course of the vehicle going

19 off the road that this fence post penetrates the

20 cab, pierces Mr. Medina's body, exits his body,

21 and then gets separated from where his body ends

22 up.

23     A    It certainly becomes a much more

24 difficult assignment to match those pieces up.  So

25 I haven't thought that through.  If I'm--if I'm

JACQUELINE KLAPP, CCR - (908) 782-0874

61

Fisher - By Mr. Caldwell

1  committed, as I am, to this being blood and tissue

2  from Mr. Medina on this post, and that's

3  associated with the abdominal laceration, I

4  haven't done the analysis to say, Well, now I have

5  to get that fence into the truck and putting Mr.

6  Medina's body with the truck oriented together.  I

7  haven't--I haven't done that analysis.

8        Q     But that also presupposes what you're

9  seeing is blood and body matter and not something

10 else.  Correct?

11       A     Yes.  As I said, I'm committed to

12 that finding.

13       Q     You're committed to that finding.

14 But if it's not blood and it's not body matter,

15 then that analysis is wrong.

16       A     Yes.

17       Q     It has to be wrong.

18       A     So that finding is wrong, that

19 finding that it's blood and tissue on the fence.

20 And now we also have to come up with an

21 alternative mechanism for the abdominal laceration

22 and the intestinal evisceration.  So we're left

23 with--we're left with two holes now.

24       Q     Okay.  There was a trained medical

25 person at the scene shortly after the accident,

JACQUELINE KLAPP, CCR - (908) 782-0874

62

Fisher - By Mr. Caldwell

1  the deputy ME.  Right?

2        A     That's my understanding, yes.

3        Q     Did you see any indication that

4  Corporal Marcoux or anybody else brought this,

5  quote, blood and body matter material to the

6  attention of the deputy ME?

7        A     I didn't see that.

8        Q     Is there anything in the file that

9  demonstrates that a sample was taken of the

10 material off of the fence?

11       A     Not that I saw.

12       Q     Is there anybody else among all of

13 the other troopers, first responders, medical

14 examiners who agree with Corporal Marcoux?

15       A     I didn't see that anyone else

16 noticed--

17       Q     Well, didn't--

18       A     --to be in a position to agree or

19 disagree.

20       Q     Well, didn't Corporal Marcoux

21 describe his function as being the person who was

22 walking around and documenting things so that

23 later the accident reconstructionist and other

24 people could comb through his video and try to

25 figure out what really happened?

JACQUELINE KLAPP, CCR - (908) 782-0874

63

Fisher - By Mr. Caldwell

1        A     Yeah.  And, unfortunately, that

2  appears not to have happened.  No one commented on

3  it one way or the other.

4        Q     So either nobody else reviewed

5  Corporal Marcoux's video and it just went into the

6  archives and nobody else gave a damn about doing

7  an analysis.  That's one choice, right, going down

8  the decision tree?

9              One choice is Corporal Marcoux says

10 that he thinks it's blood and then it disappears

11 into oblivion.  Correct?

12       A     And maybe not so much because no one

13 gave a damn about doing an analysis because it was

14 just an oversight.  That's--

15       Q     Okay.  The other choice is that

16 somebody else reviewed it and disagreed with him.

17 Correct?

18       A     Yes.  So I didn't see any indication

19 of disagreement in the same way that I saw no

20 indication of agreement.  I just saw no mention of

21 it by anyone else.

22       Q     There's no mention that anybody else

23 actually reviewed Corporal Marcoux's video.

24 Correct?

25       A     At least not that part of it.  I

JACQUELINE KLAPP, CCR - (908) 782-0874

64

Fisher - By Mr. Caldwell

1  didn't see anyone, again, agreeing or disagreeing

2  or even mentioning that Corporal Marcoux had

3  documented this.

4        Q     And so you're also assuming that the

5  bowel evisceration is a demonstration of premortem

6  injury.  Correct?

7        A     Yes.

8        Q     And that the only source for that

9  injury is premortem.  Correct?

10       A     Yes.

11       Q     In your entire professional

12 experience, you have no other knowledge that would

13 lead to another alternative explanation of that

14 injury?

15       A     Where it is located on the side of

16 his--

17       Q     Yes.

18       A     Through the transverse and the--the

19 layer of transverse abdominal wall muscles and two

20 layers of oblique muscles?

21       Q     Right.

22       A     No.

23       Q     You have never read or heard anything

24 at all that would indicate that that is the result

25 of fire damage to the body?

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell                65

1     A    There have certainly been bowel

2  herniations, not through the thick triple layer of

3  transverse wall muscles.

4     Q    You're absolutely certain about that?

5     A    If you have a paper, I'd certainly be

6  happy to take a look, but I've seen these kinds of

7  bowel herniations.

8     Q    I never thought you were going to

9  ask.

10     Have you ever seen the Atlas of

11  Forensic Pathology?

12     A    Not that one.

13     Q    Not that one.

14     So Atlas of Forensic Pathology, by

15  Joseph A. Prahlow, P-r-a-h-l-o-w, and Roger W.

16  Bayard, B-a-y-a-r-d--I don't want to mangle these

17  gentlemen's names--by Humana Press, and Mr.

18  Prahlow is from the Indiana School of Medicine at

19  Notre Dame, and Mr. Bayard is from the Medical

20  School at the University of Adelaide in

21  Australia.

22     And in this textbook, one of the

23  sections is Section 19, entitled "Burns and

24  Fire-Related Deaths," beginning at page 753.

25     So, on this particular page, 757,

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                66

1  there's a photograph among the other evidence

2  that's very similar to the one that appears in

3  this book of the head, with the dentition, with

4  the teeth.  Correct?

5     A    Yes, except that the calvarium is

6  intact in the text book.

7     Q    I said "similar," yes.

8     Actually, I can't do this upside

9  down.

10     By the way, was Mr. Medina's body

11  found in a prone or supine position?

12     A    Prone.

13     Q    And who made that finding?

14     A    I noted that myself--

15     Q    This is the medical examiner.

16     A    --in the photographs.

17     Q    Right.  But the person who recorded

18  that information was the assistant medical

19  examiner.

20     A    Okay.

21     Q    I'm still looking for the other one.

22     On page 781, this photograph is more

23  similar to the photograph from the scene where the

24  calvarium is missing.

25     A    Correct.  From the part of the

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                67

1  calvarium that we can see, yes.

2     Q    Right.  And that is considered a

3  usual and common fire-induced postmortem condition

4  of the body?

5     A    Well, I would back up to say there

6  are studies that show how long it takes for

7  different parts of the body to burn, and primarily

8  done during cremations where they have

9  investigated how long it takes for different parts

10  of the body to disintegrate and that crematory

11  temperatures of 1,100 to 1,500 degrees to turn the

12  calvarium to ash requires 30 to 45 minutes.

13     So this particular case had a fire

14  that went on for a pretty long period of time.

15  The firemen did not want to approach it because of

16  the live power line.  So the fire burned longer

17  than it might have burned in a lot of cases.

18     So when you say a usual circumstance,

19  I would say maybe a usual circumstance is a very

20  hot fire that burns for 30 to 45 minutes.

21     Q    Right.  Well, that's what Dr. Bundock

22  described, a flash fire with a hydrocarbon base

23  being diesel fuel, and we all know that the fire

24  was allowed to burn for 30 or 40 minutes, and the

25  fire company just stood by protecting their own

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                68

1  self-interests, and, arguably, not a bad thing to

2  do, and just allowed the fire to rage.  Correct?

3     A    Well, again, it was 30--given that

4  the fire burned for 30 to 45 minutes, that finding

5  is consistent.

6     Q    And so on page 775, figure 19.37, it

7  says, "A portion of the intestines protrudes from

8  a thermally-induced defect in the abdomen"; does

9  it not?

10     A    I'm trying to orient where we are.

11     Q    Please just start with that's what

12  the photograph is entitled and I read the

13  narrative description of the photograph

14  correctly.

15     A    It does, yes.

16     Q    Thank you.

17     Would you care to reconsider your

18  opinion that the only source of this laceration on

19  the right side of Mr. Medina's body was from the

20  fence only and nothing else?

21     A    So now we have another way of

22  accounting for how we could possibly get the

23  injury.  So that's part one.

24     Q    Well, all right, but do you agree

25  with--

JACQUELINE KLAPP, CCR - (908) 782-0874

1    A    Another hole we need to fill is we
2  need to come up with an alternative source for the
3  tissue on the fence.
4    Q    One hole at a time.
5         All right?
6    A    Okay.
7    Q    All right.  So you agree now that you
8  could have a postmortem-induced evisceration of
9  the bowel based on what we've seen in this
10 textbook?
11   A    Yes.
12   Q    So, then, your conclusion in your
13 report that the only way that this could have
14 happened is your version of events is incorrect?
15   A    Well, let me back up again and say--
16   Q    No, no, don't back up.  Answer the
17 question.
18   A    No, that's incorrect.
19   Q    Let's find in your report where you
20 conclude that.
21        On page 12, the second paragraph, and
22 correct me if I read it improperly, "Mr. Medina
23 also had a large laceration of his right abdominal
24 wall with partial evisceration of the intestines."
25        Did I read that correctly?

1    A    Yes.
2    Q    The next sentence says, "This injury
3  was caused by a section of woven mesh fence and a
4  steel fence post, which penetrated the cab of the
5  tractor and Mr. Medina's body during the truck's
6  fall from the bridge."
7         Did I read that correctly?
8    A    Yes.
9    Q    I know there's another reference in
10 your report about this.
11   A    Same paragraph, continuing down.
12   Q    Yes.  Thank you.
13        As a matter of fact, I started that
14 before.  So, more in the middle of the paragraph
15 it says, "The presence of this 'blood and matter
16 on fence' as identified by Cpl. Marcoux, which was
17 clearly not charred like the rest of Mr. Medina's
18 body and was located remote from the cab,
19 indicates that the fence penetrated both the cab
20 and Mr. Medina's body at some point during the
21 fall from the bridge, but separated from his body
22 and cab prior to final rest on the embankment."
23        Did I read that correctly?
24   A    Correct.
25   Q    And you continue, "Although several

1  charred 'open' wounds were caused postmortem by
2  the fire, the only open wound to Mr. Medina's body
3  clearly identifiable as premortem is the large
4  abdominal tear and intestinal evisceration,
5  associating this penetrating injury most closely
6  with the tissue Corporal Marcoux identified on the
7  fence."  Correct?
8    A    Yes.
9    Q    So back to four or five questions
10 ago, you concluded that the only way that this
11 injury could have happened was premortem by the
12 fence penetrating the cab, penetrating Mr.
13 Medina's body, exiting his body and ending up on
14 the ground on the opposite side from where the
15 body was found.  Correct?
16   A    Yes.
17   Q    Yes.
18        So we still have the one hole.
19        So there is another medically
20 accepted and recognized alternative to your theory
21 of how that injury occurred.  Correct?
22   A    Yes.
23   Q    So what's the other hole you want to
24 fill?
25   A    We have to put the tissue on the

1  fence.
2    Q    Tissue on the fence.
3         Well, of course, we have to
4  presuppose that it's tissue.  And so if it's not
5  tissue, then I don't have to put it there.  I
6  don't have to explain tissue.
7         So other than your visual
8  identification of this photograph--
9    A    In Corporal Marcoux's--
10   Q    No.  He didn't say matter.  He didn't
11 say body matter.
12        Want to go to the video and see what
13 he actually said?
14   A    I think what he said was blood and
15 matter on fence.
16   Q    He didn't say body matter, did he?
17   A    No.
18   Q    No.  Okay.
19   A    I'm not sure what kind of matter he
20 meant along with blood.  But we could ask him
21 later, I'm sure.
22   Q    We may get an opportunity to do
23 that.
24        So we know now that Mr. Medina's body
25 was found prone--

73

Fisher - By Mr. Caldwell

1    A    Yes.

2    Q    --facedown.

3    A    Yes.

4    Q    All of the photos that we have in

5  this case from the police show Mr. Medina's body

6  in a supine position.  Correct?

7    A    No.  In fact, most of them show him

8  prone, until the very end, when they rolled him

9  over into the bag.

10   Q    Okay.  So you're saying that the

11 pictures before they removed the body, or started

12 to remove the body, those all support the

13 contention that the body was found prone,

14 facedown?

15   A    They clearly demonstrate that he's

16 prone.

17   Q    Does the fact that his body was found

18 facedown have any bearing on your kinematic

19 analysis?

20   A    No.  That would be consistent with my

21 analysis.

22   Q    The accident scene on the Williams

23 Street embankment, we can analogize it much to

24 being like an archeological dig.  Right?

25   A    We could.

74

Fisher - By Mr. Caldwell

1    Q    Okay.  There's various layers of

2  things that have happened over time?

3    A    Yes.

4    Q    Okay.  And even though the time frame

5  is compressed, the ground is the base.  Right?

6    A    Yes.

7    Q    Okay.  And then we have layers that

8  come up from the ground.

9    A    Yes.

10   Q    So we--

11   A    I smiled because I used this analogy

12 earlier today.

13   Q    Okay.

14   A    We're on the same page.  No, not with

15 you.  With Mr. Cook.

16   Q    Oh, okay.  I was going to say, I

17 didn't think my memory is that bad.

18   A    I was talking about the grid work

19 they lay out to identify the bits and pieces of

20 the Titanic--

21   Q    Right.

22   A    --and going through the grids to find

23 where everything came to rest.

24   Q    Okay.  So in the exhibit that was

25 marked G-9 at Mr. Granat's deposition--

75

Fisher - By Mr. Caldwell

1    A    Yes.

2    Q    Okay.

3    A    This is the cable.

4    Q    Very good.

5         Well, first of all, we see the

6  ground.

7    A    We do, yes.

8    Q    Okay.  And then on top of the ground,

9  we see the cable.

10   A    Yes.

11   Q    Okay.  And then on top of the cable,

12 we see a portion of the remains of the tractor

13 cab.

14   A    Correct.

15   Q    And in this particular orientation,

16 as a matter of fact, we're looking at the back of

17 the cab.  Correct?

18   A    We are.

19   Q    All right.  And the center of the

20 photograph is where the back of the cab would come

21 across and rest on the rails to get into the port,

22 partially.

23   A    Yes.

24   Q    So there's no doubt, using our

25 archeological analysis here, that the cable is

76

Fisher - By Mr. Caldwell

1  under the cab.

2    A    Correct.

3    Q    So the cable, no matter how it moved

4  in time and space, it had to come down before the

5  cab.

6    A    Correct.

7         (A short recess was taken.)

8  BY MR. CALDWELL:

9    Q    I believe we were doing our

10 archeological cable and then the cab.

11        Ultimately, for your analysis, it

12 didn't matter whether there was a cable there or

13 not, electrified or not, it was the injuries.

14   A    Right.  As I said, I considered the

15 cable.  But ultimately, based on things like the

16 location of the cable and the archeological dig, I

17 ruled it out as being an important contributor to

18 the injuries for my analysis.

19   Q    So did you read through enough of Mr.

20 Granat's deposition to understand that he, my

21 choice of words, acknowledged that the wire mesh

22 fence is coming off as each of the fence--as each

23 of the rail posts are being sheered off of their

24 base?

25   A    I didn't get to that part.

Fisher - By Mr. Caldwell                                77

1    Q      Okay.  Then do you agree functionally
2  that the vehicle is traveling from south to north,
3  the restraining system is on the west-hand side,
4  okay, so as the vehicle is going through the
5  restraining system, it's taking it off also from
6  south to north?
7    A      Correct.
8    Q      And that it's a system, if the two
9  fences are bolted together.
10          As a matter of fact, you can see
11  that--sorry.
12          MR. CALDWELL:  I don't have a
13     number on that one.
14          (8 1/2" by 11" color photograph
15     received and marked Exhibit F-3 for
16     identification.)
17    Q      F-3, on the left-hand side, we can
18  see the eastbound side configuration that shows
19  the same debris fence.
20    A      Yes.
21    Q      So we can also conclude from that
22  that the rail of the debris fence is lower than
23  the top rail of the fence, the guardrail.  Right?
24    A      Yes.
25    Q      Yes.  Okay.

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                                78

1    A      At least on the opposite side.
2    Q      At least on the opposite side.
3    A      Presumably, if they were symmetric,
4  that would have been the part taken down.
5    Q      It's unlikely that they would build
6  it differently.  There's four locations there.
7  There's the east side, there's the west side of
8  the northbound, there's the east side of the
9  southbound, and then there's the west side of the
10  southbound, all of which were protected in similar
11  fashion.
12    A      It makes sense.
13    Q      It makes sense.
14    Q      So in G-11, the fence post that
15  you're talking about in the still photograph--
16    A      Yes.
17    Q      --is the one on the far right-hand
18  side of the photograph with the open portion of
19  the pipe facing us.
20    A      Correct.
21    Q      And there's actually two pieces of
22  pipe there.  One of them is the vertical member
23  and one of them is the horizontal member for the
24  chain-link fence, for lack of a better name.
25    A      That appears to be the case.  I have

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                                79

1  not tried to confirm that.  But, yes, there are
2  two steel tubes there together.  Presumably, one
3  was a post and one was a horizontal piece or a
4  diagonal piece.  I'm not sure what kind of cross
5  bracing it had.  I haven't studied that
6  structure.  But, yes, there are two pieces of pipe
7  there.
8    Q      Okay.  And, of course, the remains of
9  the debris fence are also still attached to the
10  post and the rail.
11    A      It appears that it could be, sure.
12  I'm not going to say absolutely sure looking at
13  that photo, but that appears to be the case.
14    Q      Okay.  Now, in your report--and I
15  presume, then, that you relied on Mr. Granat,
16  because you say in your report that there's also a
17  series of impacts from the guide rail posts as the
18  tractor is penetrating through them.
19    A      Yes.
20    Q      And Mr. Granat described for me--and
21  Bob can correct me if I misdescribe it--that
22  essentially each of these impacts from the posts
23  occurred at a different point along the side of
24  the truck, because the truck is moving through
25  space and the posts are getting ripped up by the

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                                80

1  curb and--
2    A      Yes.
3    Q      Yes.
4    A      My understanding is that the
5  orientation of the truck is changing as it goes
6  through the posts.  So we have a row of posts, and
7  the truck is proceeding through that row of posts
8  with the--
9    Q      We're going to--go ahead.  Finish
10  your answer.
11    A      --with the driver's side--sorry, with
12  the passenger's side leading, and it becomes more
13  rearward--the force becomes more rearward oriented
14  as the truck rotates counterclockwise more
15  continuing through that series of posts and
16  because the tractor is continuing leftward
17  relative to--
18    Q      Westerly.
19    A      Westerly, yes.  It's a better frame
20  of reference.
21    Q      Right.
22    A      --continuing westerly over the edge
23  of the bridge that's going to cause those impacts
24  to be farther down the side of the truck.
25    Q      Did you consider the debris field

JACQUELINE KLAPP, CCR - (908) 782-0874

81

Fisher - By Mr. Caldwell

1  that was located northeast of the opening in the
2  rails to have any bearing on your biomechanical
3  analysis?
4      A    To the degree that I'm relying on Mr.
5  Granat, and I'll rely on him, and he can do the
6  interpretation of that.  But no, I have not
7  independently analyzed that.
8      Q    That's the point.
9          So it makes no difference that there
10  is debris northeast of the site or what is in that
11  debris field.  Correct?
12      A    Correct.
13      Q    Just so we're clear.
14          So it matters not to you whether
15  there's a license plate, batteries, the left-hand
16  step, a lens from the truck all in the debris
17  field northeast of the site?
18      A    Correct.  That's not part of my
19  analysis.
20          MR. CALDWELL:  Next number, please.
21          (Hand-drawn diagram, entitled "Medina
22      v. DTNA," received and marked Exhibit F-4
23      for identification.)
24      Q    Sir, I'll represent to you--and I'm
25  sure that Mr. Cook will not accuse me of

JACQUELINE KLAPP, CCR - (908) 782-0874

82

Fisher - By Mr. Caldwell

1  misrepresenting anything--that this is a print
2  from Mr. Granat's report that shows a portion of
3  his reconstruction involving the movement of the
4  truck along the highway.
5          All right?
6          So if you want to take a moment to
7  look at that to get yourself oriented.
8          (The witness complies with the
9      request.)
10      Q    So, on F-4, the bottom of the diagram
11  is the northbound lane of the interstate curving
12  around to the right.  Correct?
13      A    Correct.
14      Q    And the object that's depicted over
15  the lanes is the tractor-trailer.  Correct?
16      A    Correct.
17      Q    And so based on what you told me
18  before, it matters not whether or not the
19  individual placements of the tractor-trailer are
20  correct or not.
21          So for Position No. 1, starting at
22  the far left-hand side of the diagram, your
23  analysis is not dependent upon whether or not that
24  depiction of the tractor-trailer at that location
25  is correct or not.

JACQUELINE KLAPP, CCR - (908) 782-0874

83

Fisher - By Mr. Caldwell

1      A    At Position 1, no.
2      Q    The next one is Position 2.
3          Is your analysis dependent on that?
4      A    No.
5      Q    Is your analysis dependent on
6  Position 3?
7      A    No.
8      Q    Is it dependent on Position 4?
9      A    No.
10      Q    How about 5?
11          And 5, for purposes of the question,
12  means we're already showing the tractor-trailer in
13  contact with the--I'm sorry, with the tractor
14  being in contact with the westerly side of the
15  bridge.
16      A    Yes.  This is starting to get
17  important for my analysis now.
18      Q    Okay.  So 5 is important?
19      A    Yes.  And--
20      Q    And 6 is important?
21      A    6 is important.
22      Q    7 is important?
23      A    Yes.
24      Q    8?
25      A    Yes.

JACQUELINE KLAPP, CCR - (908) 782-0874

84

Fisher - By Mr. Caldwell

1      Q    And 9?
2      A    Yes.
3      Q    Okay.  The part of your analysis that
4  you say is important is the fact that Mr. Medina
5  was unrestrained in the driver's position?
6      A    That's certainly consistent with my
7  findings.
8      Q    All right.  So, in Position 1, it's
9  your opinion, though, that Mr. Medina was driving
10  this vehicle in an unrestrained manner, when I say
11  "driving the vehicle," that his body position was
12  not restrained by the combination seat and
13  shoulder harness?
14      A    Yes.  I think that's what his
15  injuries and the kinematics of the accident show,
16  yes.
17      Q    So, then, based on your report and
18  your analysis--why don't you number the positions
19  starting at the left with 1 so that...
20      A    Okay.
21      Q    Hold on to the pen, because I may be
22  asking you to do some more marking.
23          Again, just so that we're clear, we
24  have nine marked positions.  Correct?
25      A    I do, yes.

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell

Q    All right.  In Position No. 1, you
understand that Mr. Granat's theory is that the
tractor-trailer has already come into contact with
the W guardrail at approximately two to 300 feet
south of the bridge abutment.  Correct?

A    I'm not sure one way or the other if
that's his testimony.  I would defer to him on
that.

Q    Well, wouldn't that matter to you in
terms of where Mr. Medina's body is if that event
took place?

A    So what I'm interested in is once we
start to get larger forces on the vehicle, that
we're going to begin moving him out of place.
Sideswiping along the guardrail is not
significantly slowing a tractor-trailer.  It's--

Q    The delta-V isn't significant?

A    Well, the acceleration--the
deceleration of the vehicle relative to Mr.
Medina's inertia to move him out of
the--potentially move him out of the seat one way
or the other is not going to be a large factor
relative to the other factors we're going to see
as we continue downstream.

Q    It's been presumed that Mr. Medina's

Fisher - By Mr. Caldwell

vehicle was traveling at 65 miles an hour.

Q    So at Position No. 1, assuming that
he sideswiped the rail, it's your view that that
contact would not have significantly decreased the
forward speed of the vehicle?

A    I would defer to Mr. Granat on that.

Q    Well, for Position 5, did you form an
opinion as to how fast the tractor was moving?

A    No, I have not.  Again, I would defer
to Mr. Granat for that.

Q    But in your report, you're describing
the deceleration from whatever that speed is.
Correct?

A    Yes.  And the magnitude of the
deceleration is important as opposed to the
absolute speed.  So I'll defer to Mr. Granat.

Q    Okay.  Well, how much deceleration is
occurring at Position No. 5 when the tractor comes
in contact with the westerly guide rail?

A    So, again, I would defer to Mr.
Granat, but between 4 and 5, we're going to start
to see sideswiping of the truck.  So the wheels
are no longer rolling, but skidding along, which
means greater deceleration of the vehicle.
Whether that's on the order of .4, .5, .6 Gs, I

Fisher - By Mr. Caldwell

don't know.  But I would anticipate it's something
in that range.  It's rubber on asphalt in
transition from the rolling of the tires on the
asphalt to a side slip.

Again, Mr. Granat could clarify what
that deceleration is, but my understanding is it
would be less than a G.  It would be perhaps
something on par with hard braking, or not quite
that level, because we are still oriented, so that
we're rolling, to a degree.

Q    But, in your report, as a general
proposition, you say a body in motion tends to
stay in motion.  So that Mr. Medina's body, being
unrestrained in positions 1, 2, 3, 4 and 5, when
the truck starts to decelerate, Mr. Medina's body
does not.  His body continues to go forward at the
same speed as before.

A    Except for any resistance to that
kind of motion that that vehicle could provide.
And, as I said, these decelerations are going to
be within a range that he voluntarily resisted.

Q    Okay.  So he can voluntarily resist
these by holding on to the steering wheel, tensing
his muscles and holding himself between the
steering wheel and the back of his seat?

Fisher - By Mr. Caldwell

A    Bracing with his legs.  I mean, if we
had Teflon seats in our cars and Teflon floors, we
would fall off our seats every time we hit the
brakes hard.

Q    Right.

A    But because that's not the case,
there's some friction with the seat, there's some
bracing with the legs, some bracing with the hands
that keep us from falling off our seats when we
brake hard.

Q    Okay.  So is it fair to conclude that
Mr. Medina is still seated in the seat with his
hands on the wheel and his feet on the floor in
Position No. 5?

A    I have no reason to think
differently.

Q    So, for 5, could you just put a note
on there, "Driver in seat."

A    Sure.

(The witness complies with the
request.)

Q    Position 6, driver still in the seat,
according to your analysis?

A    He's going to start to move rightward
now that we're hitting these bridge rails.

89

Fisher - By Mr. Caldwell

1    Q    I understand you're saying that he's
2    moving rightward, but is he still in his seat?
3    A    Probably still in or close to--I
4    mean, I haven't looked to see by Position 6 how
5    many posts we've hit at that point.
6    Q    Well, Mr. Granat did that for us at
7    the deposition.  He told us how many posts he
8    thought he had hit at that point.
9    A    Okay.
10   Q    So what's the total number of posts
11   that you understand the tractor hit during the
12   course of this accident?
13   A    I don't recall the total number of
14   posts.  I know he hit several posts.  Those are
15   going to be low acceleration, a few Gs.  It's
16   going to be sufficient to begin to, depending upon
17   how much he's resisting this motion, it's going to
18   begin to move him out of his seat or move him out
19   of his seat by the time he's hitting the posts.
20        I haven't quantified that precisely
21   post by post.  I don't have--Mr. Granat said he
22   couldn't give me absolute decelerations.  He said
23   a few Gs of deceleration for each post impact.  He
24   couldn't quantify it more than that.  But a few Gs
25   now, rather than a fraction of a G, are going to

90

Fisher - By Mr. Caldwell

1    tend to move a person out of their seat, and,
2    depending on how much resistance, he's going to
3    move to his right.
4    Q    So one G is how much force?
5    A    One G is equal to the force of
6    gravity.  So--
7    Q    Sixteen feet per second per second?
8    A    Thirty-two feet per second per
9    second.
10   Q    Excuse me.  Thirty-two feet per
11   second per second.  I'm sorry.
12   A    That's the acceleration that would
13   result.
14   Q    Yes.
15   A    You know, what one would feel would
16   be--in terms of motion to the right would be as if
17   your body were suspended with your right side
18   toward the ground, and that force pulling your
19   body toward the ground is now pulling your body to
20   the right if you're decelerating at one G.
21   Q    When we're walking around, we're all
22   experiencing one G.  Right?
23   A    Well, we're experiencing one G of
24   force.  We're not accelerating at one G, because
25   we keep our feet under us.  So we're generally

91

Fisher - By Mr. Caldwell

1    experiencing zero, or we're experiencing one G of
2    gravity in terms of force.  We're not
3    accelerating, obviously, when we're--when we're
4    standing, we're not accelerating toward the
5    ground.
6    Q    So, then, would you please mark for
7    Position 6 if you still believe the driver is in
8    the seat, or whatever combination you think it is,
9    or partially in the seat.
10        Is he still in contact with the seat,
11   his driver's seat in Position 6?
12   A    He could be.  I would say in 5
13   through 8, he's going to tend to--he's tending to
14   move toward his right and likely coming out of his
15   seat.  If he's holding on really hard and prepared
16   for this and gets a leg up to the right to brace,
17   maybe he doesn't fall out of his seat.
18        But forces--I haven't looked at it to
19   that level of detail, and I don't know how he has
20   braced himself inside the truck, but forces would
21   certainly tend to move him to his right.  He's not
22   in a normal seated position even if he's resisting
23   and holding himself more or less in contact with
24   the seat.  Part of him is no longer going to be in
25   the seat.

92

Fisher - By Mr. Caldwell

1        I mean, we could say 5 through 8
2    moving toward the right out of normal seated
3    position, something like that.  I haven't--it's
4    going to depend upon specific conditions of how
5    he's bracing and resisting how far out of the seat
6    he goes precisely.
7    Q    And also the design of the seat.
8    Correct?
9    A    The design of the seat, if it's a
10   deeper seat, could provide more resistance if
11   there's a--
12   Q    More fundamental than that, whether
13   there's an armrest or not, like the chairs we're
14   sitting in today.
15   A    Yeah.  It gives you something to
16   brace against.
17   Q    It gives you something to brace
18   against.
19        And the design of this truck,
20   according to the cut sheets that you sent me, or
21   sent me through Mr. Cook, demonstrate that there
22   are captain's chairs with armrests on both sides.
23   Correct?
24   A    In fact, we see it in photographs of
25   the charred--we see the frame of the armrests

Fisher - By Mr. Caldwell

93

remaining.

Q    Right, pointing in the wrong
direction, but we see the armrests.

A    His truck seats have an armrest,
yes.

MR. CALDWELL:  It had more than an
armrest, as we see now in this next marked
exhibit.

(Tractor model received and marked
Exhibit F-5 for identification.)

Q    If we look into the tractor--and,
first of all, is it your understanding that this
is a replica scale model of the truck in question
or just a facsimile?

A    It's a facsimile.  I have not
confirmed every last piece.  For the general
dynamic function of how this vehicle was moving,
how it was jackknifed, I was using this.  I have
not--

Q    It's sufficiently accurate.

A    It's sufficiently accurate for the
purposes of my analysis.

Q    Okay.  So if we look down at--we'll
call it plane view.

A    Right.  Sure.

Fisher - By Mr. Caldwell

94

Q    So if we look into the plane view of
the tractor-trailer, we see the captain's seats
with the armrests on both sides.

A    We do.

Q    And the armrest on what would be Mr.
Medina's right side would provide some additional
way for him to brace himself, assuming that he's
unrestrained by the seat belt?

A    Yes.  And it could physically resist
his motion not just by bracing, but act as an
impediment to rightward motion.

Q    And an additional impediment to
rightward motion after that is the gear shifter.
Right?

A    Yes.

Q    And we know that that survived the
accident, because it's in the pictures.

A    It's on the chassis.

Q    It's on the chassis.

A    Not with the cab.

Q    Not with the cab.

So how, then, is the floor of the cab
attached to the chassis such that we can have the
shifter survive and the cab does not?

A    What's interesting is we know that

Fisher - By Mr. Caldwell

95

the seats are attached to the floor.

Q    Of the cab?

A    Of the cab.

Q    Not to the frame of the chassis?

A    Correct.

And the seats stay with the cab,
because we see the frames of the burned seats in
the other burned debris of the cab.  So we know
that the floor of the cab is at least as far
forward as the seats separate from the chassis.

Q    Right.

Forward of that, where that--where
that separation is in the floor, whether it's at
the pedals, whether it's at the instrument panel,
we know that we see part of the steering column
with the chassis, we see the gearshift with the
chassis.  So we know that that opening is
somewhere forward of the driver's seat.

Q    By the fire wall, does this truck
have a fire wall between the engine compartment
and the passenger compartment?

MR. COOK:  Objection to form.

You can answer.

A    I would expect that it does.

Q    Is that likely the place where the

Fisher - By Mr. Caldwell

96

floor would separate, would be at the fire wall?

A    I would defer to someone who knows
the vehicle structures better than I do, but the
evidence would suggest a location close to that.

Q    Although it's not quite as evident in
F-5, in the material that you sent me--again, that
was sent through Mr. Cook.

MR. CALDWELL:  Would you mark this,
please.

(Freightliner brochure of On-Highway
Truck Interiors received and marked Exhibit
F-6 for identification.)

Q    F-6 is actually brochures for two
different model trucks.  Correct?

A    Yes.

Q    The Coronado and the Cascadia.

A    And the Cascadia, correct.

Q    Neither of which is the model truck
involved in this accident.

A    I'm not sure whether this was a
Cascadia or not.  I would--again, I would defer to
someone who has more expertise on that.

Q    All right.  But certainly I
understand, from your prior testimony, that
there's a gearshift in between the driver and the

Fisher - By Mr. Caldwell                               97

1   passenger compartment.  Right?

2       A    Yes.

3       Q    So that the pictures, the fifth

4   picture down, or the fifth sheet down that shows

5   the Cascadia 72-inch raised roof, with a view from

6   the driver's door across, there is no evidence of

7   a gearshift.  Right?

8       A    In the model shown in this picture,

9   no.

10      Q    Right.  But is it your opinion that

11  the rest of the configuration that is shown in

12  here is that the truck in question had the same

13  interior design?

14      A    I couldn't say specifically that

15  every detail is the same.  Again, the general

16  layout of a CST 120 truck with a sleeper cab is

17  what I was looking for here, not, you know,

18  whether all the knobs and dials and the instrument

19  panel are in the same place, and that sort of

20  thing.

21      Q    Can you go to the one that's marked

22  Coronado, that's about six more pages down, and

23  it's essentially the same view from the driver's

24  side across, with three pictures.

25      A    Yes.

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                               98

1       Q    Okay.  And here we do see the

2   gearshift.

3       A    Yes.

4       Q    And we also see evidence of the

5   captain's seat with the arm going--in this

6   particular picture, the passenger's seat armrest

7   on the inboard side is in the up stowed position.

8       A    Correct.

9       Q    Okay.  And the orientation of the

10  internal components, for example, the way that the

11  dash mount comes around and comes in towards the

12  center of the vehicle, is the same as our specimen

13  as F-5?

14      A    Yes.

15      Q    So other things, then, that would

16  give Mr. Medina the opportunity to keep himself in

17  place in addition to the armrest is the actual

18  interior physical design of this truck, where the

19  dash component comes around and essentially cuts

20  off the middle of the truck.

21      A    Yeah.  His knees could be rightward

22  motion of forward parts of his body, like his

23  knees could be impeded by that wraparound section

24  of the instrument panel, correct.

25      Q    And assuming that he got past the--by

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                               99

1   the way, are you assuming--which configuration are

2   you assuming Mr. Medina is driving this truck in

3   terms of the seating?

4            Are you assuming, for purposes of

5   your analysis, that his right arm is down--the

6   seat arm is down, or are you assuming that the

7   seat arm is up?

8       A    I'm not assuming anything to that

9   degree of specificity.

10      Q    Assuming that he got--that the

11  armrest is down and he got past the armrest, he

12  would also have to physically get past the

13  gearshifter and the center console before he ends

14  up on the passenger's side of the vehicle?

15      A    Yes.  It would be--it would probably

16  be hard to get past the armrest and the

17  gearshift.  If the armrest is up, you could get

18  past the gearshift with little impedance, I would

19  estimate.

20      Q    How much time are you estimating

21  elapsed between Position 5 and Position 6 on F-4?

22      A    I have not quantified that.  I'm sure

23  Mr. Granat has, and he could provide us with those

24  numbers.  I didn't rely on that specific number

25  either way for my analysis.

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                              100

1       Q    Well, I'm just trying to understand

2   your report, because on page 11, the largest

3   paragraph, in the middle, you say, "As the subject

4   Freightliner tractor impacted a series of bridge

5   rail posts, Mr. Medina initially moved to his

6   right, toward the area between the front seats."

7       A    Correct.

8       Q    "As the tractor continued to yaw

9   counterclockwise, Mr. Medina's inboard movement as

10  a result of post impacts took on an increasingly

11  rearward component, tending to move him inboard

12  and rearward between the front seats toward the

13  sleeper area of the cab."

14           Did I read that correctly?

15      A    Correct.

16      Q    Okay.  So now what we're seeing both

17  in the specimen and in the cut sheet is that

18  you're saying that Mr. Medina is moving back

19  towards--diagonally back--

20      A    Yes.  So he starts off more toward

21  his right--

22      Q    Right.

23      A    --and as the truck rotates more

24  counterclockwise--

25      Q    Right.

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell                               101

1        A        --so its orientation with each
2    subsequent bridge rail post, each interaction is
3    getting more rearward.  So his rightward motion is
4    going to take a more and more rearward component.
5    So he's going between the seats but rearward
6    against his seat, and if he gets completely off
7    the seat, he would start to move rearward even
8    more.
9        Q        As the truck is designed in the
10   exemplar, the passenger's seat would tend to
11   deflect him towards the rear, into the sleeper
12   area?
13       A        Yes.  He would start to go between
14   the seats.  Gravity would also tend to bring him
15   toward the floor, so that he's--that would be
16   another obstacle of sliding clean across into the
17   passenger's seat.  There's the rearward motion and
18   the fact that he would lose some elevation
19   across--spanning the gap between the seats.
20       Q        Okay.  When you say in your report
21   "Mr. Medina's body continued toward the ground,
22   which was toward"--
23       A        I'm sorry.  Where are you?
24       Q        I'm back on the same page, on page 11
25   of your report.

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                               102

1        Q        I withdraw that.  I skipped over
2    something.  Excuse me.
3        Q        Does he make it into the sleeper area
4    in your analysis at Position 6, 7 or 8?
5        A        No.
6        Q        So he's always remaining forward of
7    the sleeper area?
8        A        Yes.  He may start to get between the
9    seats.  But again, these--my understanding, from
10   Mr. Granat's analysis, is that these impacts with
11   the posts are not high--are not high acceleration
12   impacts.  The truck is able to break those off
13   without a lot of resistance.
14                So that, you know, we're not talking
15   about like a side impact, where someone is going
16   to go a great distance across the vehicle.  He
17   could be starting to get into that gap between the
18   seats and a little bit of rearward motion.  He's
19   not going to be back deep into the sleeper area.
20   That happens later on, when there's a much more
21   significant ground impact.
22       Q        And the relative decrease in the
23   velocity at 6, 7 and 8 is relatively small?
24       A        That's my understanding, yes.
25       Q        But for sake of example, so if we

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                               103

1    picked Position 6 as going forward at 50 miles an
2    hour, just for sake of example, by the time it
3    goes through 7 and 8, it's not significantly
4    decreased.  It hasn't dropped to 30 miles an hour
5    in the space of 6, 7 and 8.  Right?
6        A        I don't know--I don't know what the
7    actual decelerations are over that range.  I know
8    that the individual post impacts are not high
9    deceleration.
10                Now, obviously, between the post
11   impacts, he's decelerating as well.  But when you
12   spread a change of velocity out over a large
13   period of time, you take away--you lower your
14   acceleration and, thus, lower the forces tending
15   to move the body to the right.
16                I asked Mr. Granat specifically not
17   about the speed at each of these points, but at
18   the accelerations associated with each of the post
19   impacts.
20       Q        And what did he tell you?
21       A        That those changes of--those
22   accelerations are going to be on the order of a
23   few G's with each post.
24       Q        Help me out.  I don't claim to be a
25   science whiz.

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                               104

1                You still have force equals mass
2    times acceleration.
3        A        Yes.
4        Q        Okay.  And you're telling me that a G
5    is a measure of lateral force here.  Right?
6        A        Yes.
7        Q        What is the functional equivalent of
8    one G, force equals mass times acceleration?
9        A        What do you mean by "functional
10   equivalent"?
11       Q        How fast would I have to be going--if
12   I walked into the wall, how fast would I have to
13   be walking in order to experience one G worth of
14   impact when I hit the wall?
15       A        It depends on how fast you stop.
16   It's not the--
17       Q        I'm coming to a dead stop.  I'm
18   walking into the wall.  I'm not walking through
19   it.
20       A        If you stop in zero time, it could
21   be--it would be--sorry.  In zero distance, it
22   would be infinite G's.
23                Obviously, in the real world, we stop
24   in a brief period of time.  If it's 10
25   milliseconds or 100 milliseconds, depending on how

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell

105

we contact the wall or draft with the wall, it
could be--it could be anywhere from relatively low
G's if your body kind of crumples into the wall
versus infinite G's if you stop instantaneously.

Q    So, for Position 7, would you make a
notation on your exhibit, please, as to where you
think Mr. Medina's body is at that point.

A    Again, I haven't determined it to
that degree of specificity.  As I said, he could,
as I've described in the report, between positions
5 and 8, he's going to tend to move inboard and
more rearward.  He's going to start to get between
the seats.  He's not going to move deep back into
the sleeper area.  He could be between the seats
kind of poised to move into the sleeper area.

But we don't have enough detail in
this case to map out point by point how he's
bracing, how he's resisting to spacing out through
the sequence.

Q    Notwithstanding any of that,
according to your analysis, he has not sustained
any of the injuries that you described in your
report?

A    No.  These are not significantly
forceful impacts.  There's contusions, and that

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell

106

sort of thing.  But, of course, we don't have
evidence of--

Q    Bumps and bruises.

A    That sort of thing.  He's not going
to be breaking bones.

Q    And not enough force here to render
him unconscious.

A    No, I don't think so, during this
sequence.

Q    For Position No. 9, and I want you to
understand that Position No. 9, when we were
discussing this with Mr. Granat, that this is
supposed to be a representation of the tractor
when it's coming into contact with the electric
wires.

A    Okay.

Q    So I want you to understand when I
ask you these questions that Position 9 is not on
the same plane as positions 1 through 8.

A    Okay.

Q    All right.  That the tractor is on
its way down below the plane of the road.  All
right?

A    Okay.

Q    Where is Mr. Medina at that point?

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell

107

Where is his body at that point?
Is it off the deck?
We're not on the ground.  We're
falling.

A    At that point, he's going to be
between his seats.  Now he's in free fall.  So
it's like--it's like when they train the
astronauts and they take them up in a plane and
the plane is in a nosedive, in a free fall.

Q    He's weightless.

A    He's weightless, yeah.  So inside his
cab, he's weightless as it falls to the ground,
and he is in that space between the--between the
two seats, and he's in that aisleway between the
two seats.

Q    Okay.  As is shown in the Coronado
photograph.

A    Yes.

Q    Okay.

A    He's getting--he's basically lined up
so that he can go rearward relatively unimpeded by
the seat when this thing makes ground impact and
everything is pulling him toward the back of the
sleeper area.

Q    And what's the distance from the

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell

108

leading edge of the seat to the back of the
cabin?

A    I haven't quantified that precisely,
but seven, eight feet, something like that.

Q    That's an estimate.

A    That's an estimate.

I'm sorry.  Did you say the leading
edge of the seat?

Q    Yes.

A    I was estimating from behind the
seat.

Q    That's fine.

A    Again, that's--

Q    Seven, eight feet.

A    Yes.

Q    Does your analysis presume that Mr.
Medina is doing anything to overcome the positions
that he's finding himself in, that he's actively
engaged in trying to save himself?

A    He could be trying to hold on to
things as--now it's going to be on the order of a
second free fall.  And if he has his--if he has
his wits about him--and again, that's a pretty
fast perception of reaction time, not my area of
expertise, but I have worked with people who had

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell

1  that area of expertise.  If he manages to grab
2  ahold of things, he could be resisting.  I
3  haven't--it hasn't affected my analysis one way or
4  the other.
5      Q  In Position 9, is it your opinion
6  that the tractor is in free fall?
7      A  The tractor is going to be in
8  something close to free fall.
9      The trailer is going to be pivoting
10  around the--the back end of the trailer is going
11  to be--I don't know if Position 9 represents that
12  it's still on the bridge, the rear wheels.  But if
13  that is the representation there--and again, I
14  would defer to Mr. Granat--that means that the
15  trailer, the front end of the trailer is falling,
16  the back end of the trailer could still be
17  supported by the bridge, so it's not falling, so
18  the trailer is rotating, but the tractor is going
19  to be in something very close to free fall.
20      Q  By the way, on the remainder of F-5,
21  which is the trailer, this particular facsimile is
22  not accurate, because this box did not have the
23  aerodynamic structures that are shown on this
24  particular facsimile.
25      Do we agree on that?

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell

1      A  I haven't confirmed that precisely,
2  but I think I would have remembered what Mr.
3  Granat--Mr. Granat probably would have mentioned
4  that one way or another in his analysis, and I
5  don't recall that.  So--
6      Q  Okay.  I just wanted to make sure
7  that we were--
8      A  It's certainly consistent with the
9  photograph.
10      Q  With the photograph, that it's not
11  there.
12      A  I would agree with that, yes.
13      Q  So back to the exhibit again that's
14  in front of you, the trailer is moving forward
15  consistently in a northwest direction?
16      A  Correct.
17      Q  And in order for the trailer to end
18  up in the final position that's shown beyond, or
19  that's part of 9, or, actually, I should call it
20  10, since it's another position separate from the
21  tractor, the trailer has to go nose down, rotate
22  90 degrees, and end up on its right side?
23      A  My understanding--and again, I would
24  defer to Mr. Granat, but my understanding is that
25  the motion is primarily yaw, or there's a

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell

1  significant yaw component.  So I'm trying to
2  orient the truck right now with Position 9.
3      Q  Mr. Granat opined, I believe, that
4  the yaw was 20 degrees.
5      A  20 degrees from where to--
6      Q  Relative to the side of the road.  We
7  started in the beginning about how we were going
8  to discuss yaw as being relative to the west side
9  of the road.
10      A  So the yaw of the trailer?
11      Q  Is 20 degrees.
12      A  Is 20 degrees.  And that looks about
13  like what we're seeing in the figure here.
14      So now we're coming off the bridge.
15  My understanding of Mr. Granat's analysis is that
16  as the truck drops from the bridge deck, from the
17  height of the bridge deck down to the embankment
18  below--
19      Q  Right.
20      A  --is that during that airborne phase
21  it's continuing to yaw and roll--the trailer is
22  rolling to the right--
23      Q  North of--northwest.  Okay.
24      A  Yes.
25      So we go--it goes off the bridge

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell

1  deck, with the trailer moving primarily forward
2  and the tractor moving primarily rearward.  It
3  yaws, you know, and as it drops, it's continuing
4  that yaw motion which it developed momentum for up
5  on the bridge deck, and we're hitting the ground--
6      Q  We've got--
7      A  --with the right side of the trailer
8  and the tail end of the tractor, resulting in an
9  impact that separates the cab of the tractor from
10  the chassis.
11      Q  Okay.  So you don't believe, based on
12  what you understand, that the tractor went tail
13  end over front end and that it ended up at a
14  position of rest by rotating through a yaw motion
15  180 degrees?
16      A  I believe it rotated through a yaw
17  motion close to 180 degrees, the entire unit,
18  tractor and trailer, from Position 9, but it also
19  rolls, what would be a passenger's side leading
20  roll for the trailer, which is a--which is a
21  driver's side roll for the tractor and a nose--and
22  a nose up pitch of the tractor, so that when the
23  side of the trailer, when the bottom wheels on the
24  side of the trailer make contact with the ground,
25  the tractor is tail end leading on that ground

JACQUELINE KLAPP, CCR - (908) 782-0874

impact.

Q    So we go off the bridge, yaw, roll in this motion. Basically, we're continuing the momentum of the motion set up already up on the bridge deck.

Q    And that's what Mr. Granat described for you at this long meeting when you were all together?

A    That's my understanding of his reconstruction, yes. That's when I--

Q    Did he actually demonstrate what you just demonstrated to me?

A    No. I got this truck afterward, unfortunately.

And just to clarify, again, I would defer to Mr. Granat for the precise detail of that.

What's important for me is that the tractor impacts the ground nose pitched up, tail end leading, because the motion in the air leading up to that is free fall, with relatively little force on Mr. Medina's body.

Q    So tell me when, then, does the mesh fence penetrate the cab, Mr. Medina's body exits and lands on the ground between positions 8 and 9,

as you have just described it.

A    So, actually, if this is Position 9, let's call the truck on the ground Position 10.

Q    Okay. That's fine.

A    So, in Position 7 and 8, we're starting to interact potentially with the fence. Now, I don't know, when we see the fence on the ground, which end we're looking at in terms of I haven't unfolded that and reconstructed which end is which with the tissue on it.

But part of that is coming into the right side of the cab as it rotates and it's gathering--so it's gathering up the fence, whether it penetrates during this right-sided impact or whether it gets pulled as the truck is falling and gets torn into the cab of the truck.

I know that there's fence structure here on the outside. Again, we don't know the--we don't know the precise details. There's no right side of the cab left for us to investigate. But that fence basically comes in and apparently gets pulled back out, so that it ends up as the truck comes to--comes onto the ground and impacts tail end leading, that that part of the fence is now over on the left side of the truck.

Q    Well, on page 12 of your report, again, roughly two-thirds of the way down, you say "which was clearly not charred like the rest of Mr. Medina's body and was located remote from the cab, indicates that the fence penetrated both the cab and Mr. Medina's body at some point during the fall from the bridge, but separated from his body and cab prior to final rest on the embankment."

So, according to your--I'm sorry. Did I read that correctly?

A    Correct, yes.

Q    So, according to your report, all of this interaction with the fence and the post happens in the time frame between 8 and 10. Correct?

A    Yes. It could it be 7 to 10, 8 to 10, something in that--in that time frame.

Q    Well, no, no. Your report says "during the fall from the bridge." So you've described before that it's not until Position 9 that we have free fall.

So doesn't the word "fall" mean the same thing in both contexts?

A    Well, part of the truck is beginning to fall from the bridge by Point 6. I mean, if we

define "free fall" specifically. But part of it is going over the bridge by Point 6. As those front wheels go over the edge of the bridge, they're going to be lower than the bridge deck. So I think I was not describing to that level of specificity.

He's going to start to capture that fencing and support posts. Those are going to have penetration as the truck is falling, whether that starts at 7 or starts at 8. But we know that by 10, once it lands on the ground, because of our archeological survey, that the fence is done interacting with the cab and, in fact, it's back out of the cab and over on the other side by the time everything lands on the ground and a lot of that fence is under the chassis of the truck.

Q    So, in your view the chassis, the tractor is not changing direction during the course of the motion. It is always pointing first west and then it starts turning more southwest and as it comes off and continues to rotate, still coming around towards the east and then ends up--in effect, it does a 360 and ends up on the ground facing northeast.

That's your version of events?

117

Fisher - By Mr. Caldwell

1   A     No.  We've got a lot of extra yaw in
2   there.  So what I have is at Position 9--and I'm
3   just going to hold this relative to the diagram in
4   Exhibit F-4--
5   Q     All right.  Just to be clear, at
6   Position 9, the tractor, in reference to the
7   northbound lane, which we're going to call 6 and
8   12.  Going north is 12.
9   A     Okay.
10  Q     Okay.  The tractor in Position 9 is
11  pointing at seven o'clock.
12  A     Approximately, yes.
13  Q     Approximately, okay.
14        And so the tractor ends up as part of
15  Position 10 pointing at one o'clock.  Correct?
16  A     Yes.
17  Q     So to get from seven o'clock to one
18  o'clock, the tractor has to do a 180 rotation
19  someplace.
20  A     Yes.  Not 360.  That's where we've
21  got too much.
22  Q     Well, it starts off at twelve o'clock
23  back at Position No. 4.
24  A     Sure.
25  Q     Sure.

JACQUELINE KLAPP, CCR - (908) 782-0874

118

Fisher - By Mr. Caldwell

1         So from 4 to the end, we're having
2   this tractor do a 360.
3   A     Yes.  About half of that up at more
4   or less bridge level with a little bit of the
5   initial free fall, and then once everything is
6   over the bridge deck, we do that other 180
7   degrees.  But we also add to that the roll, which
8   results in a pitch up, the roll of the trailer
9   results in a pitch up and some roll of the tractor
10  as well.
11  Q     Assuming all that is true,
12  nonetheless, based on the math that we've been
13  talking about and the orientation you're talking
14  about, the tractor had to do a 180 between
15  Position No. 9 and its final position of rest.
16  A     Yes.
17  Q     Okay.  And you understand that in
18  Position No. 9, that the tractor is already some
19  distance below the deck of the road.  Right?
20  A     Yes.
21  Q     It is, according to Mr. Granat, at
22  the height of the wire on the posts.
23  A     Okay.
24  Q     All right.  Well, how high--how much
25  time and how high does this tractor--let me back

JACQUELINE KLAPP, CCR - (908) 782-0874

119

Fisher - By Mr. Caldwell

1   up.  I'll withdraw that.  Let's start over again.
2         The top of the telephone poles are
3   not at the same level as the bridge deck.  Right?
4   A     Yes.
5   Q     And at the edge of the road, the
6   distance from the bridge deck to the road is
7   something more than the 32 feet where the thing
8   impacts, where the tractor impacts.
9   A     Yes.
10  Q     Yes.  Okay.
11        And so the slope of the hill is
12  acting like the hypotenuse of a triangle, from a
13  geometry point of view.
14  A     Okay.  Sure, yes.
15  Q     So if we think of the telephone poles
16  as being the leg of the right triangle, and then
17  the distance from the wire into the embankment as
18  being one of the legs of the triangle.  Right?  Am
19  I--
20  A     The wire--are you saying the wire
21  runs toward the embankment or if we drew a line
22  from the wire--
23  Q     Right.
24  A     I understand.
25  Q     At that elevation, if you just draw a

JACQUELINE KLAPP, CCR - (908) 782-0874

120

Fisher - By Mr. Caldwell

1   line across there.
2   A     Okay.
3   Q     So you have a distance from the road
4   up that's the height of the wire, and then to get
5   from the edge of the street into the embankment,
6   you go at right angles--
7   Q     --and so, then, the slope is acting
8   as the hypotenuse of that triangle coming back to
9   make that geometric figure.
10  A     Correct.
11  Q     Okay.  Fine.
12        How far above the road is the
13  tractor, in your analysis, when it contacts the
14  wire?
15  A     I have not done that analysis.
16  That's Mr. Granat's analysis.
17  Q     But in your analysis, whether you've
18  done the height analysis or not, it is from that
19  position that the tractor has to go 180 degrees.
20  From Position 9 to Position 10, it has to
21  accomplish that physical feat in that time and
22  space description.
23  A     It's my understanding of Mr. Granat's
24  analysis.  Whether now in Position 10 it's shown

JACQUELINE KLAPP, CCR - (908) 782-0874

121

Fisher - By Mr. Caldwell

1  at--it's shown at rest at this one o'clock
2  position, whether it was--whether it was like this
3  or was it three o'clock, it's tail--it's tail end
4  leading.  So we could have some pirouetting on
5  that tail end.  Again, Kevan Granat could fill in
6  the details on that.  But my understanding is
7  that, obviously, the trailer has yawed 180
8  degrees--
9       Q     No doubt about it.
10      A     --and the tractor, to the degree that
11  it yaws completely with the trailer, has yawed 180
12  degrees, but it's primarily hitting tail end
13  leading.
14            So could we be misinterpreting that
15  one o'clock rest position with its yaw angle at
16  impact?
17            Could it have been two o'clock or
18  three o'clock and then when it fell--when the nose
19  end fell down to the ground, it came into more
20  this one o'clock?
21            That's a level of detail and
22  expertise that belongs to Mr. Granat.
23      Q     I can accept your argument that maybe
24  the tractor falls to the ground.
25            But once it comes to its initial

JACQUELINE KLAPP, CCR - (908) 782-0874

---

122

Fisher - By Mr. Caldwell

1  position of rest and is leaning up against
2  something, you're not concluding that it did an
3  additional rotation through the horizontal axis,
4  are you?
5       A     Well, I'm saying once it hits on its
6  tail end, it's not going to stay standing on its
7  tail end.  It's going to fall down.  In which
8  direction it falls, whether it changes its yaw
9  angle, its yaw orientation a little bit during
10  that fall can depend upon the specifics of how it
11  hits the ground.  The level of detail and
12  expertise belong to Mr. Granat.
13      Q     I just want to make sure that you're
14  describing for me a continuous motion that the
15  tractor hits tail end and then continues to fall
16  on its wheels, that there's not some delay between
17  those two events.
18      A     No.  That's--yeah.  I don't think it
19  stays standing on its tail end, correct.
20      Q     Okay.
21      A     It's impacting, and then--the tail
22  end is impacting, and then it falls onto the
23  ground to its rest position--
24      Q     And according to--
25      A     --more or less.

JACQUELINE KLAPP, CCR - (908) 782-0874

---

123

Fisher - By Mr. Caldwell

1       Q     Okay.  And according to your
2  analysis, that's the time when the cab comes loose
3  from the chassis.
4       A     Well, according to Mr. Granat's
5  analysis.  But I certainly agree with that from a
6  physics perspective.
7       Q     Well, your analysis of the injuries,
8  his subsequent injuries is predicated on that?
9       A     Yes.
10      Q     So which way is Mr. Medina facing
11  when the tractor hits tail end?
12            Is he facing towards the front of the
13  cab?
14            Is he facing towards the passenger's
15  door?
16            Is he facing towards the driver's
17  door?
18            Is he lying on his back looking up?
19            Is he lying on the floor looking
20  down?
21            What did you conclude?
22      A     Relative to the cab, he's facing
23  toward the front of the cab, so toward the
24  windshield, with his right side--well, his back,
25  primarily, the right side of his back exposed

JACQUELINE KLAPP, CCR - (908) 782-0874

---

124

Fisher - By Mr. Caldwell

1  toward the direction he's going to go on that
2  ground impact.  And the reason for that is to get
3  the right posterior rib fractures when he moves at
4  approximately 30 miles an hour toward the back,
5  the sleeper area of the truck.
6       Q     Well, then, you're assuming that he's
7  moving at 30 miles an hour inside the cab of the
8  truck because he's not holding on to anything and
9  trying to resist these forces, he's just a passive
10  body being thrown around like a Ping-Pong ball?
11      A     Well, at a 30-mile-an-hour impact
12  with the ground, there's going to be very little a
13  human can do to resist that kind of motion.  We're
14  not talking about a couple of, you know--we're not
15  talking about a fraction of G's here, where you
16  can resist it, or a couple of G's here, where
17  you're--you're not going to resist it completely,
18  but you can maybe brace against it and mitigate
19  it.
20            Once you hit the ground at 30 miles
21  an hour, there's no amount of bracing or holding
22  on that's going to change what physics is doing to
23  you at that point in time.
24      Q     And, of course, it's not the fall.
25  It's the sudden stop that's the issue.

JACQUELINE KLAPP, CCR - (908) 782-0874

125

Fisher - By Mr. Caldwell

1       A       Exactly.  The truck comes to a sudden
2  stop, the chassis--sorry.  The chassis comes to a
3  sudden stop, the cab keeps going--Mr. Medina keeps
4  going, the cab comes to a stop, and Mr. Medina
5  keeps going--
6       Q       Right.
7       A       --and he's striking structures inside
8  the cab and fracturing his right posterior ribs, 2
9  through 10, in that impact.
10       Q       So, based on your analysis and
11  looking at the structure of this truck in F-5,
12  what is it, in your view, that he smashed into?
13       A       I haven't determined to that level of
14  specificity.  As you saw in my report, I said
15  there are cabinets back there, there's a bunk,
16  there's the rear walls.  I know he's--because it's
17  impacting tail end leading, I know that he's going
18  backward and to his right in that cab and hitting
19  something back in that area with the right side of
20  his back and fracturing his ribs.
21       Q       But he didn't fracture his collar
22  bone on the right side.  Right?
23       A       No.  It's to his back, not to his
24  front.
25       Q       And he didn't fracture his shoulder?

JACQUELINE KLAPP, CCR - (908) 782-0874

126

Fisher - By Mr. Caldwell

1       A       Correct.
2       Q       Based on the cut sheets again, it
3  certainly appears that a lot of the interior
4  surfaces of this truck are padded.  Right?
5       A       Certainly up in the driver
6  compartment they are.
7       Q       So the seats are padded, the dash is
8  padded, the steering wheel is padded, all of the--
9       A       Yeah.  And that's probably regulated
10  for that driver compartment.
11       Q       Right.  Also, in the picture that
12  precedes it, where it says, "Inside, it's a real
13  softie"--
14       A       Is that a technical term?
15       Q       Well, it's on their literature.  I'm
16  only reading what's on their literature.
17               --it does show that there is padding,
18  quilting.  It's not just a hard plastic surface in
19  the back there by the bunk bed, is there?
20       A       I'm not sure what's under--I presume
21  the mattress is soft.
22       Q       Yes.
23       A       What's behind that quilting and how
24  thick that quilting is, I don't know.  These
25  cabinets, these--

JACQUELINE KLAPP, CCR - (908) 782-0874

127

Fisher - By Mr. Caldwell

1       Q       The cabinets are probably molded,
2  extruded plastic, or something like that, bolted
3  to the floor, formfitted, or something of that
4  nature.  They're not padded.
5       A       If you hit it at 30 miles an hour,
6  it's going to fracture some ribs.
7       Q       Right.
8               MR. COOK:  You're just referring to
9       what's shown in the pictures in the
10       brochure.  Correct?
11               MR. CALDWELL:  Yes, that's correct.
12       Q       So, in B-27, we are looking at the
13  outside rear of the cab looking from the outside
14  towards the chassis.  So we're essentially looking
15  from east to west.
16       A       Yes.  Correct.
17       Q       And in G-11, back to our
18  archeological analogy, the fencing is below the
19  chassis?
20       A       Yes.
21       Q       So the fencing gets there first?
22       A       At ground contact, yes.  Yes.
23       Q       And that's true by the driver's side
24  door that's shown here and by the left rear--
25       A       The driver's side--yeah.  I guess the

JACQUELINE KLAPP, CCR - (908) 782-0874

128

Fisher - By Mr. Caldwell

1  driver's side door area, the door is gone.
2       Q       Right.  The fencing is below the
3  chassis there and below the step, and to the rear
4  it's also below the rails of the truck.  Right?
5       A       Yes.
6       Q       And that is also plainly evident, is
7  it not, in G-10, where you can see the fence
8  underneath the chassis, as a matter of fact,
9  coming forward of the wheel, and it's underneath
10  the chassis there, also?
11       A       Yes.
12       Q       And there are photographs, are there
13  not, with the remains of the two seats?
14       A       Yes, there are.
15       Q       As a matter of fact, in your
16  compilation you have them marked out, and I
17  presume that you did that work--
18       A       I did.
19       Q       --because you emphasized the
20  highlighting of those.
21       A       Yes.  Yup.
22       Q       And what was previously marked as
23  CB-4 back in June of 2012, we can see the remains
24  of the seat frames in the center of this
25  photograph.  Correct?

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell                    129

1    A    Yes.  Here's the passenger's seat
2    frame, we're looking at it side on, the driver's
3    seat frame, this is the outboard armrest, and the
4    head restraint frame up here.
5    Q    Outboard armrest, meaning closest to
6    the door?
7    A    The door, for the driver's side.
8    Q    So this is closest to the driver's
9    door.  Right?
10   A    Correct.
11   Q    And the one in the--sorry.  The
12   passenger one is which one?
13   A    So this is the passenger's seat.
14   We're looking at the driver's seat side on.  So
15   you can see a little bit of the far side--sorry,
16   the inboard side of the frame over here.  But
17   we're mostly looking at the side of the back, the
18   seat back frame.
19   Q    This is the passenger's frame.
20   Correct?
21   A    No.  That's the driver's frame.  This
22   is the driver's frame here.  This is the head
23   restraint of the driver's seat.  This is the
24   outboard side.  This is the inboard side of the
25   driver's seat.  And then this is the passenger's

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                    130

1    seat here.  This is the outboard side, head
2    restraint, inboard side, and then the support that
3    goes between the frame rails there.
4    Q    Can I see your marked-up one, please?
5    A    Sure.
6    Q    I believe it's the same picture.
7    This is a better photograph.  Okay.
8    A    There are several here.  In fact,
9    this is even closer.
10        MR. CALDWELL:  All right.  Let's mark
11   this F-7.
12        (8 1/2" by 11" color photograph
13   entitled "Accident Scene Photos: Cab"
14   received and marked Exhibit F-7 for
15   identification.)
16   Q    What's now been marked F-7, we have
17   both of the seats, which you have marked the
18   "Passenger's seat frame" and then the "Driver's
19   seat frame," and then you have also interlineated
20   where you believe Mr. Medina's body was that would
21   have been in a prone position, so, facedown, head
22   down the hill--
23   A    Correct.
24   Q    --approximately.
25   A    And this, obviously, came from

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                    131

1    studying the whole series of photos to determine
2    how his body was oriented and then going back to
3    the other photos and fitting that back in.
4    Q    And in the other corner of the
5    picture we have the remains of the front of the
6    trailer.
7    A    Yeah.  I think somebody called it the
8    kingpin plate, the part of the trailer, yeah, the
9    front floor of the trailer that attaches to the
10   tractor.
11   Q    The front floor of the trailer, which
12   is oriented backwards from where it would be if it
13   were assembled correctly.
14   A    Correct.
15   Q    And so, archeologically speaking, the
16   seats are between the ground and the underside of
17   the floor of the trailer--
18   A    Correct.
19   Q    --which means that the seats got
20   there first.
21   A    Yes.
22   Q    So, then, from that it's fair to
23   conclude that the tractor came--sorry, that the
24   cab came loose from the frame before the trailer
25   impacted the ground?

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                    132

1    A    I think the cab came loose from the
2    trailer when--
3    Q    From the tractor.
4    A    Sorry.
5         --from the tractor when the chassis
6    impacts the ground in this tail up orientation.
7         Now, if you would ask about whether
8    it stopped or whether it's a continuous motion,
9    it's going to be a continuous motion.  But the
10   tractor, you know, for a brief instant it is
11   stopping, but then it's going to continue to fall
12   over.  And what that allows, it allows for that
13   separation of the cab when this hits and the cab
14   just keeps going toward the ground at
15   approximately 30 miles an hour, it falls to the
16   ground.
17        And I'm using the truck top to
18   represent the entire cab.  And then we have our
19   fall, kind of like the free fall of this truck.
20   Now, this chassis, which is now landing tail end
21   leading, is standing, up ended, nose in the air,
22   falls down, so that the first dual tire lands more
23   or less in the front seat area.  That's what I
24   picture happening.
25   Q    By the way, the front seat area gets

JACQUELINE KLAPP, CCR - (908) 782-0874

133

Fisher - By Mr. Caldwell

1   to be under the tire before the chassis falls.
2   Right?
3          It comes from the left front corner,
4   the passenger's-sorry, the driver's seat goes all
5   the ways from being in the upper left-hand
6   quadrant of the tractor as it falls backwards,
7   being in the lower right-hand quadrant.
8       A    Correct.
9       Q    It gets to the ground first before
10  the tractor-trailer comes down on top of it,
11  archeologically speaking.  Yes?
12      A    Yes.
13      Q    The entire cab is going to--strike
14  that.
15          If we consider the chassis when it
16  strikes the ground in its vertical or semivertical
17  position with the nose up at twelve o'clock,
18  pointing up, twelve o'clock.  Right?
19      A    Okay.
20      Q    All right?
21      A    Twelve o'clock, in this--
22      Q    Twelve, six.  Right?
23          Okay.  The top of the--if the front
24  of the chassis is twelve o'clock, the bottom of
25  the chassis six o'clock, the right-hand side is

JACQUELINE KLAPP, CCR - (908) 782-0874

134

Fisher - By Mr. Caldwell

1   three--
2       A    Three.
3       Q    --and the left-hand side is nine.
4       A    Yes.  I appreciate that.
5       Q    Good.  No problem.  It helps
6   everybody.
7       A    We're talking about three dimensions
8   here.  I know it gets tricky.
9       Q    So the cab comes off and is traveling
10  from its twelve o'clock orientation towards five
11  o'clock.
12      A    Yeah.  So it's--we see that there's
13  actually some right bias, which, again, makes
14  sense.
15      Q    Let me do this.
16          If the nose of the tractor is
17  pointing at one o'clock--I don't want to talk to
18  you into an orientation that you're not happy
19  with.
20      A    Yeah.
21      Q    So if I say twelve, are you saying
22  that the nose of the tractor is more one o'clock
23  than twelve o'clock?
24      A    Between twelve and one.
25      Q    Okay.  Fine.

JACQUELINE KLAPP, CCR - (908) 782-0874

135

Fisher - By Mr. Caldwell

1          Regardless of whether it's twelve,
2   one or 12:30, you say, and I agree, that the cab
3   is going backwards towards five or six o'clock.
4       A    Correct.
5       Q    Okay.  And the fence that you say
6   penetrated the passenger's door, which is now
7   located at three o'clock--
8       A    So--
9       Q    Wait a minute.  Let me just...
10          The passenger's door that you say was
11  penetrated by the fence is at three o'clock, but
12  the fence and the post that did this is located at
13  seven o'clock.  Correct?
14      A    Correct.
15      Q    Okay.  And for purposes of our
16  analogy, we have what kind of diameter across the
17  face of this clock?
18      A    If we were to say the length of the
19  truck?
20      Q    Yes.
21          Twenty-seven feet?
22      A    Sure.  Yes.  I'll accept that
23  estimate.  I'm not certain, but that sounds
24  reasonable to me.
25      Q    And in addition to which now if we're

JACQUELINE KLAPP, CCR - (908) 782-0874

136

Fisher - By Mr. Caldwell

1   using the top of the roof to represent the entire
2   cab, you're saying that the cab comes down and
3   ends up at right angles to the chassis?
4       A    Yeah.  It actually ends up this way.
5   So--
6       Q    Sorry.  "This way" doesn't help the
7   record.
8       A    It ends up not only rearward and
9   rightward of the chassis, but also rotated, as
10  seen from above, rotated about 90 degrees
11  counterclockwise.
12          What causes it to do that, I could
13  speculate, but it would be--
14      Q    No, no.  You know better than that.
15  We don't want you to speculate.
16      A    Okay.  Something hangs on longer than
17  something else, so that it--so that it yaws.
18      Q    So that it yaws.  Okay.
19          But the distance from the cab
20  remains, whichever way it's focusing, the chassis,
21  Mr. Medina's body is between those two points, and
22  the fence post, which is on the other side of the
23  chassis, is at seven o'clock.
24      A    Sure.
25      Q    Okay.  How far?

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell                    137

1      A      It could be 20, 30 feet.  I
2  have--yes.
3      Q      Twenty to 30 feet.
4      A      Yes.
5      Q      And mind you now, according to what
6  you say happened, is that the fence post that's at
7  seven o'clock, and Mr. Granat I think estimated
8  that it was a second and a half for this last
9  portion of the accident to occur, when the tractor
10 comes off the road and hits the ground, in a
11 second and a half the fence post goes through the
12 cab, into the body, out of the body, and ends up
13 on the other side.
14     A      Yes.
15     Q      Okay.  Let's talk about what the
16 fence post has to do in order to do that.  All
17 right.
18            The passenger's side of the truck,
19 which is not represented--well, actually, it is.
20 Okay.
21            If we flip the truck over on the
22 underside, we see representations of the fuel
23 tank?
24     A      Yes.
25     Q      Okay.  And what is this

Fisher - By Mr. Caldwell                    138

1  chrome-looking thing--
2      A      I don't know.
3      Q      You don't know.
4            MR. COOK:  Do you understand that the
5  bottom of that matches up to our subject
6  truck?
7            THE WITNESS:  I don't--
8            MR. CALDWELL:  I take it that it
9  doesn't.
10           THE WITNESS:  I have not looked
11 closely at the bottom of this truck one way
12 or the other.  It doesn't affect my
13 analysis.
14     Q      But your analysis is that the post
15 and the fence come through the passenger's side of
16 the truck, so it has to go past the fairings,
17 which are along the side of the truck--
18     A      It depends on how the posts are
19 oriented.  It could be--it could be a point of the
20 post as we're--as we're knocking one end of the
21 post with the fairings, whether the point of the
22 post rotates in.
23            Again, it would be nice to have the
24 right side of this vehicle to investigate and to
25 look for that penetration.  I can't tell you that

Fisher - By Mr. Caldwell                    139

1  specifically.
2      Q      Whatever is on there in the pictures,
3  some of it is on the mesh.
4      A      Yes.
5      Q      Okay.  So are you saying that the
6  mesh came all the ways into the interior of the
7  truck?
8      A      Yes.
9      Q      And you're saying that the post that
10 the mesh is attached to came all the way into the
11 interior of the truck?
12     A      Part of the mesh and part of the post
13 came into the interior of the truck.
14     Q      Is there any evidence in the
15 photograph of blood or body matter, as you have
16 described it, on the end of the pipe?
17     A      Let's look at those photos.
18     Q      And if we haven't marked it, we
19 should mark it.
20     A      Sure.
21            This is just a series of photos.
22 These are zoomed in from the police photos, and
23 then these are stills from the video.
24     Q      So let's back up.
25            Corporal Marcoux is walking around,

Fisher - By Mr. Caldwell                    140

1  he points down, and he says, This looks like
2  blood, and he was pointing to something that was
3  laying on the ground, either the fence post or the
4  mesh.  Correct?
5      A      I thought he was pointing to what we
6  see here.
7      Q      "What we see here" being?
8      A      Sorry.  What we see here being on the
9  mesh and the post.  If he was pointing to
10 something separate from those on the ground, I did
11 not catch that.
12           MR. CALDWELL:  Let's give this one a
13 number.
14           (8 1/2" by 11" of two color
15 photographs entitled "Police Accident Scene
16 Photos" received and marked Exhibit F-8 for
17 identification.)
18           (A luncheon recess was taken.)
19           MR. CALDWELL:  Back on the record.
20 BY MR. CALDWELL:
21     Q      F-8, so how much is it zoomed in from
22 normal?  200?  300?  Do you know?
23     A      No.  I just pulled the bar until I
24 was zoomed in close.
25     Q      Okay.  I believe I was asking you

141

Fisher - By Mr. Caldwell

1 whether or not there was any evidence of body
2 matter or blood on what I'm calling the blunt open
3 end of the post.
4     A    I don't see any.
5     Q    And that's true for both
6 posts--sorry.
7         There's two pipe-shaped objects.
8 One is a post, one is a rail,
9 perhaps--
10     A    Sure.
11     Q    --but neither one of them has any
12 evidence of blood or body matter on them?
13     A    I don't see any on here, that's
14 correct.
15     Q    And in the section that is zoomed in
16 in F-8, do you want describe for me where you're
17 saying that there is evidence of whatever?
18     A    Sure.
19         So in the zoomed-in picture on F-8,
20 just above the circular end of the pipe, we see
21 some dark material, some dark tissue that's shown
22 better on some of the video just above that pipe
23 in the picture.
24     Q    If, as you described in your report,
25 the penetration of the cab took place while it was

142

Fisher - By Mr. Caldwell

1 falling from the deck, where does this fence post
2 and mesh get the resistance necessary to penetrate
3 the cab door, at the very least?
4     A    As the cab is--as the cab is moving
5 down, I mean, we could be--the truck is colliding
6 with it. So it has its own inertia. We could
7 have parts of the fence hanging up at different
8 points, snagging, so that it gets pulled through.
9 Obviously, it goes into the truck, comes back
10 out. We have a 25,000-, 30,000-pound vehicle
11 that's dropping--
12     Q    Actually, according to Mr. Granat,
13 the tractor is 17,000 pounds.
14     A    Okay. We have a 17,000-pound vehicle
15 falling to the ground and pulling this piece of
16 fence and its support structure along with it, so
17 this fence is going to go wherever that--wherever
18 the truck takes it. There's going to be times
19 when it's snagging, times when it's releasing.
20         I mean, I picture this fence
21 structure like a chain woven among poles, that
22 you're giving a yank on it and the end is flipping
23 around. I mean, this could be whipping around in
24 a number of different directions. It comes into
25 the cab, it whips back around, and it ends up over

143

Fisher - By Mr. Caldwell

1 on the left side, at rest.
2         I have not attempted to model in any
3 way the complex motions of this part of it.
4     Q    If you take this injury out of your
5 AIS evaluation, what does it reduce the score to?
6     A    Well, so, actually, the score--the
7 AIS score for the abdominal laceration is 2.
8     Q    Right. Okay. And it's not one of
9 the three highest. So it didn't end up in your
10 calculation of 27 at all.
11     A    Yeah. What's--what's interesting is
12 that the AIS does not allow for--well, it's not
13 that it does not allow for. It doesn't give a
14 scoring for evisceration.
15         And that was something that I checked
16 with a couple of our certified AIS scores with. I
17 checked with some of the people who write the AIS
18 about, you know, in a case where you have an
19 abdominal laceration with intestinal evisceration,
20 how do you--do you score that as anything more
21 than an AIS 2 abdominal laceration.
22         And they said, Well, you would
23 obviously score the intestinal injury.
24         Now, in this case, we have the
25 eviscerated intestine, but it's badly burned and

144

Fisher - By Mr. Caldwell

1 charred, and Dr. Bundock did not score--or did not
2 diagnosis or identify specific injury to the
3 eviscerated intestine.
4     Q    As a matter of fact, in her
5 deposition she kind of discounted the evisceration
6 altogether, more or less concluding that it wasn't
7 terribly significant in her analysis of cause of
8 death at all. Right?
9     MR. COOK:  Object to form.
10         You can answer.
11     A    Well, yeah, I don't know if she
12 discounted it in terms of--in terms of cause of
13 death.
14         If you're starting to--once you have
15 intestinal injury, which you can diagnose, then
16 you're jumping up to, you know--if you've
17 perforated the bowel, then you're jumping up to an
18 AIS 4 level.
19         Now, in this case, the most we can
20 score is the AIS 2 abdominal laceration,
21 completely neglecting the intestinal
22 evisceration.
23         In a case where there wasn't a fire
24 or there wasn't subsequent fire damage to that
25 eviscerated intestine, we could--we would probably

Fisher - By Mr. Caldwell

145

1  have diagnosable intestinal damage which we could
2  score, and if that were the case, we would have an
3  AIS 4 injury there.
4      Q      And Mr. Cook spent a fair amount of
5  time cross-examining my biomechanical guy about
6  what it means to be AIS certified.
7      A      AIS certified, yes.
8      Q      Okay.  So my understanding from my
9  review is that to be AIS certified, all you need
10 to do is be a high school graduate and pass the
11 exam eventually.
12     A      You have to pass the exam and you
13 have to--you have to recertify every couple of
14 years.  You more or less have to have the code
15 book--
16     Q      Memorized.
17     A      --memorized--
18     Q      Right.
19     A      --because you have to be able to
20 score it without the assistance of a book.  And
21 it's not just a matter of looking up the scores,
22 but it's knowing all the rules that say, But in
23 these cases this combines with this and but in
24 these cases this combines with that, and all of
25 those exceptions to the rule.  The easy part of

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell

146

1  the scoring, you know, I flipped down through and
2  score those very quickly.
3      Q      Right.  But from an educational point
4  of view, all you need is a high school diploma in
5  order to sit and take the test.
6      A      That's not to say that anyone with a
7  high school diploma could pass the test, but--
8      Q      Agreed.  Not everybody with a high
9  school diploma passes the driver's test, either.
10     A      Or the bar exam.
11     Q      Or the bar exam, or anything else.
12     A      Sure.
13     Q      Are you an AIS certified scorer?
14     A      I am not.
15     Q      Okay.  Equipoise has arrived back.
16            Come on.  We have to have a little
17 levity here.  Right?
18     A      I had all my scoring checked by
19 someone who's certified.
20            The name of someone else who's on the
21 bill, whose name I forgot to mention earlier,
22 Patricia Carroll, registered nurse and certified
23 AIS scorer.
24     Q      Okay.  Back to where I started.
25            If, in fact, the injury is

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell

147

1  postmortem, it wouldn't enter into the AIS
2  evaluation at all?
3      A      Correct.
4      Q      Okay.  And you're saying that it's
5  premortem and it still doesn't enter into the AIS
6  score because in manipulation of the
7  evaluation--not manipulation--in the calculation
8  of the resulting number, it's not high enough to
9  be computed?
10     A      Yes.  From a strict AIS scoring for
11 the overall reconstruction, I thought it was
12 important.
13     Q      So when you concluded 27 on a scale
14 of 1 to 75; is that correct?
15     A      Yes.
16     Q      Yes.
17     A      So that's based on the blunt trauma
18 that is available to examine and evaluate post all
19 of the thermal damage to the body.
20     Q      But the whole scale runs from 1 to
21 75.
22     A      Yes.
23     Q      75 being certainly fatal.
24     A      Well, there's a strong correlation
25 between--there's a strong correlation between the

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell

148

1  AIS--between the ISS score, which is a calculation
2  made from numerous AIS scores, there's a strong
3  correlation between ISS and fatality.
4            Any single AIS 6 score automatically
5  gives you 75.  And as we recall from Dr.
6  Arslanoglu's deposition, there are people who
7  survive AIS 6 injuries.  So it's not almost
8  certainly fatal, but certainly getting in that
9  direction.
10     Q      As the numbers go up, is it linear or
11 asymptotic?
12     A      It's--it is nonlinear.
13     Q      Is it plateau?
14     A      No.  I think once you--once you hit
15 75, it--
16     Q      Not 75.
17            Is it 1 through 10 and then 11
18 through 20?
19     A      Oh, in--
20     Q      In gradation.
21     A      Stepwise?
22     Q      Yes.
23     A      Not really.
24     Q      But it's not straight linear.
25     A      No.  If you were to plot out fatality

JACQUELINE KLAPP, CCR - (908) 782-0874

149

Fisher - By Mr. Caldwell

based on ISS score, it's a jagged line.

Q      A jagged line.

A      Statistically, if put error bars on
there, you'll see the error bars on some points
are bigger, some are smaller.  It's a--it's a
rough fit.

Q      But if you did a regression analysis,
you would find some fit?

A      Yes.

Q      Yes.

A      Okay.

Q      Okay.  So I'm asking you about the
fit.

Based on regression analysis, where
would the fit be for a 27?

A      For a 27--I looked at a paper by
Osler.  The problem with the paper by Osler is
that their selection was people who made it to the
hospital alive, and they were scoring will this
portion die at the hospital.

Q      A little adverse selection.

A      So it completely eliminates all the
people who died in the field.

Q      And didn't make it, right.  Okay.

A      I think Osler was in the 30/40

JACQUELINE KLAPP, CCR - (908) 782-0874

---

150

Fisher - By Mr. Caldwell

percent range at 27 fatality.  But again, I
could--I could look it up.

Q      I'm just trying to get a sense of
what we're talking about on your chart.

A      Yeah.

Q      And, by the way, who did the coding
chart that I got as part of the supplement from
Mr. Cook?

Did you do that, or was it one of
your assistants?

A      I forget whether I did it or Dr. Ravi
did it.  But, then, Nurse Carroll did the checking
and the confirmation and discussed with me all the
refinements based on the rules, and that sort of
thing.

Q      By the way, the whole use of this
particular scale and the way that we're doing it
is creative adaptation.  It wasn't designed for
the function that we're putting it to.  Correct?

A      Well, it's used for a variety of
different things.  But in terms of separating two
separate kind of--two different kinds of injury,
blunt trauma versus thermal, that's a creative
adaptation, that's correct.

Q      I believe one of the criticisms that

JACQUELINE KLAPP, CCR - (908) 782-0874

---

151

Fisher - By Mr. Caldwell

you had of plaintiff's biomechanical guy was that
something was scored as zero.  Right?

A      Oh, yes.  He scored blunt trauma to
the head as AIS zero, which basically is--it's
basically saying there is no blunt trauma to
the--to the head.

What I was pointing out was that Dr.
Bundock found no blunt trauma to the head because
most of the head, much of the head, important
parts of the head were gone and, therefore, could
not be evaluated.

As Dr. Bundock said in her testimony,
there certainly could have been significant head
trauma that we just don't know about.

Q      Right.  But in the law, we don't deal
with what could have been or what's possible.  We
have to deal with what's provable by a
probability.  Right?

A      Yes.  So that's--

Q      So to say something and to rule out
something is we're talking about possibility, not
probability.

A      So that's where I bring my
biomechanical analysis to bear.

Q      But just as a general rule, when a

JACQUELINE KLAPP, CCR - (908) 782-0874

---

152

Fisher - By Mr. Caldwell

doctor says and you see that they can't R/O, can't
rule out something, they're just talking about the
possibility that something might exist.  Right?

A      Yeah, sure.

Q      And so just to say that you can't
rule it out is not proof that it's there.
Correct?

A      Yes.  And, conversely, absence of
evidence is not evidence of absence.

Q      Right.

So just because we say that we can't
rule out that there's such things as pink
elephants doesn't mean that there are pink
elephants.

A      Correct.

Q      Or, on a slightly more scientific
basis, we can't say that we can't rule out the
fact that there's life on Mars because we haven't
gotten that far yet.  Right?

A      Correct.

Q      And it's not the zero--is it the zero
itself that you find to be an inappropriate
choice, or are you saying it's because there's
evidence that should support a finding of some
number other than zero?

JACQUELINE KLAPP, CCR - (908) 782-0874

## Page 153

Fisher - By Mr. Caldwell

1    A        Yes.  I would say there's evidence
2  that should support a finding other than zero.
3  He's just taking the absence of evidence as
4  evidence of absence.
5    Q        But we agree that the loss of the
6  calvarium is a postmortem change to the body?
7    A        Correct.
8    Q        And the exposed dura, it's exposed
9  because of the postmortem change--
10   A        The calvarium is gone.
11   Q        Right.  One thing leads to another.
12   A        Yes.
13   Q        Okay.  And then the epidural
14 hemorrhage, same thing.  Cause and effect.  If the
15 calvarium goes, then it leaves behind an epidural
16 hemorrhage?
17   A        Or that could be blunt trauma.  We
18 don't know one way or the other.
19   Q        Because in your analysis, certainly
20 the face is coded as zero in your analysis?
21   A        For there were no fractures of the
22 face?
23   Q        Right.
24            So, for the face, we're talking about
25 from the ears forward.  Right?

JACQUELINE KLAPP, CCR - (908) 782-0874

## Page 154

Fisher - By Mr. Caldwell

1    A        Yes.
2    Q        And from the chin to the calvarium.
3    A        Correct.
4    Q        All right.
5    A        External is a separate category from
6  face.  So that's where you're going to get the
7  thermal.
8    Q        Yes.  I understand that.
9    A        Okay.
10   Q        But for purposes of your scoring,
11 Category 2 here, the face was zero.
12            So, based on that scoring, all of Mr.
13 Medina's facial features, from his ears all the
14 ways around the front, from the chin all the ways
15 up to where the calvarium starts, just above the
16 eyebrows, no evidence of any injury whatsoever.
17   A        So, again, the external is scored
18 separately.
19   Q        Right.
20   A        What we're scoring in the face would
21 be things like bony fractures, and in contrast to
22 the calvarium, the bones of the face were
23 available for Dr. Bundock to examine.
24   Q        But there were no fractures of the
25 eye orbits or the jaw, there's no damage to the

JACQUELINE KLAPP, CCR - (908) 782-0874

## Page 155

Fisher - By Mr. Caldwell

1  teeth.  Right?
2    A        Correct.  So that's scored zero,
3  because she had the evidence in front of her, she
4  examined it, and she found no injury.
5    Q        But at the same time, he could have
6  been alive and had his face burned off during this
7  accident.  Right?
8    A        That will score under--
9    Q        External.
10   A        --external, yes.
11   Q        And you would categorize the burns
12 that are evidenced in the photographs as fourth
13 degree?
14   A        I have not--I have not tried to
15 quantify the degree of the burns.
16   Q        Well, do you have a general sense of
17 degrees of burns?
18   A        I do.  And I forget the actual burn
19 depth for fourth degree, but we're probably at the
20 highest degree of burning in this case.
21   Q        And you're not a fire causation or
22 originator or duration--
23   A        I am not.
24   Q        And the AIS, does it or does it not
25 take into consideration the soot that was found in

JACQUELINE KLAPP, CCR - (908) 782-0874

## Page 156

Fisher - By Mr. Caldwell

1  Mr. Medina's larynx and throat?
2    A        It does not.
3    Q        But certainly there are circumstances
4  that you can think of where someone could just die
5  from asphyxiation and not demonstrate any other
6  injuries.  Right?
7    A        Yes.
8    Q        So does your AIS--does your
9  analysis--excuse me.
10           So does your expert opinion take into
11 consideration the extent to which Mr. Medina might
12 have been exposed to a flash fire, as described by
13 Dr. Bundock?
14   A        I'm sorry.  Could you repeat that,
15 please?
16           MR. CALDWELL:  I'll ask the court
17 reporter to read it back.
18           (The reporter reads the following:
19 "QUESTION:  So does your AIS--does
20 your analysis--excuse me.
21 "So does your expert opinion take
22 into consideration the extent to which Mr.
23 Medina might have been exposed to a flash
24 fire, as described by Dr. Bundock?")
25   A        My analysis certainly considers that

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell                                        157

1  he was exposed to a flash fire.

2         Was there a particular part of my

3  opinion that--

4       Q    Yes.  Your opinion says that at some

5  point during the course of the accident, the

6  tractor and trailer were subjected to fire.

7       A    Yes.

8       Q    When is that sometime, or doesn't it

9  matter for your analysis?

10      A    I would say it is sometime between

11 when it's on the bridge deck, I mean, during

12 these--we have Kevan Granat's diagram that shows

13 positions 4, 5, 6, 7 and 8, and within a couple of

14 seconds, it's over the bridge and on the ground.

15 Those couple of seconds are not affecting my

16 analysis one way or the other.

17         Obviously, that's important for Mr.

18 Olson, who's trying to determine where the fire

19 began.

20         For me, that second-by-second

21 distinction of where the fire started in terms of

22 contributing to Mr. Medina's injuries is not a

23 large period of time.

24      Q    It's academic to you.

25      A    It's much more important to Mr.

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                                        158

1  Olson's analysis, yeah.

2       Q    And you do recall that Dr. Bundock,

3  when asked about the seat belt, you said that she

4  thought that that was irrelevant to her

5  determination of cause of death.  Correct?

6       A    Correct.

7       Q    Perhaps I missed it, but can you tell

8  me where in your report you actually conclude what

9  injuries or combinations of injuries were fatal to

10 Mr. Medina?

11      A    I don't think I concluded that in my

12 report.

13      Q    You would agree with me that a word

14 such as "large" or "small" is descriptive rather

15 than mathematical?

16      A    Yes.

17      Q    So when you describe something as a

18 large X, it depends on what you mean and what the

19 hearer believes you mean when you use that

20 description?

21      A    In the context in which it's used.

22      Q    Okay.  Well, when you describe

23 something as a large laceration, that's a

24 subjective interpretation of a physical event.

25 Right?

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                                        159

1       A    Yes.  And I think for some of the AIS

2  scoring purposes, they actually will use those

3  sometimes to distinguish different AIS levels.

4  They'll say a small laceration, a large

5  laceration.  A laceration not further specified

6  gets one score.  One described by the diagnosing

7  physician as large gets scored differently from

8  one described as small.

9         So there is some meaning that can be

10 quantified in, for example, the AIS coding

11 system.

12      Q    Well, on page 12 of your report, in

13 the large paragraph, where it says, "Mr. Medina

14 also had a large laceration of his right abdominal

15 wall...," that is your interpretation of the

16 laceration?

17         You didn't quote the word "large."

18         So that's your choice of word.

19 Right?

20      A    So what I have listed--

21      Q    Not what you have listed.  Let's

22 start with what you have written.

23         "Mr. Medina also had a large

24 laceration of his right abdominal wall..."

25         First of all, that's what you wrote.

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                                        160

1  Right?

2       A    It is what I wrote.

3       Q    Second of all, there's no quotation

4  marks.

5         So you're not saying that you picked

6  that from somebody else's description.  Correct?

7       A    I may be paraphrasing.  I might not

8  have the precise term that--my use of the word

9  "large" would generally mean that I am reflecting

10 what was used earlier.  So I looked earlier in my

11 report to what Dr. Bundock--where I summarized Dr.

12 Bundock autopsy findings and the word "large" is

13 used there as well, which suggests to me that

14 "large" is her word.

15         So I will just--

16      Q    Try page 103.

17      A    Or page 3 in her final autopsy

18 report, "There is a large laceration to the right

19 lateral abdominal wall tearing perpendicular to

20 muscle fibers."

21         Again, generally, I would not put

22 that word there unless that was supported by

23 someone else's factual evidence, in this case Dr.

24 Bundock's.

25      Q    Want to try page 103 in her

JACQUELINE KLAPP, CCR - (908) 782-0874

161

Fisher - By Mr. Caldwell

1  deposition?

2          Sorry.  Not page 103.  Page 90.

3          You don't have her whole deposition?

4     A    I don't have the whole thing, but I

5  may have--I'm sorry.  Which page?

6     Q    I believe it's page 90 that I want.

7     A    I have an excerpt from page 90, at

8  the beginning, but I may not have the...

9          Yes.  "Large" is the word she used on

10 page 89, line 24 of her deposition.  "There is a

11 large laceration of the abdomen" was her

12 statement.

13    Q    But on page 90, this is Mr. Cook's

14 question, I believe.

15         "You talked a little bit about the

16 abdominal laceration.  Did you make any indication

17 either in your report itself or in your--your

18 autopsy notes of the size of that abdominal

19 laceration?

20         "ANSWER:  Well, it would be shown in

21 the picture.  So sometimes a picture is worth a

22 thousand words.  I do not have a measurement

23 documented in the text."

24         Right?

25         So that we don't know the size.

JACQUELINE KLAPP, CCR - (908) 782-0874

162

Fisher - By Mr. Caldwell

1     A    Well, we do.  As she said, "a picture

2  is worth a thousand words."

3          And we have those pictures.

4     Q    Notwithstanding all of that, you

5  coded under the section "External" of your AIS

6  that the "large laceration of the right lateral

7  abdominal wall w/partial evisceration of the

8  intestine has a tube."  Correct?

9     A    Correct, based on Dr. Bundock's

10 diagnosis of a large laceration to the abdominal

11 wall.

12    Q    Okay.  And in the very next section

13 of the "External," you and/or your associate score

14 the "Charred skeletal muscle plus bone are exposed

15 over approximately 90 percent of the body."

16 "Description" is "Burns, second and third degree

17 partial and full thickness, including incineration

18 greater than 90 percent."

19         And that was scored as 6.  Correct?

20    A    Yes.

21    Q    The scoring is premortem.  Correct?

22    A    In that case, it would be

23 postmortem.

24         Well, to what degree it's pre or

25 postmortem, we don't know.  Obviously, he was not

JACQUELINE KLAPP, CCR - (908) 782-0874

163

Fisher - By Mr. Caldwell

1  alive for 45 minutes.

2     Q    No.  According to Dr. Bundock,

3  probably no more than a couple of minutes.

4     A    Yes.  So this degree of burning came

5  about in 45 minutes of fire.

6     Q    Well, no.  Later than 45 minutes.

7  This degree of burning could have happened at five

8  minutes, 10 minutes, 30 minutes.

9          Certain things happened later, such

10 as, perhaps, the blowing off of the top of the

11 skull.  But the third and fourth degree burns that

12 he suffered could have very well probably occurred

13 much sooner in the fire sequence.

14    A    Yeah.  To what what degree those are

15 pre or postmortem, we don't know.

16    Q    Dr. Bundock concluded that he

17 survived the accident to the point where he was on

18 the ground; does she not?

19    A    Yes.  And--

20    Q    So to the extent that there was a

21 fire that starts at or on the road deck and

22 continues thereafter, Mr. Medina is exposed to

23 that fire from that time onward.  Correct?

24    A    It depends on when the fire starts

25 and what he's exposed to.  His body is--we have

JACQUELINE KLAPP, CCR - (908) 782-0874

164

Fisher - By Mr. Caldwell

1  tissue which is uncharred on this piece of fence,

2  which indicates that Mr. Medina himself, this part

3  of Mr. Medina's body was not burned at the time

4  the fence penetrated the truck and then was drawn

5  back out from the truck, which...

6          So when you say Mr. Medina was

7  exposed to, are you saying--are we saying that

8  existence of a fire means exposure, or are we

9  saying exposure of his body directly to fire?

10    Q    In your analysis, why is it so

11 important that this fence penetrates the truck,

12 Mr. Medina's body and then exits?

13         Isn't the only reason it's so

14 important that you stand on this so much is

15 because it coordinates with Mr. Granat's analysis

16 of which way the truck was turning?

17    A    No.  I had--I had concluded that

18 before he presented his analysis.

19    Q    Do you have anything to document

20 that?

21         Do you have any file notes of

22 notations?

23         You're a scientist.

24         When you're doing your analysis and

25 doing your investigation, didn't you make

JACQUELINE KLAPP, CCR - (908) 782-0874

165

Fisher - By Mr. Caldwell

1  contemporaneous notes of what you were finding and
2  what you were concluding.
3              Didn't you do that, sir?
4     A      These were prepared--no, I did not.
5     Q      Okay.  But isn't that considered
6  normal scientific technique so that as you're
7  observing something, you're recording your
8  observations so that you can go back and check
9  them?
10    A      I do not operate in that way, sorry.
11    Q      I'm not asking whether you operate
12 that way.
13             I'm talking about what would be
14 considered usual and customary scientific
15 technique when you're evaluating something.
16             Wouldn't you expect a prudent
17 scientist to record their observations as they
18 make them minute by minute--
19    A      No.
20    Q      --day by day?
21    A      Some people do.  Some people don't.
22    Q      And you don't.
23    A      The answer is no.
24    Q      And so all we have for it is your
25 word that sometime between the time that you got

JACQUELINE KLAPP, CCR - (908) 782-0874

166

Fisher - By Mr. Caldwell

1  the materials from Mr. Cook's office and the
2  meeting in April of '13, you came to the
3  conclusion that the stuff on the fence was blood
4  and body matter.
5     A      Yes.  That's--
6     Q      And that conclusion is undocumented
7  in your file.
8              MR. COOK:  Object to form.
9              You can answer.
10    A      Well, truth always makes things
11 easier to present, too, and in this case I had
12 reached that conclusion before I spoke with Mr.
13 Granat.  So...
14    Q      You don't have any disagreement with
15 plaintiff's biomechanical application of the AIS
16 and the arithmetic aspect of it--
17    A      No.
18    Q      --the formula taking--
19    A      No.
20    Q      --the square root and adding it up
21 and--
22    A      No.  I--no.
23    Q      Your criticism boils down to what you
24 described before as the absence of evidence is not
25 evidence of absence.

JACQUELINE KLAPP, CCR - (908) 782-0874

167

Fisher - By Mr. Caldwell

1     A      In part.
2     Q      Where is there?
3     A      I believe we can start to fill in
4  these parts by doing biomechanical analysis,
5  looking at the occupant kinematics, looking at the
6  vehicle--looking at the vehicle dynamics,
7  appreciating whatever injuries Mr. Medina has.
8     Q      All with the goal of establishing
9  what?
10             We know what the end result was.  We
11 know what injuries he had.  It's not
12 hypothetical.
13    A      We know--
14    Q      They're real.
15    A      We know in part what blunt trauma he
16 had.
17             So tell me what additional injuries
18 you're concluding, within a reasonable degree of
19 scientific certainty, he sustained that were
20 obscured by the fire.
21    A      I believe he had head injuries which
22 were obscured by the fire.
23    Q      Based on what?
24    A      Based on the fact that when this
25 truck hits the ground and the cab hits the ground,

JACQUELINE KLAPP, CCR - (908) 782-0874

168

Fisher - By Mr. Caldwell

1  he's moving at 30 miles an hour toward the rear of
2  the cab and striking his back hard enough that
3  he's fracturing nine ribs on the right side of his
4  body.
5              So where's his head during that
6  impact?
7              His neck is not injured.  His neck,
8  which survived the fire, Dr. Bundock was able to
9  take a close look at.  There's no injury at all to
10 his neck.
11    Q      No subdural hematomas?
12    A      Yeah.
13    Q      So--
14    Q      No fractures?
15    A      Right.
16             So if you dropped the body onto a
17 surface at 30 miles an hour, you have a couple of
18 choices: either the head and the body impact the
19 structure and stop, or the body impacts the
20 structure and, again, hard enough to break nine
21 ribs and stops, the head keeps moving, because it
22 misses the structure, and Dr. Bundock diagnoses
23 severe neck injuries.
24             We don't have that here.  That tells
25 us the head came to a stop.  The absence of neck

JACQUELINE KLAPP, CCR - (908) 782-0874

169

Fisher - By Mr. Caldwell

1  injury tells us the head came to a stop and the
2  body came to a stop, and we know that the body
3  came to a stop, such that he fractured nine ribs
4  on the right side of the body.
5        That's consistent with a 30-mile an
6  hour velocity.  Twenty to 30 miles an hour,
7  cadaveric tests have shown you can get these kind
8  of rib fractures.  Studies have also shown that at
9  20 to 30 miles an hour you get severe head
10  trauma.  You get skull fractures.  You get--
11       Q     You do, but not in all instances.
12  Right?
13       The studies also show that at 30
14  miles an hour people walk away from accidents with
15  no injuries whatsoever.
16       A     I'm not talking about a car moving 30
17  miles an hour.  I'm talking about your head
18  hitting a surface at 30 miles an hour.  There's no
19  walking away from that.
20       I have in my binder or in the
21  bibliography of my report numerous papers where
22  cadaveric heads were dropped onto various surfaces
23  at different speeds.  And when you get up into a
24  range of 15, 20, particularly 30 miles an hour,
25  you're getting skull fractures in almost all

170

Fisher - By Mr. Caldwell

1  instances, and serious brain trauma.
2        That's not recorded in Dr.--or in Mr.
3  Medina's case, because his calvarium was no longer
4  available to diagnose.
5        Q     The back of his skull was, wasn't
6  it?
7        A     Let's take a look.
8        (8 1/2" by 11" color photograph
9  received and marked Exhibit F-9 for
10  identification, and
11       8 1/2" by 11" color photograph of a
12  skull received and marked Exhibit F-10 for
13  identification.)
14       A     So--
15       Q     No, no.  There's no question pending
16  at the moment.
17       So, in F-9, besides the absence of
18  the calvarium on the top of Mr. Medina's skull,
19  what else is it that you wanted show me?
20       A     Well, by calvarium, we're talking
21  about all of the skull, from the base of the skull
22  up.  So when you say--
23       Q     No.  It's not from the base of the
24  skull up.  That's not what the definition of
25  calvarium is.  You know that.  The definition

171

Fisher - By Mr. Caldwell

1  that's been used throughout the course of this
2  proceeding is from the eyebrows up, not the base
3  of the skull.
4        A     Whose definition is that?
5        I'm speaking in an anatomical sense.
6        Q     You disagree that that's the
7  definition of what the calvarium is, that it's not
8  from the eyebrows up?
9        A     On the front of the head, that's
10  fine.
11       Q     No.  Circumference, all around the
12  circumference, from the eyebrows up.  You cut a
13  section through the head, starting at the
14  eyebrows, from front to back, and you saw the
15  whole thing off.
16       You're disagreeing that that's not
17  the definition of what the calvarium is?
18       A     That is not the definition of the
19  calvarium.
20       Q     So if Dr. Bundock said that, she's
21  wrong?
22       A     Well, let me point out what Dr.
23  Bundock said.
24       Dr. Bundock said:
25       "And by entirely missing, what did

172

Fisher - By Mr. Caldwell

1  you mean by that?
2        "Well, I couldn't identify the
3  frontal," parietal--sorry--"frontal, temporal,
4  parietal or occipital bones that comprise the bulk
5  of the skull."
6        Q     And so where is the eyebrow arch on
7  that diagram?
8        A     That would be right here.
9        Q     Right.
10       And all the things that you've
11  described are above that.
12       A     Except the temporal bone and most of
13  the--and much of the occipital, all of which she
14  says she could not identify on Mr. Medina's
15  skull.
16       Q     And your conclusion is?
17       A     Most of his head is gone.
18       We're not talking about a little spot
19  that's missing where, Hey, unless we hit him
20  there, he has a fracture there, there is no head
21  trauma.
22       We're talking about from the base of
23  the skull up, everything is gone.  The entire
24  cranial vault could have had fractures that we
25  will never know about from the physical evidence.

173

Fisher - By Mr. Caldwell

1    Now, we can reconstruct by looking at
2  the vehicle dynamics, by looking at the occupant
3  kinematics, by knowing how the rest of his body,
4  by looking at the injuries that he does have, by
5  looking at the nine rib fractures he has on the
6  right side of his body, the absence of neck
7  fractures and say, There's a pretty good chance
8  he's hit his head significantly enough to have
9  skull fractures and severe head trauma.
10    Q    Only if your initial assumption about
11  him being unrestrained is true.  Right?
12    If he's sitting in his seat in
13  astronaut position when the back of the chassis
14  hits the ground--
15    A    Then we have to take away his rib
16  fractures, which we know he had--
17    Q    One step at a time.  I'm plugging
18  your holes for you, as you like to say.
19    So one of the alternatives is that
20  he's actually seated in the driver's seat, because
21  he was wearing his seat belt, and he's going down
22  in an astronaut position.
23    A    Okay.
24    Q    Yes?
25    A    Yes.

JACQUELINE KLAPP, CCR - (908) 782-0874

174

Fisher - By Mr. Caldwell

1    Q    Okay.  So that would eliminate all of
2  your analysis about him being between the seat and
3  crashing into the back of the cab at 30 miles an
4  hour.  Correct?
5    A    But we have to--
6    Q    Correct?
7    A    We need to do two other things,
8  though.
9    Before I can agree to your
10  hypothetical, I have to point out the other pieces
11  we're going to have to account for, which is the
12  mechanism of the rib fracture now and the state of
13  the driver's seat.
14    Q    The rib fractures could also be
15  caused by the astronaut position and there's the
16  potential for crush damage when he comes down,
17  he's bouncing around, he's got the seat belt
18  across him, he comes down on the back of the seat
19  and fractures his ribs.
20    A    In layman's terms, perhaps.  Not from
21  a biomechanics perspective.  We're not going to do
22  that.
23    Q    You may not want to do it, but we can
24  do it.
25    A    Well, we have some studies here that

JACQUELINE KLAPP, CCR - (908) 782-0874

175

Fisher - By Mr. Caldwell

1  will support that.
2    Q    Which studies specifically?
3    A    The Cavanaugh studies would be
4  supportive, the Pintar study in the bibliography
5  of my report there.
6    Q    What other hole do you want to plug?
7    A    Let's take a look at the driver's
8  seat.
9    The rib fractures are there.  That's
10  a hole we're not going to be able to plug.  The
11  driver's seat is more of a consistent width.
12    Q    You mean the frame, the padded
13  frame?
14    A    Yeah.
15    I have looked at a number of
16  high-speed rear-end collisions, and you get a 15-,
17  20-, 25-mile-per-hour delta-V vehicle, and it
18  usually yields the seat frame back.
19    Now, I can't see the base of the seat
20  well in these pictures, but I went through from
21  every angle that I could and tried to find both
22  the seat pan and the seat back, and I do not see
23  the kind of seat back affirmation where it's
24  pushing the entire seat back, back relative to the
25  seat pan.

JACQUELINE KLAPP, CCR - (908) 782-0874

176

Fisher - By Mr. Caldwell

1    I have not studied the structure of
2  the Freightliner seat--
3    Q    But the armrests are in the wrong
4  position, isn't that true, as shown in the
5  pictures?
6    A    The armrest is twisted around
7  rearward, which is--
8    Q    180 degrees in the wrong direction.
9    A    It's certainly consistent with the
10  vehicle impacting the ground.
11    Q    What would be holding it in place in
12  its prefire condition that would prevent that
13  rotation?
14    A    I'm sorry.  What would--
15    Q    In its prefire condition--
16    A    Yes.
17    Q    --it's oriented 180 degrees the other
18  way.  Right?
19    If you tried to rotate it through its
20  range of motion from down to being up in its
21  stored position, there's something that prevents
22  it, is there not, from going back another 90
23  degrees?
24    A    I don't know if there is or not.
25    MR. COOK:  You're assuming that the

JACQUELINE KLAPP, CCR - (908) 782-0874

177

Fisher - By Mr. Caldwell

1    armrest was down at the time of the impact?

2    Q    There's a couple of choices.  Either

3    it's up or it's down.

4         In this particular picture, it ends

5    up 90 degrees in the wrong direction.  Correct?

6         If it started in the up position,

7    it's 90 degrees in the wrong position.  Correct?

8    A    This is certainly consistent with the

9    ground impact.

10        When the back of that cab hits the

11   ground, even if this is--if this is in a stowed

12   position, even if there is, you know, a little

13   tooth there, or something, to keep it from

14   rotating back more, the inertia of that armrest

15   alone could break it off and rotate it into this

16   position prior to any prior damage.

17   Q    You're assuming that Mr. Medina is

18   not seated in the astronaut position with his arms

19   down braced against the armrest.

20   A    I'm just saying how it could get into

21   that position from the impact.

22   Q    Right.  And I'm saying that if you

23   add another fact that Mr. Medina is seated in the

24   seat in the astronaut position and then it

25   wouldn't get that way through impact because his

178

Fisher - By Mr. Caldwell

1    arms would be pressed down against it.

2    A    But we know that's not the case,

3    because he's not going to have rib fractures.  And

4    again, I would--

5    Q    You're hinging your--

6    A    --expect to see deformation of the--

7    Q    You're hinging your--

8    A    --more deformation of the seat back

9    and--there was one picture that had the--there's

10   some pictures where I was able to see the seat

11   back relative to the seat frame, and I was looking

12   for signs of seat back deformation.

13        And again, I see the seat back--

14   Q    Is that the seat back or the seat

15   bottom of the--the object with the round holes in

16   it in the center of the picture?

17        That's the frame.

18   A    Oh, this is for the--this is maybe

19   the seat bottom of the passenger's seat.  I can't

20   see the seat bottom of the driver's seat in this.

21   Q    Do you conclude, first of all, that

22   it's the bottom of the seat or the back of the

23   seat?

24   A    This piece?

25   Q    Not the frame.

179

Fisher - By Mr. Caldwell

1         The portion with the holes in it,

2    this portion underneath--I'm red/green

3    color-blind.

4         This arrow that you have here that's

5    leading to the driver's seat that bisects some

6    object that's right behind it in the background,

7    what's that?

8    A    I'm not a hundred percent sure.  I

9    think that might be the seat pan of the

10   passenger's seat.  I wouldn't say that for

11   certain, though.

12   Q    Is it the pan looking from the top

13   plane view, or is it looking from the bottom up?

14   A    I think it's looking from the top

15   down.  And that's just estimating from the

16   orientation of the rest of the seat frame.

17        Of note, the inboard armrest of the

18   passenger's seat is also rotated completely

19   rearward as well, consistent with that impact that

20   wouldn't involve Mr. Medina holding on to it.

21   MR. CALDWELL:  We don't have a number

22   on this one or this one.

23        (8 1/2" by 11" color photograph, with

24   the decedent's body, received and marked

25   Exhibit F-11 for identification, and

180

Fisher - By Mr. Caldwell

1    8 1/2" by 11" color photograph, with

2    the passenger's and driver's seat frame,

3    received and marked Exhibit F-12 for

4    identification.)

5    Q    So, let's recapitulate.

6         F-11 is the photograph with the two

7    seats frames and--is that red, the red arrow?

8    A    Yes.

9    Q    Thank you.

10        Sorry.  That's 12.  The lower

11   right-hand corner, that's F-12.

12   A    F-12.

13   Q    And F-11 is the one that has the

14   stick figure of the decedent's body in the picture

15   as well, and that's yellow?

16   A    Yes.  And we see the seat, yes, the

17   seat frames viewed from the passenger's side.

18   Q    And in F-12, this frame is considered

19   the driver's seat frame, and this is the--

20   A    That would be the outboard armrest of

21   the driver's seat.

22   Q    By the door.

23   A    By the door.

24   Q    By the door.  Okay.

25        And that's the same as in F-11.  This

181

Fisher - By Mr. Caldwell

1  is the same, but a different angle, it's the same
2  piece of metal?
3      A     That's the inboard armrest of the
4  passenger's seat.
5      Q     The center, the passenger's center.
6  Right?
7      A     Yes.  Yes.
8      Q     And we can tell that because this is
9  the L-frame shape of the seat--
10     A     Correct.
11     Q     --in F-11.
12     A     Yes.
13     Q     So this is the passenger's seat.
14 Okay.
15           And so that arm is rotated 90 degrees
16 from its stowed position if that's 180 degrees
17 from its operational position.
18     A     Correct.
19     Q     In F-12, this is the driver's seat
20 frame.
21           So the bottom of the picture is the
22 back and the top is the front, facing forward, if
23 we were to--
24     A     The bottom is the--correct.  So, as
25 we look at the photo, the thing closest to the

JACQUELINE KLAPP, CCR - (908) 782-0874

182

Fisher - By Mr. Caldwell

1  photographer is the frame rail, that would be the
2  outboard side of the seat closest to the driver's
3  door, and just behind that we see another frame
4  parallel to the--
5      Q     Again, we can see the joint down at
6  the bottom of the lower left corner of the
7  picture--
8      A     Correct, down at the bottom.
9      Q     --and the armrest is, again, either
10 90 degrees off from the stowed position or 180
11 degrees off from the operational position.
12     A     Yeah.  Or even beyond that.
13     Q     Or even beyond that.
14           And, then, we were talking about the
15 seat pan.  It appears that this is the lip and the
16 shape for the buttocks and the hips, and it
17 appears to be the top of the pan, and this appears
18 to be the bottom of the pan?
19     A     I'm not a hundred percent sure
20 whether we're looking down on the seat.  I see a
21 hole here.  I know sometimes those are just for
22 aeration.
23     Q     Right, for aeration.
24     A     The seats have holes.  So we might be
25 looking down at the top, almost perpendicular,

JACQUELINE KLAPP, CCR - (908) 782-0874

183

Fisher - By Mr. Caldwell

1  straight down onto the passenger's side seat pan.
2  I'm not a hundred percent sure.  I was looking for
3  some other photos that might give us a different
4  perspective on that.
5      Q     But overall, the gist of your
6  position is that the rib fractures are indicative
7  of unrestrained motion at the tail end of the
8  accident, when Mr. Medina is propelled into the
9  right rear corner of the cab, and that's when he
10 breaks the ribs.
11     A     Yes.
12     Q     When does he break his leg?
13     A     He may be tumbling as he goes back in
14 there.  I have not identified that specifically.
15 He has fractures of his left leg and his left
16 arm.
17     Q     Which are on the opposite side of the
18 body from where the rib fractures are.
19     A     Yeah.  So his back is hitting--again,
20 it's a 30-mile-an-hour impact, approximately 30
21 miles an hour, with structures in the sleeper area
22 of that cab.
23     Q     But he didn't break his right
24 shoulder, his right arm, upper or lower arm, his
25 right elbow, or his right wrist.

JACQUELINE KLAPP, CCR - (908) 782-0874

184

Fisher - By Mr. Caldwell

1      A     No.  It's hitting him on the right
2  side of his back.
3      Q     Flush?
4            Is he going into whatever--
5      A     Again, I have not specified--I have
6  not identified what structure it is.  It would
7  be--it would be nice in cases, you know, where you
8  can look at a vehicle and identify witness marks
9  indicating contact.
10           In this case, we have a fire, and all
11 of those kinds of witness marks were gone.  So we
12 don't have that assistance to help us specify what
13 was contacted.  I know the general direction based
14 on kinematics.
15     Q     And F-11, the general orientation of
16 the seat is towards and underneath the chassis.
17 Correct?
18     A     Yes.  It looks like, we'll call it
19 the second axle or the front dual axles of the
20 tractor appear to be more or less in the seat area
21 of the driver's and passenger's seat.
22           MR. CALDWELL:  I'm sorry.  Could
23     you read that back?
24           (The reporter reads the following:
25           "ANSWER:  Yes.  It looks like, we'll

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell                185

1    call it the second axle or the front dual

2    axles of the tractor appear to be more or

3    less in the seat area of the driver's and

4    passenger's seat.")

5        Q       Okay.  In the seat area.

6        A       Yes.

7        Q       Okay.

8        A       And as we see here, we see the steel

9    belting from inside the tire more or less in the

10   driver's seat.

11       Q       Okay.  And so the windshield area and

12   the dash that we saw in the catalog, they are

13   further under the chassis in F-11.

14       A       If they separated with the cab and

15   didn't stay attached to the chassis.  And again--

16       Q       There's no reason to believe that the

17   windshield and the dash didn't stay attached to

18   the cab as they fell as a unit, is there?

19       A       I'm not sure.  I don't know where the

20   weak points are going to be and where that's going

21   to separate.  But--

22       Q       But you didn't see evidence of that

23   portion of the cab anyplace else, did you?

24       A       No.  We see, obviously, that part of

25   the chassis burned as well.  We see the

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                186

1    gearshift.  We see the steering column up on the

2    chassis.  So whether the rest of the instrument

3    panel that was connected to and surrounding those

4    stayed attached to the chassis and burned there

5    versus separated with the cab and burned there, we

6    don't know.

7        And, obviously, then, these, as we

8    pointed out, these wheels, the rims of those

9    wheels have landed more or less in the driver's

10   seat, and the steel belting, which I guess is

11   another indication that Mr. Medina was not seated

12   there; otherwise, he would have been pinned there

13   with the rim of that wheel in his lap.

14       Q       Well, unless he survived and he was

15   trying to stave his fall to the position where his

16   body was found prone on the ground.

17       A       Well, he's not going to come to rest

18   with the wheel in his lap and then crawl out from

19   under it.  So that would be just one more piece of

20   evidence.

21       Q       If everything is falling tail first

22   and the chassis hits and the cab continues

23   downward to the right and you're saying that Mr.

24   Medina's body is unrestrained, he's also going to

25   continue even further downward and to the right.

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                187

1    Correct?

2        A       Correct.  Toward the right rear

3    corner of the cab.  The cab hits the ground, comes

4    to rest.  The chassis, having been mostly stopped

5    by the ground impact, now tips, lands flat, and

6    the wheel lands in his seat.

7        MR. CALDWELL:  Mark that 13, please.

8        (8 1/2" by 11" color photograph

9    received and marked Exhibit F-13 for

10   identification.)

11       Q       In F-11, is the driver's seat uphill

12   or downhill of the passenger's seat?

13       A       I can't really tell.  I can't really

14   distinguish whether there's much of a hill there.

15       Q       Well, you know that there's a hill.

16       A       Well, the hill is oriented to our

17   right, whereas the one seat is in the foreground

18   and the other seat is in the background.

19       Q       The street is in the background.

20       You're looking down the slope; are

21   you not?

22       The picture is running uphill towards

23   the top.

24       A       Just a second.

25       Q       Sure.

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                188

1    You can see all the paper and stuff

2    on the debris in the background.

3        A       I'm just going to grab an overhead

4    shot, because that will be helpful for me to

5    orient.

6        Q       Let me help you out.

7        We agree that the trailer floor is

8    pointed 180 degrees the wrong way over the back of

9    the chassis and the back of the chassis is pointed

10   downhill towards the street.  Right?

11       A       Yes.

12       Q       And in this picture that is F-11, the

13   street is in the background--

14       A       Yes.

15       Q       --and the hill is running up into the

16   picture.

17       A       Yes.

18       Q       So one more time, then, please.

19       Is the driver's seat uphill or

20   downhill of the passenger's seat?

21       A       The driver's seat is downhill, yes,

22   of the passenger's seat.

23       Q       Okay.  So in the preposition of this

24   picture, the driver's seat would have started

25   uphill of the passenger's seat.  Correct?

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell                    189

1   A        What do you mean by "in the
2   preposition of this picture"?
3   A        Well, before the cab comes lose in
4   your version of it going down and backwards to the
5   right, the passenger's compartment with the
6   driver's seat is going to be uphill and the
7   driver's seat is going to be to the left.
8   A        Slightly, yes.
9   Q        Yes.  Your thumb is the driver's
10  seat.
11  A        Yes.
12  Q        My fifth finger is the passenger's
13  seat.
14  A        Yes.
15  Q        The chassis is coming down towards my
16  elbow.  Right?
17  A        And we discussed between like twelve
18  and one.
19  Q        Right.
20  A        So that's slightly--it's going to put
21  the driver's seat slightly higher.
22  Q        Slightly higher and to the left.  But
23  it ends up slightly to the right and slightly
24  below the passenger's seat.  So the driver's seat
25  goes past the passenger's seat.

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                    190

1   A        Correct.  It rotates 90 degrees
2   counterclockwise in a plane view of the truck and
3   hits the ground and then the chassis comes down on
4   top of it, from our archeological investigation.
5   Q        Have you accounted for the testimony
6   that says that the cab was leaning up against the
7   bridge pier and only came to rest after the fire
8   was extinguished some 45 minutes later?
9   A        I was trying to figure that out,
10  because, as we identified, the wheels of the
11  chassis are a layer higher, archeologically, are
12  stacked on top of the driver's seat.
13           So we know that the floor of the cab
14  and the seats are in place when the chassis is
15  down, which suggests that, you know, it didn't
16  slide in--when the vehicle burned a while and then
17  the cab righted itself, the seats and the floor
18  didn't slides in under those wheels.
19           So I was wondering whether perhaps we
20  have separation of the right wall of the cab,
21  perhaps that's leaning against something, perhaps
22  that's why someone saw part of the cab leaning
23  against the pillar, which is to the right--
24  Q        To the south, please.  Right?
25  A        To the east.

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                    191

1   Q        To the east.  The pillar is to the
2   east.  Williams Street runs east/west.  The slope
3   runs north/south.
4   A        To the east.
5           So, yes, that's where the pillar is.
6   So the pillar is to the east of the cab, which
7   is--
8   Q        With the back of the cab facing
9   east.
10  A        With the back of the cab facing
11  east--
12  Q        The inside of the cab facing west
13  towards the chassis.
14  A        So the right rear corner of the cab
15  is toward that pillar.  So if the cab is leaning
16  against that pillar, that would lift the left
17  front corner off the ground, if we're treating it
18  as a rigid body, and tilting it against that
19  pillar, which means it can't--which means those
20  seats can't be under the wheels, as we see in the
21  photos they are.
22           So we have to somehow reconcile these
23  disparate pieces of evidence, or the disparate
24  evidence with the testimony of witnesses who saw
25  part of the cab leaning against this pillar.

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                    192

1           One possibility that I see is that we
2   can't treat that whole cab as a rigid body.  It's
3   already started to tear open, it started to
4   separate probably by the damage it sustained to
5   its right side in the bridge impact and in the
6   fall and then the fence coming in and out of it,
7   which means maybe there's a portion of it leaning
8   against the pillar, which when it burns and then
9   drops ash down along the side of the pillar, and
10  that settling might be what the witnesses saw.
11           And again, that's trying to reconcile
12  just that piece of witness testimony with the
13  physical evidence we have before us.  That's a
14  possibility that I see.
15  Q        In your summary on page 6, you have
16  the fire chief saying that he "recalled that the
17  cab was facing uphill and north on the slope off
18  Williams Street..."
19  A        Uphill.  So the cab is facing--
20  Q        Uphill.
21  A        --about 45 degrees from uphill and
22  more northwest.  The photos show us how it's
23  facing.  The testimony--
24  Q        Ultimately.
25  A        Yes.

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell                                193

1  Q       There's also testimony that says that
2  that piece of the vehicle moved between the
3  beginning and the end of the event.
4  A       Well, we've already discussed the
5  seats under the wheels, which we know again--
6  Q       Is it your testimony that the wheels
7  are actually on top of the frame of the seats?
8          And, if so, which picture are you
9  saying shows that?
10  A       You probably have something marked as
11  an exhibit.  I think we looked at one from the
12  opposite side.  F-12 does not quite show it.
13  Q       "Show it," meaning what?
14  A       Shows the rim of the wheel in the
15  driver's seat.  We can see where the seat frame
16  comes down.  We know that where this bracket
17  widens, we're going to start to get seat pan, and
18  we see lug nuts of the rim of the wheel pretty
19  close to the seat back and over where the missing
20  part of the picture would show the seat pan.
21          Let's see if we can find a different
22  angle on that.
23  Q       Let me show you what I think might be
24  helpful.  It was previously marked at Chief
25  Bucossi's deposition as Exhibit No. 2.

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                                194

1          That's a photograph looking up the
2  hill towards the back of the chassis, with the
3  trailer to the left.  Correct?
4  A       Yes.
5  Q       And the seat frames that we're
6  talking about, or at least one of them is evident
7  to the right of the floor of the trailer.
8  Correct?
9  A       Correct.
10  Q       And the object, the blue object that
11  is there, that's the back edge of the cab.
12  Correct?
13  A       Correct.
14  Q       And certainly at least as to the rear
15  wheels, the picture shows that the rear wheels are
16  not on top of the seats.  Correct?
17  A       The third axle.
18  Q       We can eliminate the third axle.
19  A       Correct.  It's the second axle.
20  Q       It's the second axle that we're
21  talking about.
22  A       Yes.
23  Q       Okay.
24          MR. CALDWELL:  Next, please.
25          (8 1/2" by 11" color photograph

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                                195

1  received and marked Exhibit F-14 for
2  identification.)
3  Q       F-14 is now--let's get an
4  orientation.
5          This is the front of the tractor
6  floor pointed in the wrong direction--
7  A       Correct.
8  Q       --downhill.
9  A       Yes.
10  Q       This is the axle that we're
11  interested in.  Right?
12  A       No.  This is the rear--this is the
13  third axle.
14  Q       I thought that's what you said, the
15  third axle.
16  A       No.  The second.
17  Q       The second axle is in the
18  foreground.  Excuse me.
19  A       Yes.  So we see the inner rim here.
20  The outer rim is fractured.
21  Q       The seats, if they're anyplace,
22  should be in the lower right-hand corner of the
23  picture.  Right?
24  A       Yeah.  We have part of the seat
25  here--

JACQUELINE KLAPP, CCR - (908) 782-0874

---

Fisher - By Mr. Caldwell                                196

1  Q       Here.
2  A       You're indicating the lower left-hand
3  corner of the picture.
4  Q       Can I just--it's upside down.  Excuse
5  me.  I just need to...  All right.
6          In that sense, you can see the
7  axle--you can see the wheel--excuse me.  You can
8  see the wheel dug into the ground.  Right?
9          It is deformed, the ground underneath
10  it, from the impact.  Correct?
11  A       Correct.
12  Q       And there is no evidence of the seat
13  frames, either the passenger's or the driver's
14  seat frame, being under that wheel, is there?
15  A       The third axle, under the third axle,
16  no.
17  Q       And under the second axle, you can
18  also see that the ground is deformed.  Right?
19  A       I don't see the ground here.  I see--
20  Q       Maybe I'm seeing--as a matter of
21  fact, one of the wheels is, in fact, mostly
22  destroyed.  Right?
23          There should be a dual--
24  A       Exactly.
25  Q       There should be two wheels here.

JACQUELINE KLAPP, CCR - (908) 782-0874

197

Fisher - By Mr. Caldwell

1    A    This is the inner tire, it goes on
2  the rim, and then we have--
3    Q    The outer--
4    A    The fractured part.  But there should
5  be more rim here, which is gone.
6    Q    And based on our archeological
7  analogy, there is no evidence of the seat frames
8  being underneath, is there?
9    A    I think this is actually the seat
10  pan.  Remember, we discussed before the hole for
11  the aeration.  It looks like the seat pan is kind
12  of buckled in half underneath that broken rim.
13    Q    But you identified--I believe you
14  started to identify that this is part of the seat
15  frame that we've seen in the other pictures.
16    A    The seat back, correct.  And I think
17  this is the seat pan, including the sheet metal
18  pan with the aeration hole, and the wheel seems to
19  be--that fractured rim seems to be plunked down
20  right in that seat pan.
21    Q    I know you're not an accident
22  reconstructionist, but the fractured wheel, you
23  have no idea when that happened?
24    A    No idea.  I don't see the fractured
25  part there.

JACQUELINE KLAPP, CCR - (908) 782-0874

198

Fisher - By Mr. Caldwell

1    Q    Right.
2    A    But it could be just outside the
3  field of view.  I don't know.
4    Q    Even assuming that this is the seat
5  pan, there's still no evidence that the seat frame
6  is, archeologically speaking, under that fractured
7  wheel?
8    A    I don't know what's in the center of
9  the--in the center of the photo, we see a piece of
10  tubing with a little spring attached to it.  I
11  don't know the structure of the seat, whether the
12  seat pan is suspended by springs on the seat
13  frame.
14    I've seen that kind of design
15  before.  I don't know if that's the kind of design
16  we're looking at here.  But if that's the case,
17  that would indicate that the front end of the seat
18  frame and part of the sheet metal seat pan are
19  under the fractured rim and the other rim ahead of
20  it, if this is the seat pan and this is part of
21  the frame for the pan and this is the frame for
22  the seat back.
23    Q    So, 15 minutes ago we started talking
24  about plugging holes, like an astronaut, and you
25  said no, you were rejecting that because of the

JACQUELINE KLAPP, CCR - (908) 782-0874

199

Fisher - By Mr. Caldwell

1  fractures to the ribs, and all of this leads to
2  your conclusion that there should have been or
3  must have been substantial head trauma based on
4  the dynamics of the accident that have all been
5  obscured by the fire.
6    A    Correct.
7    Q    But you can't prove that except by
8  interpolation.  You don't have direct evidence of
9  that.
10    A    I think we can demonstrate it to
11  reasonable degree of certainty.  We know we have
12  rib fractures consistent with the 20- to
13  30-mile-an-hour impact.  We know we stopped the
14  head at the same time, because he did not have
15  neck injuries, which means we have to bring the
16  head at 20 to 30 miles an hour to a stop.
17    Q    You you're saying that the back of
18  the head and the back of the body all come to rest
19  at the same time because there's fractures to the
20  ribs, but no fracture to the neck.  So you're
21  saying that the head didn't snap back.
22    A    Correct.  Everything has decelerated
23  from that approximately 30-mile-an-hour speed to
24  zero very suddenly, which causes trauma.  It
25  causes trauma to the torso.  It causes trauma to

JACQUELINE KLAPP, CCR - (908) 782-0874

200

Fisher - By Mr. Caldwell

1  the head.
2    Q    And all of this assumes, of course,
3  that there is the free fall necessary to achieve a
4  delta-V of 30 miles an hour.
5    A    Well, we know there's a--
6    Q    We know there's some change.
7    A    Yeah.  We know there's a fall to the
8  ground.
9    Q    We know there's a fall to the
10  ground.
11    A    The tractor goes over first, begins
12  its fall.
13    Q    Begins its fall, right.  But we don't
14  know whether it's free fall or not because there's
15  the other compounding factors of the fencing and
16  the counterweight of the trailer up on the road
17  deck.
18    A    Well, the trailer is not hanging up
19  there.  It's just supported there while it rotates
20  until it falls.  So, the tractor begins its free
21  fall, the trailer is rotating, the front end
22  is--the front end is free falling, the rear end is
23  supported.
24    Q    It's not free falling because it's
25  still attached to another object that still has a

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell

1  rest point--
2      A      A support point.
3      Q      A support point.
4             So it's not free falling--
5      A      So that's why I said the front
6  end--the front end wants to free fall, the rear
7  end is supported.  So we have the trailer--
8      Q      We have resistance from the trailer.
9  It's holding it back--
10     A      It's supported.  So that, obviously,
11 the center of mass of the trailer wants to free
12 fall, and so it's going to rotate around that
13 support point.
14            The tractor, on the other hand, once
15 it's unsupported, can more or less free fall,
16 except for the attachment of the kingpin to the
17 trailer, which again, relative to a 17,000-pound
18 falling trailer is not going to make a significant
19 difference, just like that fence that it tears
20 through or the cable that it pulls down with it
21 are not going to significantly slow the drop of
22 that 17,000-pound trailer.
23     Q      What's acting as the fulcrum between
24 the tractor and the trailer?
25            Your description of what's happening

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell

1  there, there has to be a fulcrum there that--
2      A      You mean an attachment?
3      Q      No, not between the tractor and the
4  trailer.  But if the trailer is on the road or
5  touching the road, there has to be a point of
6  fulcrum.  Right?
7      A      The weights are--the fulcrum is the
8  thing you put underneath to increase your
9  mechanical advantage.
10            What do you mean by--
11     Q      Maybe it's the wrong choice of word.
12            You see that?  That's the fulcrum.
13 Right?
14     A      Yes.  The fulcrum is the wedge.
15     Q      The wedge.
16     A      The wedge, right.
17            There's a fulcrum in your theory of
18 the accident, isn't there, that the trailer is
19 still up on the road and there is weight in the
20 back of the trailer from its wheels.  Right?
21     Q      If the tractor and the trailer are
22 not both in free fall, the trailer is still acting
23 as a counterweight, in the simplest explanation,
24 to the weight of the tractor.  The center of
25 gravity of the trailer is different than the

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell

1  center of gravity of the tractor.
2      A      Yes.
3      Q      Okay.  And the rear wheels on the
4  trailer are operating physically through the
5  center of gravity pulling the rear end of the
6  trailer towards the road surface.  Right?
7      A      Well, they're not--they're not
8  pulling it.  They're just--they're supporting this
9  end, so when gravity tries to accelerate the
10 entire tractor-trailer toward the ground, it can't
11 accelerate the rear wheels.  It can accelerate the
12 rest of the trailer.
13     Q      But at a certain point, based on the
14 angles involved, is the box of the trailer going
15 to come into contact with the edge of the curb and
16 the curb is going to act as a fulcrum?
17     A      As the wheels roll off and then the
18 end of the trailer contacts the curb?
19     Q      Based on your understanding of the
20 mechanics of this accident, does the bottom of the
21 trailer come into contact with the curb?
22     A      Oh, you would have to ask Mr.
23 Granat.  I don't know whether that makes physical
24 contact or whether it's going fast enough that it
25 clears it without making contact.

JACQUELINE KLAPP, CCR - (908) 782-0874

Fisher - By Mr. Caldwell

1      Q      Assuming that it makes contact.
2      A      So you're going to have some
3  frictional drag--assuming it makes contact, you
4  would have some frictional drag.  It's probably
5  not going to be a significant effect on the speed
6  of the trailer.  But Kevan Granat could answer
7  that question better than I could.
8             My understanding is that,
9  particularly for the tractor that we're dealing
10 with, it's something relatively close to free
11 fall.
12            Is it a few miles an hour less?
13            Maybe. .
14            But whether the head is hitting the
15 surface at 20 miles an hour or 30 miles an hour,
16 the risk for serious head trauma is very, very
17 high.  We're kind of topping off the curve,
18 whether it's 20 or 30.
19     Q      Having said all that, your opinion is
20 still limited to the potential of head injury, but
21 not that it caused death.  Correct?
22     A      Correct.
23     Q      Okay.  In your report, can you just
24 turn to your bibliography section, please?
25     A      Sure.  Okay.

JACQUELINE KLAPP, CCR - (908) 782-0874

205

Fisher - By Mr. Caldwell

1    Q    Which of these references are you
2  saying are the ones that you're relying upon for
3  this interpretation and analysis that you've been
4  discussing for the last 10 or 15 minutes?
5    A    For the risk of head trauma?
6    Q    Yes.
7    A    The Allsop study.  The Gurdjian
8  study.
9         MR. CALDWELL:  G-u-r-d-j-i-a-n.
10        THE WITNESS:  Yes.
11   Q    No.  That's okay.  I'm just helping
12 the court reporter.
13   A    Hodgson.  H-o-d-g-s-o-n.
14   Q    I see the title of that one says,
15 "Fracture behavior of the skull frontal bone
16 against cylindrical surfaces."
17        That would seem to be a specialized
18 study that's not analyzing the forces and the
19 types of injuries that are present in this case.
20   A    Yeah.  I think they did a variety of
21 different head impacts there.  So I would have to
22 check.  That is a head impact study.  I'm not sure
23 whether that was just frontal or whether that
24 included other parts of the skull.
25        I have it with me.  I can take a look

206

Fisher - By Mr. Caldwell

1  at it in a second.
2    Q    Well, I assume I'm going to get all
3  of them on the thumb drive when I get it.
4    A    Yes.  In fact, they're all on the
5  thumb drive and...
6    Q    I'm sorry.  I didn't mean to cut you
7  off.
8         On the next page, are there any other
9  references--
10   A    Yes.
11        McIntosh did a head impact study.
12        Nahum and Melvin, N-a-h-u-m and
13 M-e-l-v-i-n, that's a book, and in that book is a
14 chapter by Allsop, the same author of the first
15 study.
16   Q    Is it on the thumb drive?
17   A    That chapter is on the thumb drive.
18   Q    Yes, the thumb drive.
19   A    Schneider, S-c-h-n-e-i-d-e-r, "Impact
20 studies of facial bones and skull," and the Voigt
21 paper, V-o-i-g-t, and finally, the Yoganandan,
22 Y-o-g-a-n-a-n-d-a-n, "Biomechanics of skull
23 fracture."
24        Actually, while I'm looking at the
25 bibliography, the two Cavanaugh papers, so

207

Fisher - By Mr. Caldwell

1  regarding the rib fractures, cadaveric studies
2  with rib fracture impacts, Cavanaugh
3  C-a-v-a-n-a-u-g-h, two papers, and the Pintar
4  paper, P-i-n-t-a-r, on the second page, both deal
5  with rib fractures.
6    Q    One of the inherent limiting factors
7  of all cadaveric studies is that you're dealing
8  with a dead body and not a live person.  Right?
9    A    Yeah.  So you're not going to have
10 muscles tension and those kinds of responses.
11   Q    And the ability to react and
12 resistance and all the other things that a human
13 person, who's alive and conscious, might be trying
14 to do.
15   A    Correct.
16   Q    So all these studies have an inherent
17 limited applicability as a result of that.
18   A    Those limitations are apparent at
19 lower speeds, where people can resist thousands of
20 pounds of force moving in a particular direction.
21        There have been studies that have
22 looked at--once you get to certain impact speeds,
23 the cadaveric studies are going to be very similar
24 to live human studies just because there's not
25 much you can do to change how you move in a

208

Fisher - By Mr. Caldwell

1  30-mile-an-hour impact.
2    Q    Right.
3    A    A cadaver and a dummy and a live
4  person are going to be more or less the same way.
5    Q    A hundred miles an hour is a hundred
6  miles an hour.
7    A    Or 30 miles an hour.  That cutoff is
8  probably in the teens somewhere.
9    Q    Okay.  What's the cutoff for the rib
10 fractures in terms of miles per hour for this
11 accident?
12   A    So these kinds of rib fractures,
13 again, depending on the--
14   Q    Sorry.  Let's do it the other way.
15        What's the threshold--what's the
16 minimum speed at which these type of rib fractures
17 could occur, based on your training and
18 experience?
19   A    It depends on the surface, how padded
20 it is.  But they were showing things on even
21 padded surfaces at 20 miles an hour, on padded
22 surfaces at 15 miles an hour, they were getting
23 rib fractures.
24   Q    What speed do you need to break the
25 bone in the leg?

---

**209**

Fisher - By Mr. Caldwell

1    A    It depends on how the leg is oriented
2  and what the constraints are.  You can break the
3  leg at relatively low speeds or at a high speed.
4  It depends on--the leg, being a long bone--
5    Q    Right.
6    A    --it really depends on the
7  bending--or the loading mechanism.  Are you
8  crushing it axially or getting kind of impacted
9  that buckles the bone in the middle, or are you
10  constraining an end and moving the other part of
11  the body so that you're bending.
12    Q    Leverage.
13    A    The forces can be--the forces can
14  range from high to low.  If someone takes a fall
15  and happens to plant their knee in the right way
16  and gets it wedged so that when the rest of the
17  body rotates, it can be a relatively low speed
18  versus--
19    Q    Low speed, high torque.
20    A    Yeah.
21    Q    A lot of variables, in other words.
22    A    A lot of variables, which is why I'm
23  not real specific on the leg fracture.  There's a
24  lot of things that could be contributing to that.
25    Q    So it's not generally true to assert

---

**210**

Fisher - By Mr. Caldwell

1  that a leg fracture would require more force than
2  a rib fracture.
3    A    No.  It would depend on many other
4  variables.
5    Q    Have you published any articles
6  yourself?
7    A    Yes.
8    Q    On this particular subject?
9    A    Nothing on this particular subject.
10    Q    Anything relevant to the subject
11  matter we're discussing today?
12    A    I see you're included as a coauthor
13  on something.
14    A    I don't believe so.
15    A    Is there another Fisher on here?
16    Q    I'm sorry.  Maybe I'm confusing
17  with--I thought I saw you as a coauthor.
18  Apparently not.  You're not the right age bracket
19  for some of these studies.
20    A    Correct.
21    Q    As a matter of fact, for most of them
22  you're not the right age bracket.
23    A    No.  I have not published--I have
24  published some stuff on low-speed occupant
25  kinematics, probably not quite at this speed.

---

**211**

Fisher - By Mr. Caldwell

1    But no, nothing spot on relevant to
2  this.
3    Q    So of the six or seven, whatever,
4  that you gave me, which of these do you consider
5  to be peer review journals?
6    A    SAE uses peer review.  Forensic
7  Science International is a peer review journal.
8  Staff is peer reviewed, Staff Car Crash Journal.
9    Q    Do you serve as a peer reviewer for
10  any journal?
11    A    I have served as a peer reviewer for
12  a number of different journals, yes.
13    Q    Have you served as a peer reviewer
14  for any of the journals that are listed in your
15  bibliography?
16    A    I have served as a peer reviewer for
17  SAE World Congress, SAE papers.  I have done peer
18  review for them.
19    Q    What did you do your dissertation in?
20    A    Lung trauma.
21    I have not done peer review for any
22  of the other journals.  SAE is the only one on
23  this list.
24    Q    Mechanistic, Clinical and Preventive
25  Corrolations, is that peer reviewed?

---

**212**

Fisher - By Mr. Caldwell

1    A    I'm sorry.  The--
2    Q    The Gurdjian article.
3    A    Gurdjian?
4    Q    The Gurdjian article, is that--
5    A    I think that's a book.
6    Q    That's a book.
7    A    I think it might be a book chapter.
8  In fact, yes.  Chapter 6 is by Gurdjian.
9    Q    By the way, when did you compile all
10  of this "Selected Bibliography"?
11    Is this before the April meeting you
12  had all this information about all these articles
13  in April of 2013 or earlier?
14    A    The chest trauma, I believe I did.
15  The fire fracture, the fire related studies I
16  had--
17    Q    So you're changing gears.  Please
18  stick to authors so I can match them.
19    A    Okay.  So, by chest trauma, I meant
20  the Cavanaugh papers, and the Pintar.  I think I
21  had those ahead of time.
22    The head trauma I may have had before
23  then.  I know I pulled some head trauma literature
24  in response to a statement made by Dr. Manion in
25  his deposition about the absence of base of the

213

Fisher - By Mr. Caldwell

1  skull fractures being indicative of no head
2  trauma, and which papers I pulled prior to the LEC
3  Meeting, in which I pulled the supplement, or a
4  little bit more, to show that calvarial fractures
5  often occur without base of the skull fractures.
6          After reading Dr. Manion's
7  deposition, I haven't sorted them in that way.  I
8  have a folder in my file that says "Literature,"
9  and I drag papers into it, and as I'm reviewing a
10  deposition, I say, You know what, let me find a
11  few more papers that are on point for that issue,
12  and I will drag them into the--into that file.
13          What the timing is and when which
14  papers got dragged in, I don't know.  And then
15  when I write my report, I look at what's in my
16  literature folder and write it up in the
17  bibliography.
18      Q    I'm sorry.  I confused your
19  publications, because, obviously, you're coauthor
20  of some articles.
21          So are there any of your own
22  publications that you could point me to as being
23  supportive of the positions that you've taken
24  today?
25          And the second related question is,

JACQUELINE KLAPP, CCR - (908) 782-0874

---

214

Fisher - By Mr. Caldwell

1  are they on the disk?
2      A    Not specifically.  No, not
3  specifically.  That is, there are no specific
4  publications that I have authored that I would
5  point to as being relevant to my analysis in this
6  case.  But, no, I don't think I have provided all
7  of my publications on the disk.  Everything in the
8  bibliography is on the disk.
9      Q    I'm still trying to figure out what
10  changes in the epithelial cell plasma membrane
11  surface area, the static stretch is all about.
12      A    It's an entire chapter of my
13  dissertation.  I can tell you all about it.
14      Q    Thank you.  That's what your
15  dissertation committee was for, not me.
16          And then tell me about the selected
17  invited presentations where you were asked to be a
18  speaker.
19      A    Yeah.  That would be where I was
20  asked to come speak or where I was selected as a
21  speaker, a guest lecturer for--I think I have
22  lectures at universities in there where professors
23  asked me to come and speak to a class or speak at
24  a conference as a guest speaker, where I was
25  invited, as opposed to it was an open call for

JACQUELINE KLAPP, CCR - (908) 782-0874

---

215

Fisher - By Mr. Caldwell

1  papers and I submitted a study.
2      Q    I'm trying to understand where you're
3  invited to a presentation, and the second one that
4  talks about nursing 334/534, that sounds like a
5  course designation of third-year nursing and
6  first-year graduate nurses presentation.
7      A    Yeah.  That's a forensic science
8  class.
9      Q    A forensic science class.
10      A    At the University of Pennsylvania.
11      Q    University of Pennsylvania School of
12  Nursing.
13      A    Yes.
14      Q    Okay.  So, other than Widener, all
15  the other stuff appears to be in-house.  When I
16  say "in-house," in-house to the University of
17  Pennsylvania.
18      A    Well, again I'm not at Penn.  I'm
19  at--
20      Q    Yes.  But at times you were at Penn.
21  You have since left Penn.  All these presentations
22  are post leaving Penn.  You're no longer a
23  graduate student there.  They have asked you to
24  come back.
25      A    Correct.

JACQUELINE KLAPP, CCR - (908) 782-0874

---

216

Fisher - By Mr. Caldwell

1      Q    What's the distinction between
2  low-energy automotive accidents and high-energy
3  automotive accidents?
4      A    I don't have a particular cutoff, but
5  some people will say low-speed accidents,
6  high-speed accidents.  But there are sometimes
7  accidents that occur at high speed, maybe a
8  sideswipe, where two vehicles are moving at 50 or
9  55, it's high speed, but they barely touch, and so
10  there's very little energy transfer.
11          So a lot of the analysis that goes
12  into determining how people move, how people
13  resist movement in a sideswipe of 50 miles an hour
14  might be very similar to a sideswipe at five miles
15  an hour.
16          So low energy was used in place of
17  low speed in order to capture the idea that some
18  of the absolute speeds can be high.  But we're
19  looking at low-energy, minimal occupant
20  kinematics, resistible kinematics, those kinds of
21  things.
22      Q    And in a collision between objects,
23  it's energy that's transferred from one to the
24  other, not momentum.  Correct?
25      A    It's actually momentum which

JACQUELINE KLAPP, CCR - (908) 782-0874

217

Fisher - By Mr. Caldwell

1  is--momentum is transferred from one to another.

2  Energy often gets--energy often gets dissipated in

3  other ways.

4      So momentum is--momentum is always

5  conserved.  Energy, of course, is always conserved

6  as well.  But there are lots of things sometimes

7  hard to account for, whereas momentum is easier to

8  see.  Energy can be lost in crush, in sound, in

9  injury.

10     Q   So if a tennis ball is hit against a

11  30-mile wide, 100-mile high and 100-mile thick

12  wall, the wall still has momentum.

13     A   Yeah.  It moves very little.  The

14  energy transfer is very lopsided.

15     MR. CALDWELL:  Thank you, sir.

16     THE WITNESS:  Let's indicate that I

17  want to review my transcript.

18     (The deposition of Joseph L. Fisher,

19  Ph.D., P.E., concluded at 3:30 p.m.)

20

21

22

23

24

25

JACQUELINE KLAPP, CCR - (908) 782-0874

---

218

1      C E R T I F I C A T E

2      I, EDWIN SILVER (Certificate No.

3  XI00379), Certified Court Reporter and Notary

4  Public of the State of New Jersey, do hereby

5  certify that prior to the commencement of the

6  examination JOSEPH L. FISHER, Ph.D., P.E., was

7  duly sworn by me to testify the truth, the whole

8  truth and nothing but the truth.

9      I DO FURTHER CERTIFY that the

10  foregoing is a true and accurate transcript of the

11  testimony as taken stenographically by and before

12  me at the time, place and on the date hereinbefore

13  set forth.

14     I DO FURTHER CERTIFY that I am

15  neither a relative nor employee nor attorney nor

16  counsel of any of the parties to this action, and

17  that I am neither a relative nor employee of such

18  attorney or counsel, and that I am not financially

19  interested in the action.

20

21

22

23  Notary Public of the State of New Jersey

24  My Commission expires January 12, 2018

25  Dated:  February 21, 2014

---

219

1      WITNESS'S CERTIFICATION

2

3

4

5      JOSEPH L. FISHER, Ph.D., P.E.

6      On              , 2014 the foregoing

7  deposition was submitted to JOSEPH L. FISHER,

8  Ph.D., P.E., the witness, taken on February 18

9  2014, for his examination.

10     At which time the deposition was read by the

11  witness and any proposed changes desired were

12  subsequently entered upon an errata sheet and

13  attached to the transcript.

14     Thereafter, the deposition was duly

15  witnessed and signed by:

16

17

18

19

20

21  _____

22  Notary Public in and for the

23  County of

24  State of

25  My Commission Expires

---

JACOB L. FISHER, Ph.D. - 2/18/14    CondenseIt™    '- acknowledged

(Dense condensed-transcript word index — individual entries not legibly resolvable.)

JACQUELINE KLAPP, CCR - (908) 782-0874    Index Page 1

JACOB L. FISHER, Ph.D. - 2/18/14    Condenselt™    across – assume

JACOB L. FISHER, Ph.D. - 2/18/14    Condenselt™    assumes – Bundock

JACOB L. FISHER, Ph.D. - 2/18/14    Condenselt™    Bundock's – committee

JACOB L. FISHER, Ph.D. - 2/18/14    Condenselt™    common – debris

**JACOB L. FISHER, Ph.D. - 2/18/14**   Condenselt™   decedent's - drag

**JACOB L. FISHER, Ph.D. - 2/18/14**   Condenselt™   dragged - eye

*[Condensed deposition index columns — word entries with page:line references, not individually legible.]*

**JACOB L. FISHER, Ph.D. - 2/18/14**   Condenselt™   eyebrow - fracture

**JACOB L. FISHER, Ph.D. - 2/18/14**   Condenselt™   fractured - Hodgson

*[Condensed deposition index columns — word entries with page:line references, not individually legible.]*

JACOB L. FISHER, Ph.D. - 2/18/14   Condenseit™   penetration – pretty

*[Court reporter condensed transcript index — dense multi-column keyword index with page:line references; individual entries not legibly resolvable.]*

JACOB L. FISHER, Ph.D. - 2/18/14   Condenseit™   prevent – represented

JACOB L. FISHER, Ph.D. - 2/18/14   Condenseit™   representing – seat

JACOB L. FISHER, Ph.D. - 2/18/14   Condenseit™   seated – specific

(Dense back-of-book word index columns — individual entries not legibly transcribable.)

(Dense back-of-book word index columns — individual entries not legibly transcribable.)

(Dense back-of-book word index columns — individual entries not legibly transcribable.)

(Dense back-of-book word index columns — individual entries not legibly transcribable.)